**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 20-cv-24897-CMA/Torres

SHTERNA PINCHASOV, Individually and on Behalf of
All Other Similarly Situated Plaintiffs,

      v.

ROBINHOOD FINANCIAL LLC,

          Defendant.

_____/

**DECLARATION OF ELLIOT GREENFIELD IN SUPPORT OF**
**NON-PARTY VLADIMIR TENEV'S MOTION TO QUASH SUBPOENA**
**AND FOR PROTECTIVE ORDER**

I, Elliot Greenfield, do hereby declare and state the following pursuant to 28 U.S.C. § 1746:

1.      I am a partner at Debevoise & Plimpton LLP and a member of the Bar of the State of New York representing both Robinhood Financial LLC and Vladimir Tenev in connection with this matter.  I make this declaration on personal knowledge and in support of Non-Party Vladimir Tenev's Motion to Quash Subpoena and for a Protective Order.

2.      Attached as **Exhibit 1** is a true and accurate copy of Plaintiff's Notice of Subpoena to Vladimir Tenev, dated June 15, 2021.

3.      Attached as **Exhibit 2** is a true and accurate copy of Vladimir Tenev's testimony before the United States House of Representatives Committee on Financial Services on February 18, 2021.

4.      Attached as **Exhibit 3** is a true and accurate copy of Plaintiff's Rule 30(b)(6) deposition notice, entitled "Notice of Taking Video-Taped Recorded Deposition(s) *Duces Tecum*," served on May 26, 2021.

5.      Attached as **Exhibit 4** is a true and accurate copy of Plaintiff's "First Request for Production to Defendant," served on June 14, 2021.

6.      Attached as **Exhibit 5** is a true and accurate copy of Plaintiff's "Notice of Serving Plaintiff's First Interrogatories to Defendant," served on June 14, 2021.

I declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 28th day of June, 2021, at New York, New York.**


*/s/ Elliot Greenfield*

Elliot Greenfield

**EXHIBIT  1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

CASE NO. 20-CV-24897-CMA

SHTERNA PINCHASOV, Individually and on
Behalf of All Others Similarly Situated,

      Plaintiff,

vs.

ROBINHOOD FINANCIAL, LLC,

      Defendant.

_____/

## NOTICE OF SUBPOENA

| | | |
|---|---|---|
| To: | Elliot Greenfield (*pro hac vice*) | Grace L. Mead |
| | **DEBEVOISE & PLIMPTON LLP** | **STEARNS WEAVER MILLER** |
| | 919 Third Avenue | 150 West Flagler Street, Ste. 2200 |
| | New York, New York 10022 | Miami, Florida 33130 |
| | Telephone: 212.909.6000 | Telephone: 305-789-3200 |
| | Email: mloconnor@debevoise.com | Email: gmead@stearnsweaver.com |
| | Email: egreenfield@debevoise.com | Email: rthornton@stearnsweaver.com |
| | *Counsel for Defendant* | *Counsel for Defendant* |

      **PLEASE TAKE NOTICE,** pursuant to Federal Rule of Civil Procedure 45, that the

Plaintiff intends to serve a Subpoena, in the form attached hereto, on Vladimir Tenev a/k/a Vlad

Tenev on June 15, 2021, or as soon thereafter as service may be effectuated.

                          Respectfully submitted,

                          */s/ Ely R. Levy*
                          Ely R. Levy, Esq.
                          Florida Bar No.: 15452
                          Venessa Valdes Solis, Esq.
                          Florida Bar No. 77122
                          **LEVY & PARTNERS, PLLC**
                          3230 Stirling Road, Suite 1
                          Hollywood, Florida 33021
                          Telephone: (954) 727-8570
                          elevy@lawlp.com – Service Address

venessa@lawlp.com – Service Address
Maritza@lawlp.com – Service Address

Michael A. Citron, Esq.
Florida Bar No.: 105083
**MAC Legal, P.A.**
3100 N. 29th Court, Suite 100
Hollywood, FL 33020
Michael@maclegalpa.com
Service@maclegalpa.com

Igor Hernandez, Esq.
Florida Bar No. 106386
**CORNISH HERNANDEZ GONZALEZ, PLLC**
2525 Ponce de Leon Blvd, Suite 300
Coral Gables, Florida 33134
Telephone: (305) 780-6058
service@CHGLawyers.com
ihernandez@chglawyers.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 15, 2021, the foregoing document is being served this

day via electronic mail on the following:

Grace L. Mead
Ryan T. Thornton
**STEARNS WEAVER MILLER** Museum Tower
150 West Flagler Street
Suite 2200
Miami, Florida 33130 Telephone: 305-789-3200
Email: gmead@stearnsweaver.com
Email: rthornton@stearnsweaver.com

Maeve L. O'Connor (*pro hac vice*)
Elliot Greenfield (*pro hac vice*)
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue New York, New York, 10022
Telephone: 212.909.6000
Email: mloconnor@debevoise.com
Email: egreenfield@debevoise.com

By: _____*Ely R. Levy*_____
        ELY R. LEVY, ESQ.
        Florida Bar No.: 15452

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Southern District of Florida ▼

| | |
|---|---|
| SHTERNA PINCHASOV, Individually and on Behalf of All Others Similarly Situated | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   20-CV-24897-CMA |
| ROBINHOOD FINANCIAL, LLC | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
                                        VLADIMIR TENEV
                        *(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Zoom Link to be provided. | Date and Time: 07/08/2021 10:00 am |
|---|---|

The deposition will be recorded by this method:   video recorded Zoom Conference - U.S. Legal Support

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

                        See Schedule "A" attached.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   06/15/2021

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Ely R. Levy |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   SHTERNA PINCHASOV, Individually and on Behalf of All Others Similarly Situated  , who issues or requests this subpoena, are:
Ely R. Levy, Esq., Levy & Partners, PLLC, 3230 Stirling Road, Suite 1, Hollywood, Florida 33021, elevy@lawlp.com, (954) 727-8570

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 20-CV-24897-CMA

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE "A"
### (to Federal Subpoena Duces Tecum for Vladimir Tenev)

**DEFINITIONS:**

"Congressional Testimony" refers to the HEARING BEFORE THE UNITED STATES HOUSE OF REPRESENTATIVES COMMITTEE ON FINANCIAL SERVICES on February 18, 2021, wherein testimony of Vladimir Tenev was heard.

"Document" or "documents" refers to all written, typed, printed, reported, recorded or graphic matter and all photographic matters or sound reproduction tapes, records, or other devices, however produced, reproduced, or stored, now or formerly within your actual or constructive possession, custody or control, including but not limited to in their original or native format. "Document" or "documents" shall include, but are not limited to, all telegrams, telexes, cables, telephone records, telephone bills, memoranda (circulated and uncirculated), market studies, correspondence, e-mails, reports, studies, compilations of data, filings, files, internal policies or rules or regulations, minutes, agenda, requests, records, charts', lists, analyses, graphs, diagrams, schematics, blueprints, specifications, worksheets, change orders, drawings, cost estimates, books, expense reports, notebooks, notes, diaries, appointment books, calendars, recordings, transcriptions, computer discs, file cards, computer printouts, computer programs, microfilm, microfiche, video tapes, media articles or reports, accounts, books and records, ledgers, journals and other financial records, audits, instructions, questionnaires, profit and loss statements, financial statements, annual reports, state and federal tax returns, checkbooks, canceled checks, billings, contracts or agreements or releases, and any drafts, copies, or reproductions of the foregoing; and any copy of the foregoing upon which any notations in any form have been made which do not appear on the originals; and any copy of the foregoing upon which any language, notation or comments, in any form, which appear on the original or any other copy have been deleted, highlighted, altered or edited.

**SPECIFIC REQUESTS**

1.  Please produce documents showing the "membership rules for the clearinghouses with which [you] transact to fulfill customer orders" or "for post-trade processing, which includes clearance and settlement" as they relate to stock transactions while a T1 Halt is in effect for that stock.

2.  Please produce a list of the "simple, easy-to-understand and easy-to-use tools and educational resources that are not filled with complex industry jargon", as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock.

3.  Please produce any and all documents, in whatever form, that show you "provide people with the resources to make informed financial decisions and become long-term investors", as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock.

4.  Please produce any and all document, in whatever form, which show the criteria used "in deciding whether to approve a customer account for options trading", as you refer to in your Congressional Testimony.

5. Please produce any and all documents, in whatever form, which show how you "improved our options educational materials" and what these options educational materials were prior to this improvement, as you refer to in your Congressional Testimony, for the past four years.

6. Please produce any and all documents, in whatever form, that show the changes made "to our app interface to add more safeguards and information", as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock.

7. Please produce any and all documents, in whatever form, which show an example of how "market-makers provide Robinhood with a rebate for executed orders" as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock.

8. Please produce any and all documents, in whatever form, that show what was given or provided to customers as the "tools and information to learn about investing and keep tabs on their finances", as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock.

9. Please produce any and all documents, in whatever form, that show the "features regarding, for example, stock price movements, . . . and breaking news are for informational purposes only, [which] are opt-in tools, and are used by other retail brokerages", as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock and/or as it relates to market volatility.

10. Please produce any and all documents, in whatever form, that show the "useful tools to inform our customers", as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock.

11. Please produce any and all documents, in whatever form, that show the "new, innovative ways to share digestible business news to help customers stay up-to-date on the markets", as you refer to in your Congressional Testimony, as they relate to stock transactions while a T1 Halt is in effect for that stock and/or as it relates to market volatility.

12. Please produce any and all documents, in whatever form, that show "Robinhood Financial has taken steps to proactively inform customers about certain financial products like [OTM] options" which caused customers "to suffer losses immediately upon execution" despite "Robinhood's warnings" regarding same, as you refer to in your Congressional Testimony. This request also seeks the "warnings" mentioned therein.

13. Please produce any and all documents, in whatever form, that show Robinhood's reasons to "prevent these losses" and "implement[] a procedure requiring customers to speak to a live registered representative before exercising OTM options", as you refer to in your Congressional Testimony.

14. Please produce any and all documents, in whatever form, which show which entity has the authority or responsibility to hold or pause a stock transaction placed by a customer during a T1 Halt in the following scenario, as you refer to in your Congressional Testimony: "When a customer buys or sells a security, Robinhood Financial, as the introducing broker, sends the order to Robinhood Securities, the clearing broker, which routes the order for execution to a market-maker and submits the resulting trade to a clearinghouse for clearance and settlement."

15. Please produce any and all documents, in whatever form, which show all instances Robinhood had "temporarily restrict trading on certain securities during periods of significant volatility", as you refer to in your Congressional Testimony, in the past four years.

16. Please produce any and all documents, in whatever form, which showed how "Robinhood Financial continued communicating with customers about the increased risks and the importance of being an informed investor", as you refer to in your Congressional Testimony, in the past four years.

17. Please produce any and all documents, in whatever form, which showed how "Robinhood Financial also sent targeted messages to customers with existing positions in GameStop and other affected securities informing them that those securities were experiencing significant volatility and investments in those companies may involve added risk", as you refer to in your Congressional Testimony.

18. All documents, whether in written or electronic format, relied upon by you for your Congressional testimony provided on February 18, 2021.

**EXHIBIT  2**

**HEARING BEFORE THE UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON FINANCIAL SERVICES**

February 18, 2021

Testimony of Vladimir Tenev
Robinhood Markets, Inc.

## I.    Introduction

Chairwoman Waters, Ranking Member McHenry, and Members of the Committee: My name is Vlad Tenev, and I am the co-founder and CEO of Robinhood Markets, Inc.[1]  Thank you for the opportunity to speak with you today about Robinhood and the millions of individual investors we serve.

Robinhood has changed the investing world for the better.  We pioneered a mobile-first investing platform that allows our customers to trade stocks, exchange-traded funds ("ETFs"), options, and other investments with no trading commissions and no account minimums.  By taking down these traditional barriers to investing and creating an accessible and intuitive platform, Robinhood opened up the markets to millions of retail investors.

---

[1]   It is common in the financial services industry for broker-dealer firms' operations to be subsidiaries of a larger holding company, as is the case with Robinhood.  Robinhood Markets, Inc. ("Robinhood Markets") is an American financial services company headquartered in Menlo Park, California.  Robinhood Markets wholly owns Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Crypto, LLC ("Robinhood Crypto").  Robinhood Financial acts as an introducing broker for our customers by taking their trade orders.  Robinhood Securities, a member SEC-registered clearinghouse, serves as a clearing broker for Robinhood Financial.  In that capacity, Robinhood Securities executes customer orders received from Robinhood Financial by routing them to market-makers.  Robinhood Securities also clears and settles customer trades.  Robinhood Crypto facilitates cryptocurrency trading.

As broker-dealers, both Robinhood Financial and Robinhood Securities are registered with the SEC, and are members of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC").  Robinhood Securities is also a member of several clearinghouses and is bound by membership rules for the clearinghouses with which we transact to fulfill customer orders.  Once customer trades have been executed by market-makers, Robinhood Securities then submits those trades to clearinghouses for post-trade processing, which includes clearance and settlement.

Unless otherwise specified, the terms "Robinhood," "we," and "our," as used herein, generally refer to the broker-dealers Robinhood Financial and/or Robinhood Securities.

There have been some inaccurate reports that Robinhood Markets and its senior staff should be registered with FINRA.  FINRA requires that only those entities and individuals engaged in the firm's securities business be registered.  However, Robinhood Markets, Inc., as a parent company that wholly owns broker-dealer subsidiaries, need not be registered.  The entities and individuals involved in executing, settling, and clearing trades, Robinhood Securities, LLC and Robinhood Financial, LLC, are all appropriately licensed and registered with FINRA.  It is common for those broker-dealer operations to be subsidiaries of a larger holding company, as is the case with Robinhood.

The buying surge that occurred during the last week of January in stocks like GameStop Corp. ("GameStop") was unprecedented,[2] and it highlighted a number of issues that are worthy of deep analysis and discussion. I look forward to addressing those issues today, but I want to be clear at the outset: any allegation that Robinhood acted to help hedge funds or other special interests to the detriment of our customers is absolutely false and market-distorting rhetoric. Our customers are our top priority, particularly the millions of small investors who use our platform every day to invest for their future.

What we experienced last month was extraordinary, and the trading limits we put in place on GameStop and other stocks were necessary to allow us to continue to meet the clearinghouse deposit requirements that we pay to support customer trading on our platform. We have since taken steps to raise $3.4 billion in additional capital to allow our customers to resume normal trading across Robinhood's platform, including trading in the stocks we restricted on January 28. We look forward to continuing to serve our customers.

## II.     The Robinhood Story

I was born in Bulgaria, a country with a financial system that, at the time, was not accessible to ordinary people and was on the verge of collapsing. I immigrated with my family to America for a better life when I was five years old, and my co-founder Baiju Bhatt is the son of immigrants. Robinhood's mission to democratize finance for all has special meaning for us. My parents, both of whom worked at the World Bank, instilled in me at an early age the values of financial responsibility and opportunity for all. And those values lie at the heart of Robinhood today. We fundamentally believe that participation in the U.S. capital markets is empowering and that everyone should have the opportunity to participate responsibly in our financial system.

Today, however, approximately 84 percent of the value of all stocks owned by Americans belong to the wealthiest 10 percent of households, and roughly half of all American households do not own any stocks at all.[3] We want to open up access to the markets so everyday people, even those with small amounts to invest, can build wealth. We started by eliminating commissions and minimum investments, and we continue to pioneer changes that democratize finance for all, such as fractional shares and recurring investments. Further, we subscribe to the belief that participation and information are power. We provide simple, easy-to-understand and easy-to-use tools and educational resources that are not filled with complex industry jargon. This helps support customers from all backgrounds in their investing journey.

Our rapid growth has confirmed that retail investors were waiting for the right platform to help them enter the markets. We have over 13 million customers, and we are seeing new customers open accounts every day to take part in our financial markets. Robinhood Financial's customers trade thousands of stocks and ETFs, as well as options and cryptocurrency—all with zero commissions and no account minimums.

---

[2]     Analysts have referred to the activity as a five standard deviation, or five sigma, event–in other words, an event that had about a 1 in 3.5 million chance of occurring.

[3]     Edward Wolff, *Household Wealth Trends in the United States, 1962 to 2016: Has Middle Class Wealth Recovered*, National Bureau of Economic Research (Nov. 2017), https://www.nber.org/system/files/working_papers/w24085/w24085.pdf.

Even though we have grown and changed the investing landscape for the better, one thing has not changed: we recognize the responsibility that comes with helping our customers invest in dynamic financial markets. Robinhood is not an investment adviser and does not make investment recommendations, but we are committed to providing quality educational resources to our customers and the general public about the investment opportunities available to them. That is why Robinhood Financial offers a library of free, digestible articles about investing on the Learn website, which is available to the general public. Our goal is to provide people with the resources to make informed financial decisions and become long-term investors.

## III.   Robinhood's Products and Features

Customers can invest in over 5,000 securities on Robinhood Financial's brokerage platform, including U.S. equities and ETFs listed on U.S. exchanges. Robinhood Financial also currently offers covered options contracts for U.S. exchange-listed stocks and ETFs. Robinhood Crypto offers certain cryptocurrencies, including Bitcoin, Dogecoin, Ethereum, and Litecoin.

Importantly, there are some activities and products that are not available on the Robinhood platform.[4] Robinhood does not offer certain products that may carry a higher risk profile such as uncovered options contracts and over-the-counter bulletin board stocks.[5] Robinhood also does not allow short selling on our platform.

In addition to the products available, Robinhood Financial has introduced features that have opened the door for many investors who have historically been unable to access the stock market, allowing them to invest in stocks and ETFs they care about for the long-term. Robinhood Financial's innovative fractional share and recurring investment products, for example, provide the ability for customers to purchase portfolios of blue chip stocks and ETFs over time. Further, the vast majority of our customers appear to be adopting buy and hold strategies to invest over extended periods. In fact, Robinhood customers purchasing fractional shares typically buy shares of blue chip companies. Only about two percent of customers qualify as pattern day traders.[6]

Overall, as of the end of 2020, about 13 percent of Robinhood customers traded basic options contracts (e.g., puts and calls), and only about two percent traded multi-leg options. Less than three percent of funded accounts were margin-enabled.[7]

---

[4]   Some or all of these products are available on competitor platforms.

[5]   Customers are able to close their positions in securities that trade over the counter after being delisted. Robinhood Financial also offers a limited number of American Depositary Receipts for globally-listed companies.

[6]   FINRA Rule 4210(f)(8)(ii) defines the term "pattern day trader" as "any customer who executes four or more day trades within five business days."

[7]   Robinhood Instant and options accounts may also be considered margin accounts. However, Robinhood Gold provides customers with the ability to trade securities on margin not simply related to a "float" or short-term extension of credit. In the case of Robinhood Instant, the "float" applies to unsettled funds after the initiation of a deposit from a customer's bank or the sale of securities. In the case of options accounts, the short-term extension of credit may apply in circumstances such as early assignments. *Letter to Reps. Sherman, Foster, Casten, Underwood and Sens. Durbin and Duckworth*, Robinhood (Aug. 7, 2020).

With respect to options trading, under FINRA rules, broker-dealers are required to collect certain information about a customer to determine whether to approve that customer's request to trade options. Specifically, Robinhood requires customers to disclose, among other things, stated investment experience and knowledge, age, investment objectives, employment status, estimated annual income from all sources, estimated net worth, estimated liquid net worth, and number of dependents. Robinhood conducts an assessment of information collected in deciding whether to approve a customer account for options trading.

We also recently made several changes to our options offering. For example, we improved our options educational materials and hired a dedicated Options Educations Specialist to support our continued education initiatives. We made changes to our app interface to add more safeguards and information, added the ability to cover early assignments in-app, and strengthened the eligibility criteria for new customers seeking to trade certain types of options strategies. We invested in growing our customer support teams and began offering, among other things, phone-based customer support for options traders.[8]

## IV.    Robinhood's Customers

Since founding Robinhood, we have made great progress removing barriers to finance for everyday investors and spurring changes in the industry. In fact, most incumbent brokerage firms recently followed Robinhood's lead by eliminating their own commissions and account minimums, saving American investors—regardless of whether they are Robinhood customers—millions of dollars per year in commission fees.

By offering zero-commission trades and no account minimums, Robinhood Financial opened up investing to a younger and more diverse group of Americans. The median age of our investors is 31, and about half of the customers self-identify as first-time investors. The median customer account size is about $240, with an average account size of about $5,000. As noted above, most customers appear to be investing in listed stocks and ETFs for the long-term. What we see is generally not consistent with popular memes suggesting that most of our brokerage customers are unsophisticated day traders taking inordinate risks with large sums of money on complex financial products.

We are also proud that the number of women trading on Robinhood's platform nearly tripled in 2020, and women today represent a higher percentage of our customer base than ever before. Robinhood customers are also more racially and ethnically diverse than the industry average. Based on a representative sampling between July and December 2020, African American investors represented nine percent of Robinhood's customer base, compared with just three percent at incumbent firms. Over the same period, Hispanic investors accounted for 16 percent of Robinhood's customers, compared with seven percent at incumbent firms.[9] Across all brokerages in the United States, stock ownership is younger and more diverse than when Robinhood was

---

[8]  An Update on Robinhood's Options Offering, Robinhood (Sept. 7, 2020),
     https://blog.robinhood.com/news/2020/9/7/an-update-on-robinhoods-options-offering.
[9]  *See* Answer to Mass. Securities Division Complaint, *In the Matter of Robinhood Financial LLC*, No. E-2020-0047 (Jan. 29, 2021).

founded back in 2013, and we believe that our platform has helped to propel those changes across the industry.

## V.   How Robinhood Makes Money

As Robinhood has grown and other brokerage firms have adopted our business model, there have been questions about how we offer zero-commission trades and other benefits to customers. As disclosed to customers and the public, Robinhood Securities receives what is called "payment for order flow" to route trades to market makers[10] that generally offer better prices than those available on exchanges.[11] Most retail brokerage firms receive payment for order flow, and subject to certain disclosure requirements, the SEC has permitted payment for order flow for decades.[12]

With payment for order flow, market-makers provide Robinhood with a rebate for executed orders, and in return, they provide reliable, quick, and competitive trade executions. Importantly, we have negotiated the same rebate rate with each of the market-makers to whom we route customers' orders, which eliminates any incentive for Robinhood to direct orders to any specific market maker. Robinhood Financial and Robinhood Securities conduct regular and rigorous reviews of execution quality for our customers as required by mandated best execution rules.

Robinhood's customers benefit greatly from payment for order flow as market-makers typically provide better prices than public exchanges. In fact, Robinhood customers received more than $1 billion in price improvement—the price they received compared to the best price on a public exchange—in the first half of 2020. Robinhood Securities' routing system is designed to prioritize routing orders for execution to market venues based on the likelihood of obtaining price improvement in a stock over the last 30 days. We believe this model benefits customers by further seeking best execution for every trade on the Robinhood platform.

---

[10]   A "market maker" is a firm that stands ready to buy or sell a stock at publicly quoted prices. *See Market Centers, Buying and Selling Stock*, SEC, https://www.sec.gov/fast-answers/answersmarkethtm.html#:~:text=A%20%22market%20maker%22%20is%20a,routing%20your%20order%20to%20them.

[11]   We also generate revenue while serving our customers in a variety of other ways, including our subscription service, Robinhood Gold, which provides customers with a suite of powerful investing tools. Income generated from cash, stock loan income from counterparties, and interchange fees from purchases made with the Robinhood Cash Management debit card are other avenues from which we generate revenue. *See How Robinhood Makes Money*, Robinhood, https://robinhood.com/us/en/support/articles/how-robinhood-makes-money/.

[12]   Payment for order flow has been used by broker-dealers for decades. Since 1994, the SEC has taken the position that "disclosure is the appropriate response to issues raised by payment for order flow" and acknowledged that payment for order flow "may result in lower execution costs, facilitate technological advances in retail customer order handling practices and facilitate competition among broker-dealers." *See* Payment for Order Flow, Exchange Act Release No. 34-34902, 1994 WL 587790 (Oct. 27, 1994) (available at https://www.sec.gov/rules/final/orderfin.txt). Consistent with this approach, In November 2000, the SEC again considered the potential conflict of interest issues related to payment for order flow and adopted additional rules to "increase[e] the visibility of order execution and routing practices" by requiring Rule 606 reports to be filed quarterly, thereby "empower[ing] market forces with the means to achieve a more competitive and efficient national market system for public investors." *See* Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 34¬43590, 2000 WL 1721163, at *12 (Nov. 17, 2000).

As stated, Robinhood is not unique in receiving payment for order flow. Annual reports show that Charles Schwab, E*Trade, and TD Ameritrade all received significant payment for order flow revenues in 2019.[13] It is important to note that Robinhood's payment for order flow relationships are with market-makers and not with hedge funds. Robinhood Securities regularly evaluates its counterparties and routes customer orders to those market-makers that can provide the best execution quality on those orders.

Consistent with SEC Rule 606, Robinhood discloses its payment for order flow arrangements with market-makers on a quarterly basis.[14] These disclosure reports are publicly available on the Robinhood Financial website and in the app.[15] These order flow disclosures help our customers better understand our routing decisions on order execution quality.

## VI.    The Robinhood App

At Robinhood, we pride ourselves on providing access to commission-free investing through an appealing, simple platform. But even though we have made investing easier, we recognize it is not a game. While I am not aware of any agreed upon definition of "gamification," I do know that Robinhood Financial designed its app to appeal to a new generation of investors who are more comfortable trading on smartphones than speaking with a broker, and Robinhood has built it to include features that, based on our outreach and research, customers feel familiar with and expect to see in a mobile product. The mobile app provides the intuitive experience customers want, while also providing them with tools and information to learn about investing and keep tabs on their finances.

I am confident that the easy-to-use interface enables customers to understand, control, and direct their finances in a responsible way. Robinhood Financial does not offer rewards or levels to encourage more trading. Robinhood Financial does sparingly use features like confetti animation to celebrate certain infrequent milestone events or a reward stock for signing up or referring friends. This is in line with similar animations and celebrations used, for example, when customers sign-up for the debit card product in the application. We believe that by making finance accessible and familiar, more people will access the markets. Other features regarding, for example, stock price movements, upcoming earnings calls, and breaking news are for informational purposes only, are opt-in tools, and are used by other retail brokerages.

---

[13] Prior to Robinhood's entrance into the market, many incumbent brokerages were charging customers a trading commission and collecting payment for order flow as well. *See, e.g.,* 2017 TD Ameritrade Annual Report (available at https://s2.q4cdn.com/437609071/files/doc_financials/annual/2017/TD-Ameritrade-2017-Annu al-Report.pdf); 2017 Charles Schwab Annual Report (available at https://content.schwab.com/web/retail /public/about-schwab/schw_annual_report_2017.pdf).

[14] SEC Rule 606 requires broker-dealers that route customer orders to publish quarterly reports that provide a general overview of their routing practices. In this report, the venues to which non-directed customer orders in U.S. exchange-listed equity securities and options were routed for execution must be disclosed, as well as the nature of any relationship the broker-dealer has with each venue. SEC Rule 606 disclosures also include information on the total shares executed, fill rate, and average fill size. The purpose of this report is to provide the public with information on how broker-dealers route orders, enable the evaluation of order routing practices and foster competition among market participants.

[15] *See 2020 Q4 Rule 606 Disclosure Report,* Robinhood Securities, https://cdn.robinhood.com/assets/robinhood/legal/RHS%20SEC%20Rule%20606a%20and%20607%20Disclos ure%20Report%20Q4%202020.pdf.

Ultimately, Robinhood listens to its customers and build products that serve their needs. For example, we recently launched a Cash Management feature that allows customers to deposit paychecks, pay bills, make debit-card purchases, manage their budget, and access cash from an ATM.

We are honored to play a significant role in our customers' financial lives. We look forward to further innovation and to offering our customers the services they can use to manage their day-to-day finances and build wealth.

## VII.    Informing and Supporting Customers

Financial literacy remains a key area of investment as Robinhood Financial continues to grow its trading platform. We fully recognize, and have always taken seriously, the responsibility that comes with helping customers invest. That's why Robinhood provides free educational resources available to everyone—not just our customers—on the Robinhood Learn website. We've also rolled out features like our profiles and "Year in Review" that help customers reflect on their investing activity and understand the diversity of their investments — all with a focus on simplicity and ease-of-understanding.

Our goal is to demystify finance as much as possible by avoiding complex industry language and providing useful tools to inform our customers. Robinhood Financial has published more than 650 articles to help people learn about investing and answer their most fundamental questions about investing such as "What is a Limit Order?" along with articles covering a host of other subjects. In 2020, Robinhood Learn articles were read by more than 3.2 million people, and unique visits rose 260% from January through November 2020. Robinhood Financial provides all customers with free access to premium financial news, including videos and articles from the *Wall Street Journal*, *Bloomberg News*, *Reuters*, and *Barron's*. It is also finding new, innovative ways to share digestible business news to help customers stay up-to-date on the markets, like Robinhood's Snacks Daily podcast, which was downloaded nearly 40 million times in 2020.

Additionally, Robinhood Financial has taken steps to proactively inform customers about certain financial products like options. For example, one type of options contract—a "call option"— confers the right to buy a specified amount of stock at a specified price (the "strike price") by a specific date (the "expiration date"). If the stock rises above the strike price, a call option is said to be in the money. The customer has the right to buy the stock at the strike price even though the stock is trading at a higher price. By contrast, if the stock price is below the strike price, the option is out of the money ("OTM"). As there is no reason for the customer to exercise an OTM option, the customer could simply let the contract expire. In January 2021, Robinhood became aware that some customers were occasionally exercising OTM options, causing them to suffer losses immediately upon exercise. This issue continued despite Robinhood's warnings and education materials available through Robinhood Learn. To prevent these losses, Robinhood Financial implemented a procedure requiring customers to speak to a live registered representative before exercising OTM options. This requirement was intended to provide an opportunity for the representative to explain to the customer the downsides of exercising an OTM option. This procedure remained in effect through January 28, 2021. As of January 29, 2021, Robinhood

Financial does not permit customers to exercise OTM options.  Robinhood Financial has also recently implemented a call-back service line dedicated to answering customers' questions about options trading, and we are in the process of expanding live phone support to customers needing assistance with account security.

## VIII.    GameStop and Market Volatility

As has been widely reported, there was historic volatility in the trading of certain securities during the week of January 25, 2021.  This movement in the market garnered significant attention in the press and was propelled, in part, by increased activity on social media.  In the face of this unprecedented volatility and volume, which has been cited as a five sigma event, Robinhood Securities placed temporary restrictions on certain securities to facilitate compliance with clearinghouse deposit requirements, thereby allowing Robinhood to continue to serve our customers and comply with all trading regulations.  A number of other brokerage firms imposed similar restrictions for similar reasons.[16]  Once again, I want to be clear. The action we took was for one reason and one reason only: to allow us to continue to meet our regulatory deposit requirements.

To understand the actions Robinhood took in the wake of this market volatility, it is crucial to understand how the clearing process currently operates.  A brief overview of this process is included below, followed by a description of Robinhood's experience over the course of the week of January 25.

When a customer buys or sells a security, Robinhood Financial, as the introducing broker, sends the order to Robinhood Securities, the clearing broker, which routes the order for execution to a market-maker and submits the resulting trade to a clearinghouse for clearance and settlement.  For equities, it takes several days for the clearinghouse to process the transaction and effect the related transfers of cash and securities between buyers and sellers.  This is known as "T+2" settlement, denoting the trade date plus a two-day "settlement period."  This T+2 settlement cycle is codified by SEC Rule 15c6-1(a), which prohibits broker-dealers from effecting the purchase or sale of a security later than the second business day after the execution of the trade.[17]  Pursuant to the SEC Rule, a customer's cash or securities is locked up during the T+2 settlement process.

To cover the open settlement risk during the settlement period, Robinhood Securities is required to place a deposit using its own funds (not customer funds) at the clearinghouse to cover the risk until the trade "settles."   To ensure that both sides follow through on a given trade, each side is required to post collateral with the relevant clearinghouse for the two-day period between when a trade is executed and when it settles.  This collateral requirement is referred to as the "Value-at-Risk" collateral ("VaR").   To calculate the collateral deposit requirement, the clearinghouse looks

---

[16]   See Mark DeCambre, GameStop and AMC Trading Restricted by TD Ameritrade, Schwab, Robinhood, Others, MarketWatch (Jan. 27, 2021), https://www.marketwatch.com/story/gamestop-amc-trading-is-now-being-restricted-at-td-ameritrade-11611769804.

[17]   Following the sale of securities, a customer's funds need to settle for two business days before the funds can be withdrawn. See Withdrawal Rules, Robinhood, https://robinhood.com/us/en/support /articles/withdraw-money-from-robinhood/.

at unsettled trades and applies a number of risk-based metrics.  The clearinghouse may also assign additional collateral requirements.

In order to clear and settle customer transactions, each trading day by 10:00 a.m. ET, clearing brokers like Robinhood Securities must satisfy clearinghouse deposit requirements to support their customer trades during the settlement period.  Depending on a particular day's deposit requirement at the clearinghouse, Robinhood Securities may be required to deposit additional money with the clearinghouse during the day.

On January 25, Robinhood Securities' collateral obligation from NSCC, its principal clearinghouse, totaled approximately $124 million.  By January 27, Robinhood Securities increased the margin maintenance to 100 percent for GameStop and other securities, making them non marginable.  This meant that customers had to pay cash to purchase these securities and they could not use the securities as margin collateral to buy other stocks on margin.  Robinhood also began limiting customers from opening new options positions in GameStop and certain other securities.  These actions were taken for risk management purposes.  The same day, the Chicago Board Options Exchange Volatility Index, or "VIX", spiked by 62%, a dramatic increase that the *Wall Street Journal* reported was the third-largest percentage daily gain since 1990.[18]  In just three days, from January 25 to January 28, the price of GameStop shares rose over 530 percent.

At approximately 5:11 a.m. EST on January 28, the NSCC sent Robinhood Securities an automated notice stating that Robinhood Securities had a deposit deficit of approximately $3 billion.  That deficit included a substantial increase in Robinhood Securities's VaR based deposit requirement to nearly $1.3 billion (up from $696 million), along with an "excess capital premium charge" of over $2.2 billion.  SEC rules prescribe the amount of regulatory net capital that Robinhood Securities must have,[19] and on January 28 the amount of the NSCC VaR charge exceeded the amount of net capital at Robinhood Securities, including the excess net capital maintained by the firm.  Under NSCC rules, this triggered a special assessment—the "excess capital premium charge."  In total, the NSCC automated notice indicated that Robinhood Securities owed NSCC a total clearing fund deposit of approximately $3.7 billion.  Robinhood Securities had approximately $696 million already on deposit with NSCC, so the net amount due was approximately $3 billion.

Between 6:30 and 7:30 am EST, the Robinhood Securities operations team made the decision to impose trading restrictions on GameStop and other securities.[20]  In conversations with NSCC staff early that morning, Robinhood Securities notified the NSCC of its intention to implement these restrictions and also informed the NSCC of the margin restrictions that had already been imposed. NSCC initially notified Robinhood Securities that it had reduced the excess capital premium charge by more than half.  Then, shortly after 9:00 am EST, NSCC informed Robinhood Securities that the excess capital premium charge had been waived entirely for that day and the net deposit

---

[18]   Quentin Webb, *Volatility Index Soars*, WSJ (Jan. 27, 2021), https://www.wsj.com/livecoverage/amc-gamestop-stock-market/card/G0TKmyrTdokxPNjwtwje.

[19]   Robinhood Securities remained in compliance with SEC net capital rules at all relevant times.

[20]   Those who owned GameStop and the other small number of restricted stocks could sell their shares but not buy more, and those who were exercising options contracts on GameStop could buy shares to cover.  Robinhood Securities did not impose these trading restrictions at the request of hedge funds or to try and move prices in GameStop one way or the other.

requirement was approximately $1.4 billion, nearly ten times the amount required just days earlier on January 25. Robinhood Securities then deposited approximately $737 million with the NSCC that, when added to the $696 million already on deposit, met the revised deposit requirement for that day.

The chart below illustrates the approximate NSCC depository requirements that Robinhood encountered over the course of the week of January 25, 2021[21]:

| Date | Daily VaR Requirement Start of Day | Daily VaR Requirement End of Day |
|---|---|---|
| January 25, 2021 | $125 million | $202 million |
| January 26, 2021 | $291 million | $291 million |
| January 27, 2021 | $282 million | $690 million |
| January 28, 2021 | $1.4 billion | $1.4 billion |
| January 29, 2021 | $354 million | $753 million |

The events of the week of January 25, 2021 and the related NSCC depository requirements were unprecedented. In response, Robinhood took swift action to ensure that our customers could continue trading in the thousands of other stocks available on our platform that day and in the days ahead.

Robinhood Securities worked quickly to remove trade restrictions in GameStop and other affected securities. After Robinhood Securities paid the NSCC deposit requirement on January 28, Robinhood began discussions with our investors to raise new capital to ensure that we could meet future potential deposit requirements and thereby return to providing Robinhood customers unrestricted access to all securities on the platform. Over the course of approximately four days, we received commitments for approximately $3.4 billion from investors.

## IX.    Robinhood's Customer Notifications and Communications

Transparency is a priority at Robinhood, and the ability to restrict trades is disclosed to customers when they sign up with Robinhood Financial. Robinhood's ability to temporarily restrict trading on certain securities during periods of significant volatility is communicated to our customers as part of the account opening agreement. When opening an account, all customers are required to sign a customer agreement, in which the customer acknowledges that Robinhood retains authority, in its "sole discretion and without prior notice," to restrict customer trading activity. Agreements with these terms are standard across the industry.[22]

In addition, on January 30, 2021, the SEC released an investor alert and bulletin titled, "Thinking About Investing in the Latest Hot Stock? Understand the Significant Risks of Short-Term Trading Based on Social Media," which not only warned retail investors of the risk of short-term investing

---

[21]   Robinhood's actual funds on deposit with NSCC may exceed the required deposit amounts.

[22]   *See* Robinhood Customer Agreement at 6 ("I understand Robinhood may at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities."); *id.* at 11 ("I understand that Robinhood may, in its discretion, prohibit or restrict the trading of securities . . . in any of My Accounts.") (available at https://cdn.robinhood.com/assets/robinhood/legal/Robinhood%20Customer%20Agreement.pdf).

in a volatile market, but made clear that broker-dealers had the right to reject or limit customer transactions for legal, compliance, or risk management reasons. The SEC highlights that "in certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks."[23]

Throughout this recent period of heightened volatility in GameStop and other securities, Robinhood Financial continued communicating with customers about the increased risks and the importance of being an informed investor. Robinhood Financial also sent targeted messages to customers with existing positions in GameStop and other affected securities informing them that those securities were experiencing significant volatility and investments in those companies may involve added risk.

## X.    Real-Time Settlement: Big Changes Could Protect Small Investors

As previously described, it takes the trade date plus two days for an equities transaction to be cleared and settled by a clearinghouse. During this period, the buyer and seller of the security must post collateral with the clearinghouse, and the clearinghouse may require an additional deposit as excess collateral. Clearinghouses look at a firm's unsettled equity trades when determining how much collateral is required.[24] Clearinghouses look at a number of factors, including volatility, when looking at specific stocks in order to quantify risk and may assign additional charges based on how many unsettled trades there are of one stock.[25]

Additionally, if a firm's customers have more buy than sell orders, and the securities they are buying are more volatile, the deposit requirement will be significantly higher.[26] For example, if a broker-dealer's customers have submitted more orders to purchase than to sell a particular security and the price of the security that the broker-dealer's customers are buying is more volatile, then the resulting deposit requirement will generally be higher.

In addition to clearinghouse requirements, as broker-dealers, Robinhood Financial and Robinhood Securities are subject to SEC regulations that require broker-dealers to maintain certain levels of regulatory capital to ensure the ability to promptly satisfy their liabilities at all times.[27] The SEC's primary rule is generally referred to as the "Uniform Net Capital" rule, which sets forth a methodology for computing a broker-dealer's net capital, sets forth minimum net capital levels which must be maintained at all times, establishes notification requirements in the event that a broker-dealer's level of net capital falls below certain minimum thresholds, and sets restrictions

---

[23] *Thinking About Investing in the Latest Hot Stock? Understand the Significant Risks of Short-Term Trading Based on Social Media*, SEC (Jan. 30, 2021), https://www.sec.gov /oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.

[24] *See NSCC Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* at 57-61, DTCC (Dec. 31, 2020) https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/NSCC_Disclosure_Framework.pdf).

[25] *See* SEC Release No. 34-82631, File No. SR-NSCC-2017-808, at 6 (the volatility charge formula is set forth at Procedure XV, § 1(A)(1)(a)(i), p. 287-90 of the NSCC Rules and Procedures) (available at https://www.sec.gov/rules/sro/nscc-an/2018/34-82631.pdf).

[26] *Id.*

[27] *See* 17 C.F.R. § 240.15c3-1.

11

on broker-dealer activities when capital falls below certain levels.[28]  The Uniform Net Capital Rule functions as a net liquid assets requirement insofar as the rule recognizes only liquid assets as contributing to regulatory capital.[29]

To ensure compliance with the Uniform Net Capital Rule, broker-dealers perform repeated net capital computations.[30]  The calculation begins with the broker-dealer's ownership equity under Generally Accepted Accounting Principles.  The broker-dealer is then required to perform adjustments by deducting illiquid assets and applying variable "haircuts" or charges to risky assets such as securities to compensate for market and credit risks.  The resulting figure is the broker-dealer's regulatory capital.  This amount is then compared to various minimums based on the broker-dealer's types and volume of activity.  If a broker-dealer were to fail to maintain specified levels of regulatory capital, it could be subject to immediate suspension or revocation of registration, which could lead to the liquidation of its holdings on behalf of customers and the elimination of its ability to serve its customers.

During the week of January 25, 2021, Robinhood saw the impact the T+2 trade settlement period has on its customers and ultimately the entire American financial system.  Clearinghouse deposit requirements skyrocketed overnight.  People were unable to buy some of the securities they wanted.

The existing two-day period to settle trades exposes investors and the industry to unnecessary risk and is ripe for change.  Every day, clearing brokers like Robinhood Securities have to meet deposit requirements imposed by clearinghouses to support customer trades between the trade date and the date the trades settle.  Investors are left waiting for their trades to clear, and the clearing brokers have their proprietary cash locked up, until the settlement is final days after the trade.  The clearinghouse deposit requirements are designed to mitigate risk, but last week's wild market activity showed that these requirements, coupled with an unnecessarily long settlement cycle, can have unintended consequences that introduce new risks.

There is no reason why the greatest financial system the world has ever seen cannot settle trades in real time.  Doing so would greatly mitigate the risk that such processing poses.  Indeed, real-time settlement would have allowed Robinhood Securities to better react to periods of increased volatility in the markets without restricting the purchasing of securities.

It has been four years since the securities industry moved from a three-day to a two-day settlement cycle.[31]  The Depository Trust & Clearing Corporation has recognized the benefits of an even shorter timeframe, leveraging technology.[32]  Meanwhile, millions of new investors have entered

---

[28]   *Id.*

[29]   *Id.*

[30]   *See Net Capital Requirements for Brokers or Dealers SEC Rule 15c3-1*, FINRA (2014), https://www.finra.org/sites/default/files/sea-rule-15c3-1-interpretations.pdf.

[31]   *See SEC Adopts T+2 Settlement Cycle for Securities Transactions*, SEC (Mar. 22, 2017), https://www.sec.gov/news/press-release/2017-68-0.

[32]   *See Modernizing the U.S. Equity Markets Post-Trade Infrastructure*, DTCC (Jan. 2018) available at https://www.dtcc.com/~/media/Files/downloads/Thought-leadership/modernizing-the-u-s-equity-markets-post-trade-infrastructure.pdf.

the market for the first time as technology transforms the world.  It is time for the financial system to catch up.

The industry, Congress, regulators, and other stakeholders need to come together to deploy our intellectual capital and engineering resources to move to real-time settlement of U.S. equities. Accomplishing this won't be without its well-documented challenges, but it is the right thing to do and Robinhood is eager to drive this critical effort on behalf of all investors.

## XI.    Conclusion

There are certainly lessons to be learned from the events of the last month, and Robinhood looks forward to being part of the conversation around these issues moving forward. I want to thank the millions of customers who use Robinhood to access the markets every day and to express my appreciation for being able to discuss these important issues with you today. I welcome the opportunity to answer your questions.

**EXHIBIT  3**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

CASE NO. 20-CV-24897-CMA

SHTERNA PINCHASOV, Individually and on
Behalf of All Others Similarly Situated,

      Plaintiff,

vs.

ROBINHOOD FINANCIAL, LLC,

      Defendant.

      _____/

## NOTICE OF TAKING VIDEO-TAPED RECORDED DEPOSITION(S) *DUCES TECUM*

To:    Elliot Greenfield (*pro hac vice*)
      **DEBEVOISE & PLIMPTON LLP**
      919 Third Avenue
      New York, New York 10022
      Telephone: 212.909.6000
      Email: mloconnor@debevoise.com
      Email: egreenfield@debevoise.com
      *Counsel for Defendant*

**PLEASE TAKE NOTICE** that the undersigned law firm will take the deposition(s) of:

| Deponent | Date & Time | Location | Schedules |
|---|---|---|---|
| Corporate Representative of Robinhood Financial, LLC | June 22, 23, 24 or within the next 35 days[1] | **Deponent and Plaintiff's Counsel shall appear for Deposition via a recorded Video Zoom Conference for Video Conference.** | Schedules "A" and "B"[2] appended. |

---

[1] This deposition shall not be unilaterally cancelled without good cause within 48 hours of this depositions scheduled occurrence, as coordinated by the parties' counsel.

[2] For each area of inquiry and document request, if Defendant intends to assert anything is subject to privilege, then Defendant is to produce a proper privilege log as provided by the rules. The privilege log must contain sufficient information for a person reviewing the log to determine whether, in fact, the privilege properly applies. This may include the name of the person who wrote it, the name of the recipient, a general description of the subject matter, etc.

Upon oral examination before the above listed court reporter, Reporting Service, Notary Public, or any other Notary Public or other officer authorized by law to take depositions in the given State for examination. The oral examinations, which will be videotaped as well, will continue from day to day until completed. The depositions are being taken for the purposes of discovery, for use at trial, or for such other purposed as are permitted under *Federal Rule of Civil Procedure 30.*

The attached schedules "A" and "B" both, outline specific topics and/or items the Deponent must (i) be prepared to discuss in all aspects during their deposition (Schedules "A" and "B"), and (ii) provide to Plaintiffs' Counsel (via email, facsimile, regular mail, express mail, or personal delivery) AT LEAST five (5) days PRIOR to appearing at his/her/its respective deposition (Schedule "B"). The Corporate Representative shall provide the documents listed on Schedule "B" to Plaintiffs' counsel prior to the deposition.

In compliance with Fed. R. Civ. P. 30(b)(4) the parties, both Plaintiff(s) and Defendant hereby stipulate that this deposition shall be taken by telephone or other remote means. In compliance with Fed. R. Civ. P. 30(b)(5), prior to start of the deposition the deponent shall be subject to the "on-the-record statement" that includes:

(i) the officer's name and business address;

(ii) the date, time, and place of the deposition;

(iii) the deponent's name;

(iv) the officer's administration of the oath or affirmation to the deponent; and

(v) the identity of all persons present.

**AMERICANS WITH DISABILITIES ACT**. If you are a person with a disability who needs any accommodation to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Brandy Lonchena, Chief

Deputy Operations 400 North Miami Avenue, 8th Floor Miami, FL 33128 Phone: (305) 523-5678

at least 7 days before your scheduled court appearance, or immediately upon receiving this

notification if the time before the scheduled appearance is less than 7 days; if you are hearing or

voice impaired, call 711.

Respectfully submitted,

 _/s/ Michael A. Citron_____
Michael A. Citron, Esq.
Florida Bar No.: 105083
**MAC Legal, P.A.**
*Counsel for Plaintiffs*
4601 Sheridan Street, Suite 205
Hollywood, FL 33021
Michael@maclegalpa.com
Service@maclegalpa.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 26, 2021, the foregoing document is being served this

day via electronic mail on the following:

Grace L. Mead
Ryan T. Thornton
**STEARNS WEAVER MILLER** Museum Tower
150 West Flagler Street
Suite 2200
Miami, Florida 33130 Telephone: 305-789-3200
Email: gmead@stearnsweaver.com
Email: rthornton@stearnsweaver.com

Maeve L. O'Connor (*pro hac vice*)
Elliot Greenfield (*pro hac vice*)
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue New York, New York, 10022
Telephone: 212.909.6000
Email: mloconnor@debevoise.com
Email: egreenfield@debevoise.com

### SCHEDULE "A"

*Each deponent must be prepared to discuss in detail the following during his/her/its respective deposition:*

1.     Each of the facts and circumstances known to Defendant surrounding the allegations made in Plaintiffs' operative Complaint [D.E. 1-1 at Pg. 2-14].

2.     The factual basis, if applicable, for each of the points raised by Defendant in its Motion to Dismiss [D.E. 21-22-1]. This topic does not seek legal argument or legal theories but rather facts upon which Defendant's motion to dismiss is predicated upon.

3.     The factual basis, if applicable, for each of the points raised by Defendant in its Answer and Affirmative Defenses and Demand for Jury Trial [D.E. 49]. This topic does not seek legal argument or legal theories but rather facts upon which Defendant's Answer and Affirmative Defenses and Demand for Jury Trial is predicated upon.

4.     The customer agreement(s) with Plaintiff(s).

5.     The Defendant's corporate policies and procedures surrounding T1 Halts, including, but limited to, policies and procedures for trade executions, for placing trade orders for stocks that are subject to T1 Halts, for notifying customers of TI Halts, how Defendant is notified of T1 Halts, and for listing prices of stocks during T1 Halts.

6.     The Defendant's corporate policies and procedures surrounding the system and/or platform used by a customer when placing trade orders.

7.     All correspondence (digital, video, written, etc.) between Defendant, its subsidiaries, affiliates, clearinghouses, and the like, and Plaintiff or Plaintiffs' representatives concerning the claims asserted by Plaintiffs or other similarly affected parties, including but not limited to fulfilment of trades and halts.

8.     The identity of all individuals, entities, and systems, who, on behalf of Defendant,

or its subsidiaries, affiliates, clearinghouses, and the like, received any payments or other remuneration from trading firms (i.e., "payment for order flow") regarding any of Plaintiffs' orders referred to in Plaintiffs' Complaint.

9. The identity and function of all individuals and systems, who, on behalf of Defendant, or its subsidiaries, affiliates, clearinghouses, and the like, were involved in the execution of the Plaintiffs' orders. This inquiry will also concern all actions, the Defendant's terms or rules on halts and trades, analyses conducted, and responsibilities undertaken by the entities above concerning the Plaintiffs' transaction regarding the stock subject to the T1 Halt.

10. The dynamic configuration protocols as they relate to Plaintiffs' use of Defendant's services and Plaintiffs' transactions regarding the stock subject to the T1 Halt. NOTE: this inquiring does NOT seek to invade proprietary or trade secret information.

11. The factual basis for each of Defendant's denials to each of the allegations in the operative Complaint.

12. The factual basis for each of Defendant's affirmative defenses, if any and if applicable. This does not seek legal argument.

13. Defendant's protocols regarding all trade executions both generally and specifically related to the allegations made by Plaintiffs in this Action.

14. Defendant's duties and responsibilities, both generally and specifically, to its customers as it relates to trade executions, T1 Halts, using its interface, and providing stock and pricing information.

## SCHEDULE "B"
### DUCES TECUM REQUEST: DOCUMENTS TO BE PRODUCED AT DEPOSITION

1.      The Customer Agreement in place during the Plaintiffs' loss as alleged in the Complaint.

2.      All writings, memorandums, notes and/or other written materials reflecting Defendant's actions immediately after being notified, in any way, of the Plaintiffs' loss as alleged in the Complaint.

3.      All emails or written communications received by Defendants from the Plaintiffs regarding Defendant's services to Plaintiffs or any stock transactions, or attempted stock transactions by Plaintiffs.

4.      All emails or written communications sent by Defendants to the Plaintiffs regarding Defendant's services to Plaintiffs or any stock transactions, or attempted stock transactions by Plaintiffs.

5.      All written policies and procedures, to include, corporate guidelines, employee handbooks, policy and/or procedure manuals, whether found in paper or electronic format, and whether referencing directly or indirectly, regarding trade executions, to include but not be limited to trade executions during T1 Halts, how Defendant is informed of T1 Halts, and T1 Halts in general.

6.      All written policies and procedures, to include, corporate guidelines, employee handbooks, policy and/or procedure manuals, whether found in paper or electronic format, regarding Defendant's duties and responsibilities to its customers.

7.      All documents, whether in written or electronic format, whether in-house or from a governmental entity, governmental agency, private entity or otherwise, that discuss or refer to in any way, whether directly or indirectly, Defendant's acquiring knowledge of T1 Halts currently implemented or to be implemented, or Defendant's handling/trading of stocks during T1 Halts. This does not seek documents protected by attorney client privilege or work-product.

8.      All documents, whether in written or electronic format, videos, recordings, transcriptions, graphs, electronic communications, etc., which relate to or refer to or support the topic areas listed in Schedule A above.

**EXHIBIT  4**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(Miami Division)

**CASE NO. 20-CV-24897-CMA**

SHITERNA PINCHASOV, Individually and
on Behalf of All Others Similarly Situated,

      Plaintiff(s),

         v.

ROBINHOOD FINANCIAL LLC,

      Defendant.

_____/

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT

The Plaintiff, SHITERNA PINCHASOV, Individually and on Behalf of All Others

Similarly Situated, by and through its undersigned attorneys, pursuant to Rule 34 of the Federal

Rules of Civil Procedure, hereby requests that Defendant, ROBINHOOD FINANCIAL, LLC,

produce the following documents and things within 30 days:

Dated: June 14, 2021.

Respectfully submitted,

Michael A. Citron, Esq.
Florida Bar No.: 105083
**MAC LEGAL, P.A.**
4601 Sheridan Street, Ste. 205
Hollywood, Florida 33021
Telephone: (954) 395-2954
Michael@maclegalpa.com – Correspondence
Service@maclegalpa.com - Service Address

Igor Hernandez, Esq.
Florida Bar No. 106386
**CORNISH HERNANDEZ GONZALEZ, PLLC**
2525 Ponce de Leon Blvd, Suite 300

Coral Gables, Florida 33134
Telephone: (305) 780-6058
service@CHGLawyers.com
ihernandez@chglawyers.com

Ely R. Levy, Esq.
Florida Bar No.: 15452
Venessa Valdes Solis, Esq.
Florida Bar No. 77122
**LEVY & PARTNERS, PLLC**
3230 Stirling Road, Suite 1
Hollywood, Florida 33021
Telephone: (954) 727-8570
elevy@lawlp.com – Service Address
venessa@lawlp.com – Service Address
Maritza@lawlp.com – Service Address

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 14, 2021, the foregoing document is being served this

day on all counsel of record or pro se parties identified on the attached service list in the manner

specified.

By:___/s/ Venessa V. Solis_____
             VENESSA V. SOLIS, ESQ.

## SERVICE LIST

Grace L. Mead, Esq.
Ryan T. Thornton, Esq.
**STEARNS WEAVER MILLER**
Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: 305-789-3200
Email: gmead@stearnsweaver.com
 Email: rthornton@stearnsweaver.com

Maeve L. O'Connor, Esq. (*pro hac vice* application forthcoming)
Elliot Greenfield, Esq. (*pro hac vice* application forthcoming)
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, New York 10022
Telephone: 212.909.6000
Email: mloconnor@debevoise.com
Email: egreenfield@debevoise.com

## <u>DEFINITIONS AND INSTRUCTIONS</u>

For the purposes of these requests, the following definitions and instructions shall apply:

1.  "You", "Yours", "Your", and "Defendant" shall refer to ROBINHOOD FINANCIAL, LLC, including its respective managers, members, managing members, employees, attorneys, accountants, affiliates, agents, associates, representatives, investigators, assistants, secretaries, and all other persons who have acted on its behalf and/or who are or have been in possession of or may have obtained information for or on behalf of it in any manner with respect to any matter referred to in the pleadings in the above-styled cause.

2.  Plaintiff shall refer to SHITERNA PINCHASOV, Individually and on Behalf of All Others Similarly Situated.

3.  The "Discovery Time Period" shall refer to the four (4) year period preceding the filing of the subject lawsuit.

4.  If there were any changes in the policy or procedure relating to the substance of the Interrogatory during the Discovery Time Period to the present, state in your answer all such policies and procedures in effect during that general period, further specifying when each policy and procedure was in effect.

7.  The term "person" means any natural person, partnership, corporation, firm, association,group, organization or other entity of any nature.

8.  The terms "and" and "or" have both the conjunctive and disjunctive meanings.

9.  The terms "document" or "documents" mean all written, typed, printed, reported, recordedor graphic matter and all photographic matters or sound reproduction tapes, records, or other devices, however produced, reproduced, or stored, now or formerly within your actual or constructive possession, custody or control, including but not limited to in their original

or native format. "Document" or "documents" shall include, but are not limited to, all telegrams, telexes, cables, telephone records, telephone bills, memoranda (circulated and uncirculated), market studies, correspondence, e-mails, reports, studies, compilations of data, filings, files, internal policies or rules or regulations, minutes, agenda, requests, records, charts', lists, analyses, graphs, diagrams, schematics, blueprints, specifications, worksheets, change orders, drawings, cost estimates, books, expense reports, notebooks, notes, diaries, appointment books, calendars, recordings, transcriptions, computer discs, file cards, computer printouts, computer programs, microfilm, microfiche, video tapes, media articles or reports, accounts, books and records, ledgers, journals and other financial records, audits, instructions, questionnaires, profit and loss statements, financial statements, annual reports, state and federal tax returns, checkbooks, canceled checks, billings, contracts or agreements or releases, and any drafts, copies, or reproductions of the foregoing; and any copy of the foregoing upon which any notations in any form have been made which do not appear on the originals; and any copy of the foregoing upon which any language, notation or comments, in any form, which appear on the original or any other copy have been deleted, highlighted, altered or edited.

10.     The term "record" or "records" is defined as all writings of any kind, including the originals and all non-identical copies, whether different from the original due to any notation made on such copies or otherwise, including (without limitation) correspondence, memoranda, notes, diaries, statistics, letters, telegrams, reports, studies, statements, summaries. interoffice and intra-office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, printed matters, computer printouts, all drafts, alterations, modifications, changes, amendments of any of the foregoing, records or documents or representations of any kind, including (without limitation) photographs, charts, graphs, microfiches, microfilm, videotape,

recordings, motion picture, and electronic mechanical or electric records or representation of kind, including (without limitation) tapes, cassettes and disc recordings. This includes but is not limited to in their original or native format.

11.     The terms "relate to," "relates to" or "relating to" mean concerning, respecting, referring to, summarizing, digesting, embodying, reflecting, establishing or not establishing, tending to establish, derogating from, tending not to establish, evidencing or not evidencing, comprising, connected with, commonly known as, used in putting together, commenting on, responding to, agreeing or disagreeing with, showing, describing, reporting on, analyzing, evaluating, interpreting, representing, constituting or including.

12.     The terms "detailing," "describing," "showing," "concerning," "pertaining to," "relating to," "referring to," "describing," "evidencing," "constituting," "comprising," "memorializing," "commenting on," "regarding," "discussing," "reflecting," "in connection with," or "analyzing" or any other derivatives thereof, shall be construed as interchangeable and include within their scope any legal, logical, or factual connection with the matter discussed.

13.     The term "communication" shall mean the transmittal of information and includes any written, oral, telephonic or other inquiry, representation, discussion, conversation, agreement, understanding, meeting memorandum, letter, note, telegram, advertisement or interview, including but not limited to in their original or native format.

14.     The term "identify" or "list" when used with reference to (i) an individual person means to state his or her full name, employer, job title, present or last known address and telephone number, and present or last known business address and telephone number; (ii) a document means to state the type of document (e.g., letter, memorandum, etc.) and its date, author, addressee, general subject matter and present location and custodian. (If any document was, but no longer is,

in your possession, state what disposition was made of it and the facts or reasons for such disposition.

15.     The term "information" shall be expansively construed and shall include, but not be limited to, facts, data, opinions, images, impressions, concepts and formulae.

16.     The term "in furtherance of" shall mean "for", "for the sake of", "in favor of", "in the name of", "in the service of", "on account of", "on behalf of", and include within its scope any legal, logical, or factual connection with the matter discussed.

17.     All words in the present tense include the past and all words in the past tense include the present.

18.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others as appropriate in the context.

19.     The terms "and" and "or" mean either the conjunctive or disjunctive as context may require so that the meaning is inclusive rather than exclusive.

20.     The term "damages" shall mean monetary compensation that may be awarded by a court in a civil action to an individual who has been injured through the wrongful conduct of another party.

21.     In responding to these requests, you are requested to provide all information known or available to you at the time of your response, regardless of whether such information is possessed directly by you, your representatives, agents or investigators, or by your attorneys or by their agents or representatives.

22.     If any documents requested or responsive to these requests cannot be produced in full, then answer to the extent possible and state the reason or reasons for your inability to produce the documents.

23.     These requests are continuing so as to require supplemental responses in the event that Defendant or any person acting on Defendant's behalf obtains additional documents or information called for by these requests. If further information is obtained of the nature sought by these requests after the service of your answer, you are specifically requested to supply such further information to the Plaintiffs.

24.     If any request is not clear enough, do not answer that the question is vague or other similar response, but telephone or email the undersigned attorney for a clarification. If your response is that a request is duplicative of another request, state which request asks for the same information and state that your answer is the same as that provided in response to that other request. When asked to "detail" a transaction, other event, or state of affairs, provide enough factual content and relevant information as to fairly communicate a meaningful answer.

## SPECIFIC REQUESTS TO DEFENDANT

1. Please produce the contract(s) in effect during the Discovery Time Period for all of Defendant's customers that placed a trade order during a T1 Halt during the Discovery Time Period, to include any amendments thereto.

ANSWER:

2. Please produce the documents you referenced or would reference to determine the total number of Defendant's customers who placed a trade order during a T1 Halt during the Discovery Time Period.

ANSWER:

3. Please produce all documents that show the identity of Defendant's customers who placed a trade order during a T1 Halt during the Discovery Time Period.

ANSWER:

4. For all customers that placed a trade order during a T1 Halt in the Discovery Time Period, please produce all documents that identify the price of the stock when the customer placed the order.

ANSWER:

5. For all customers that placed a trade order during a T1 Halt in the Discovery Time Period, please produce all documents that identify the price of the stock when Defendant actually effectuated that customer's order to sell that stock.

ANSWER:

6. Please produce each document filed by or for Defendant with the SEC, any national securities exchange, or any state agency regarding T1 Halts.

ANSWER:

7. Please produce each document filed by or for Defendant with the SEC, any national securities exchange, or any state agency regarding any halts.

ANSWER:

8. Please produce each document (including correspondence in any form) given to or received by the SEC, any national securities exchange, or any state agency regarding T1 Halts.

ANSWER:

9. Please produce each document (including correspondence in any form) given to or received by the SEC, any national securities exchange, or any state agency regarding any halts.

ANSWER:

10. All documents or other electronically searchable materials on servers or in archived files, including documents sent to or from any employee or agent of Defendant, created, sent, modified or distributed in the Discovery Time Period, that contains any of the following strings of characters and/or satisfies the following search criteria:

   a. "T1 Halt" or "halt", within the same email or email string as "order"

   c. "T1 Halt" or "halt", within the same email or email string as "customer"

   The search shall be performed regardless of whether a term is preceded or followed by a space or another character, so that a search for "order" will turn up "ordered", "orders" and "order" and a search for "halt" will turn up "halts", "Halt" or "halt".

ANSWER:

11. Please produce all documents that show the difference in price of the Hertz stock when Plaintiff first placed an order to sell same during a T1 Halt (as described in the Complaint) and when Defendant actually effectuated that order.

ANSWER:

12. Please produce all documents that identify the time difference between when Plaintiff placed her order to sell Hertz stock during a T1 Halt (as described in the Complaint) and when Defendant actually effectuated that transaction.

ANSWER:

13. Please produce all documents that identify the time difference between when any of Defendant's customer placed a trade order during a T1 Halt in the Discovery Time Period and when Defendant actually effectuated that transaction. This request is meant to discover each customer's time difference.

ANSWER:

14. Please produce all documents that show the difference in price of a stock when any of Defendant's customers first placed a trade order during a T1 Halt in the Discovery Time Period and when Defendant actually effectuated that order. This request is meant to discover each customer's price difference.

ANSWER:

15. Please produce all documents tending to show that Defendant notified its customers of any or all T1 Halts during the Discovery Time Period.

ANSWER:

16. Please produce all documents tending to show that Defendant notified its customers of any halts during the Discovery Time Period.

ANSWER:

17. Please produce all materials, documents, links and/or advertisements shown to, distributed to, or made available to Defendant's customers during the Discovery Time Period that refer to a T1 Halt, or any other type of halt.

ANSWER:

18. Please produce all documents that show Defendant's current policies and procedures relating to Defendant's customers placing orders to sell during T1 Halts and/or Defendant effectuating these orders during T1 Halts.

ANSWER:

19. Please produce all documents that show Defendant's previous policies and procedures relating to Defendant's customers placing orders to sell during T1 Halts and/or Defendant effectuating these orders during T1 Halts.

ANSWER:

20. Please produce all of your manuals, written policies, written procedures, or the like, that discuss or refer to a T1 Halt, which were in effect during the Discovery Time Period.

ANSWER:

21. Please produce all documents that show how Defendant is notified, or otherwise becomes aware, of a T1 Halt, during the Discovery Time Period.

ANSWER:

22. Please produce all documents that show how Defendant is notified, or otherwise becomes aware, of any halt during the Discovery Time Period.

ANSWER:

23. Please produce any complaints and/or discovery from any other case in which any plaintiff or class of plaintiffs has made allegations relating to T1 Halts and orders placed during same.

ANSWER:

24. Please produce all documents showing how many T1 Halts applied to stocks Defendant transacted business in during the Discovery Time Period.

ANSWER:

25. Please produce all documents showing the stocks Defendant transacted business in that had T1 Halts applied to them during the Discovery Time Period.

ANSWER:

26. Please produce all documents showing how many halts, regardless of the type, applied to stocks Defendant transacted business in during the Discovery Time Period.

ANSWER:

27. Please produce all documents that show, in any way, all trade orders placed during a T1 Halt which were not immediately effectuated by Defendant because of the T1 Halt.

ANSWER:

28. Please produce all documents showing all communications between Defendant's customers and Defendant that refer to T1 Halts and/or Hertz stocks during the Discovery Time Period.

ANSWER:

29. Please produce all documents showing that you provided any information to any beginner, novice, or newcomer stock trader (as showing on your website) during the Discovery Time Period.

ANSWER:

30. Please produce all documents you will use in opposition to Plaintiff's contention that this lawsuit meets any requirements of a class action.

ANSWER:

31. Please produce all documents that tend to show the facts you rely on to support your Affirmative Defenses, as stated in your Answer.

ANSWER:

**EXHIBIT  5**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(Miami Division)

**CASE NO. 20-CV-24897-CMA**

SHITERNA PINCHASOV, Individually and
on Behalf of All Others Similarly Situated,

      Plaintiff(s),

           v.

ROBINHOOD FINANCIAL LLC,

      Defendant.

_____/

**<u>NOTICE OF SERVING PLAINTIFF'S</u>**
**<u>FIRST INTERROGATORIES TO DEFENDANT</u>**

      The Plaintiff, SHITERNA PINCHASOV, Individually and on Behalf of All Others Similarly Situated, by and through its undersigned attorneys, propound the attached First Interrogatories to be answered under oath by the Defendant, ROBINHOOD FINANCIAL, LLC, in accordance with the applicable Federal Rules of Civil Procedure.

      Dated: June 14, 2021.

Respectfully submitted,

Michael A. Citron, Esq.
Florida Bar No.: 105083
**MAC LEGAL, P.A.**
4601 Sheridan Street, Ste. 205
Hollywood, Florida 33021
Telephone: (954) 395-2954
Michael@maclegalpa.com – Correspondence
Service@maclegalpa.com - Service Address

Igor Hernandez, Esq.
Florida Bar No. 106386
**CORNISH HERNANDEZ GONZALEZ, PLLC**

2525 Ponce de Leon Blvd, Suite 300
Coral Gables, Florida 33134
Telephone: (305) 780-6058
service@CHGLawyers.com
ihernandez@chglawyers.com

Ely R. Levy, Esq.
Florida Bar No.: 15452
Venessa Valdes Solis, Esq.
Florida Bar No. 77122
**LEVY & PARTNERS, PLLC**
3230 Stirling Road, Suite 1
Hollywood, Florida 33021
Telephone: (954) 727-8570
elevy@lawlp.com – Service Address
venessa@lawlp.com – Service Address
Maritza@lawlp.com – Service Address

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 14, 2021, the foregoing document is being served this

day on all counsel of record or pro se parties identified on the attached service list in the manner

specified.

By:      /s/ Venessa V. Solis
          VENESSA V. SOLIS, ESQ.

## <u>SERVICE LIST</u>

Grace L. Mead, Esq.
Ryan T. Thornton, Esq.
**STEARNS WEAVER MILLER**
Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: 305-789-3200
Email: gmead@stearnsweaver.com
 Email: rthornton@stearnsweaver.com

Maeve L. O'Connor, Esq. (*pro hac vice* application forthcoming)
Elliot Greenfield, Esq. (*pro hac vice* application forthcoming)
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, New York 10022
Telephone: 212.909.6000
Email: mloconnor@debevoise.com
Email: egreenfield@debevoise.com

## <u>DEFINITIONS AND INSTRUCTIONS</u>

For the purposes of these requests, the following definitions and instructions shall apply:

1.          "You", "Yours", "Your", and "Defendant" shall refer to ROBINHOOD FINANCIAL, LLC, including its respective managers, members, managing members, employees, attorneys, accountants, affiliates, agents, associates, representatives, investigators, assistants, secretaries, and all other persons who have acted on its behalf and/or who are or have been in possession of or may have obtained information for or on behalf of it in any manner with respect to any matter referred to in the pleadings in the above-styled cause.

2.          Plaintiff shall refer to SHITERNA PINCHASOV, Individually and on Behalf of All Others Similarly Situated.

3.          The "Discovery Time Period" shall refer to the four (4) years preceding the filing of the subject Complaint.

4.          If there were any changes in the policy or procedure relating to the substance of the Interrogatory during the Discovery Time Period to the present, state in your answer all such policies and procedures in effect during that general period, further specifying when each policy and procedure was in effect.

5.          Whenever the word "identify" is used with reference to a document, you are requested to state:

  a.  The date of creation;

  b.  The person(s) responsible for creating it;

  c.  The place where the document is stored currently (along with identifying the custodian of said document);

  d.  The type of document (e.g. letter, memorandum, etc.).

6.          Whenever the word "identify" is used with reference to a natural person, you

are requested to state:

      a.  His or her full name;

      b.  Title or position;

      c.  Last known home and business addresses and telephone numbers; and

      d. Current employer, dates of employment, job title, job responsibilities, business address, and telephone number.

7.      Whenever the word "identify" is used with reference to an entity other than a natural person, you are requested to state:

      a.  Its name;

      b.  The address and telephone number of its principal place of business;

      c.  Its owner; and

      d.  Its commercial name and address.

7.      The term "person" means any natural person, partnership, corporation, firm, association, group, organization or other entity of any nature.

8.      The terms "and" and "or" have both the conjunctive and disjunctive meanings.

9.      The terms "document" or "documents" mean all written, typed, printed, reported, recorded or graphic matter and all photographic matters or sound reproduction tapes, records, or other devices, however produced, reproduced, or stored, now or formerly within your actual or constructive possession, custody or control, including but not limited to in their original or native format. "Document" or "documents" shall include, but are not limited to, all telegrams, , telexes, cables, telephone records, telephone bills, memoranda (circulated and uncirculated), market studies, correspondence, e-mails, reports, studies, compilations of data, filings, files, internal policies or rules or regulations, minutes, agenda, requests, records, charts', lists, analyses, graphs, diagrams, schematics, blueprints, specifications, worksheets, change orders, drawings, cost

estimates, books, expense reports, notebooks, notes, diaries, appointment books, calendars, recordings, transcriptions, computer discs, file cards, computer printouts, computer programs, microfilm, microfiche, video tapes, media articles or reports, accounts, books and records, ledgers, journals and other financial records, audits, instructions, questionnaires, profit and loss statements, financial statements, annual reports, state and federal tax returns, checkbooks, canceled checks, billings, contracts or agreements or releases, and any drafts, copies, or reproductions of the foregoing; and any copy of the foregoing upon which any notations in any form have been made which do not appear on the originals; and any copy of the foregoing upon which any language, notation or comments, in any form, which appear on the original or any other copy have been deleted, highlighted, altered or edited.

   10. The term "record" or "records" is defined as all writings of any kind, including the originalsand all non-identical copies, whether different from the original due to any notation made on suchcopies or otherwise, including (without limitation) correspondence, memoranda, notes, diaries, statistics, letters, telegrams, reports, studies, statements, summaries. interoffice and intra-office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, printed matters, computer printouts, all drafts, alterations, modifications, changes, amendments of any of the foregoing, records or documents or representations of any kind, including (without limitation) photographs, charts, graphs, microfiches, microfilm, videotape, recordings, motion picture, and electronic mechanical or electric records or representation of kind, including (without limitation) tapes, cassettes and disc recordings. This includes but is not limited to in their original or native format.

   11. The terms "relate to," "relates to" or "relating to" mean concerning, respecting, referring to, summarizing, digesting, embodying, reflecting, establishing or not establishing,

tending to establish, derogating from, tending not to establish, evidencing or not evidencing, comprising, connected with, commonly known as, used in putting together, commenting on, responding to, agreeing or disagreeing with, showing, describing, reporting on, analyzing, evaluating, interpreting, representing, constituting or including.

12.     The terms "detailing," "describing," "showing," "concerning," "pertaining to," "relating to," "referring to," "describing," "evidencing," "constituting," "comprising," "memorializing," "commenting on," "regarding," "discussing," "reflecting," "in connection with," or "analyzing" or any other derivatives thereof, shall be construed as interchangeable and include within their scope any legal, logical, or factual connection with the matter discussed.

13.     The term "communication" shall mean the transmittal of information and includes any written, oral, telephonic or other inquiry, representation, discussion, conversation, agreement, understanding, meeting memorandum, letter, note, telegram, advertisement or interview, including but not limited to in their original or native format.

14.     The term "identify" or "list" when used with reference to (i) an individual person means to state his or her full name, employer, job title, present or last known address and telephone number, and present or last known business address and telephone number; (ii) a document means to state the type of document (e.g., letter, memorandum, etc.) and its date, author, addressee, general subject matter and present location and custodian.  (If any document was, but no longer is, in your possession, state what disposition was made of it and the facts or reasons for such disposition.

15.     The term "information" shall be expansively construed and shall include, but not be limited to, facts, data, opinions, images, impressions, concepts and formulae.

16.     The term "in furtherance of" shall mean "for", "for the sake of", "in favor of", "in

the name of", "in the service of", "on account of", "on behalf of", and include within its scope any legal, logical, or factual connection with the matter discussed.

17.     All words in the present tense include the past and all words in the past tense include the present.

18.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others as appropriate in the context.

19.     The terms "and" and "or" mean either the conjunctive or disjunctive as context may requireso that the meaning is inclusive rather than exclusive.

20.     The term "damages" shall mean monetary compensation that may be awarded by a court in a civil action to an individual who has been injured through the wrongful conduct of another party.

21.     In responding to these interrogatories, you are requested to provide all information known or available to you at the time of your response, regardless of whether such information is possessed directly by you, your representatives, agents or investigators, or by your attorneys or by their agents or representatives.

22.     If any documents requested or responsive to these requests cannot be produced in full, thenanswer to the extent possible and state the reason or reasons for your inability to produce the documents.

23.     These interrogatories are continuing so as to require supplemental responses in the event that Defendant or any person acting on Defendant's behalf obtains additional documents or information called for by these requests. If further information is obtained of the nature sought by these requests after the service of your answer, you are specifically requested to supply such further information to the Plaintiffs.

24.      If any request is not clear enough, do not answer that the question is vague or other similarresponse, but telephone or email the undersigned attorney for a clarification. If your response is that a request is duplicative of another request state which request asks for thesame information and state that your answer is the same as that provided in response to thatother request. When asked to "detail" a transaction, other event, or state of affairs, provideenough factual content and relevant information as to fairly communicate a meaningful answer.

## **FIRST INTERROGATORIES TO DEFENDANT**

1. Please state the name(s) of the person(s) answering these interrogatories, his or her place of employment, business address and claimed authority for answering these interrogatories on behalf of the Defendant.

ANSWER:

2. State all facts, and identify all documents or other sources of information, concerning your denial in the answer to the plaintiffs' class action complaint that the definition of the classes does not meet the standards for implementation, prosecution, or maintenance under Federal Rule of Civil Procedure 23(a), 23(b)(1)(A), 23(b)(2), and/or 23(b)(3).

ANSWER:

3.  State all facts, and identify all documents or other sources of information, concerning your denial in the answer to the plaintiffs' class action complaint that the questions of law and fact are common to the classes and predominate over any question affecting only individual class members. This question assumes a response was required for paragraph 46 of Plaintiff's complaint.

ANSWER:

4.  State all facts, and identify all documents or other sources of information, concerning your denial in the answer to the Plaintiff's class action complaint that the claims of Plaintiff are typical of the claims of her respective class. This question assumes a response was required for paragraph 44 of Plaintiff's complaint.

ANSWER:

5.  State all facts, and identify all documents or other sources of information, concerning your denial of the allegations in the answer to the plaintiffs' class action complaint that the plaintiffs will fairly and adequately represent the interest of the classes in that the plaintiffs' claims are typical of those of the class members. This question assumes a response was required for paragraph 49 of Plaintiff's complaint.

ANSWER:

6.  State all facts, and identify all documents or other sources of information, concerning your denial of the allegations in the answer to the plaintiffs' class action complaint that maintenance of this action as a class action is a fair and efficient method for adjudication of those controversy. This question assumes a response was required for paragraph 47 of Plaintiff's complaint.

ANSWER:

7. State all facts, and identify all documents or other sources of information, concerning your denial of the allegations in the answer to the plaintiffs' class action complaint that "Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense, and risk of inconsistent rulings that numerous individual actions would cause." This interrogatory assumes that a response was required for paragraph 47 of Plaintiff's complaint.

ANSWER:

8. Identify the contract in effect during the Discovery Time Period for all of Defendant's customers that placed an order to sell during a T1 Halt during the Discovery Time Period, to include where this contract is kept by Defendant and in what form. If there is more than one contract, please state the differences for each and why there are more than one contract. If there were amendments to any contract, please state the reasons for amendments and how this amended contract was relayed to the customers.

ANSWER:

9. "Identify" all non-expert witnesses you intend to and/or will call to testify at any hearing on class certification and state the substance of their testimony.

ANSWER:

10. Identify all expert witnesses you intend to and/or will call to testify at any hearing on class certification and state the substance of their testimony or opinions. This should include:

a) the expert's name, business address, occupation, employer, and/or title;

b) a summary of the expert's educational background, employment history, and membership in professional associations;

c) the subject matter about which the expert is expected to and/or will testify;

d) a summary of the grounds for each opinion, including without limitation, a statement of the facts and assumptions upon which the expert relies and/or will rely for each opinion and identification of all documents upon which the expert relies and/or will rely for each opinion.

ANSWER:

11. State the total number of Defendant's customers who placed an order to sell during a T1 Halt during the "Discovery Time Period" and identify all documents which one could refer to make this determination.

ANSWER:

12. Describe any types of records in your possession to which one could refer to determine:

a) the identity of Defendant's customers who placed an order to sell during a T1 Halt during the "Discovery Time Period";

b) the timing of when these orders went through;

c) the price of the stock when the order to sell was placed by the customer;

d) the price of the stock when the order to sell was effectuated by Defendant.

ANSWER:

13. Identify any and all materials, documents, links and/or advertisements shown to, distributed to, or made available to Defendant's customers during the Discovery Time Period that refer to a T1 Halt, or any other type of halt, and how it relates to customers' transactions.

ANSWER:

14. State the ways in which your policies and procedures relating to Defendant's customers placing orders to sell during T1 Halts and/or Defendant effectuating these orders during T1 Halts has changed during the Discovery Time Period, being sure to specify the dates of the changes and the reasons for the changes.

ANSWER:

15. Set forth in a list any and all of your manuals, written policies, written procedures, or the like, which were in effect during the Discovery Time Period that discuss a T1 Halt, to include where each one is kept by Defendant and in what form.

ANSWER:

16. "Identify" any and all officers, directors or employees of Defendant having knowledge of T1 Halts, to include how Defendant is notified, or otherwise becomes aware, of a T1 Halt, how T1 Halts affect orders to sell placed by customers during the Discovery Time Period, how T1 Halts affect Defendant's actions related to customers' orders, if at all, and state the substance of these persons knowledge related to same.

ANSWER:

17. "Identify" the person most knowledgeable about your document retention related to T1 Halts and customer orders to sell/Defendant effectuating customer orders to sell placed during same, including but not limited to storage, access of, and searching electronic information stored by you relating to these types of transactions during the Discovery Time Period.

ANSWER:

18. "Identify" any other court actions or arbitrations in which any plaintiff or class of plaintiffs has made allegations relating to T1 Halts and orders placed during same.  This interrogatory, like all the interrogatories contained herein, is covered by the ongoing duty to supplement answers as provided in Federal Rule of Civil Procedure 26(e).

ANSWER:

_____

By: _____

**STATE OF FLORIDA**
**COUNTY OF** _____

        BEFORE ME, the undersigned authority, personally appeared, _____, who is personally known to me or who has produced _____ as identification and who, after being duly sworn, deposes and states that the above matters contained in the Answers to Interrogatories are true and correct to the best of his/her information and belief.

        SWORN TO AND SUBSCRIBED before me this ___ day of _____, 2021.

_____
NOTARY PUBLIC

_____
Commission Expires: _____

(seal)