**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 20-cv-24897-CMA/Torres**

SHTERNA PINCHASOV, on her own behalf, and on
behalf of those similarly situated,

       Plaintiff,

v.

ROBINHOOD FINANCIAL, LLC,

       Defendant

_____/

**DECLARATION OF BRANDON FETZER IN SUPPORT OF DEFENDANT**
**ROBINHOOD FINANCIAL LLC'S BRIEF IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION**

I, Brandon Fetzer, do hereby declare and state the following pursuant to 28 U.S.C. § 1746:

1.      I am an associate at Debevoise & Plimpton LLP and a member of the Bar of the State of New York representing Defendant Robinhood Financial LLC ("RHF") in connection with this matter.  I make this declaration on personal knowledge and in support of RHF's brief in opposition to Plaintiff's motion for class certification.

2.      Attached as **Exhibit 1** is a true and accurate copy of a U.S. Securities and Exchange Commission article entitled "Trading Halts and Delays," dated July 23, 2010, available at https://www.sec.gov/fast-answers/answerstradinghalthtm.html.

3.      Attached as **Exhibit 2** is a true and accurate copy of Nasdaq Rule 4120, "Limit Up-Limit Down Plan and Trading Halts," available at https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/nasdaq-equity-4.

4.      Attached as **Exhibit 3** is a true and accurate copy of the New York Stock Exchange Listed Company Manual § 202.07, "Trading Halt Procedures," available at https://nyse.wolterskluwer.cloud/listed-company-manual.

5.      Attached as **Exhibit 4** is a true and accurate copy of the FINRA Rule 5260, "Prohibition on Transactions, Publication of Quotations, or Publication of Indications of Interest During Trading Halts," available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/5260.

6.      Attached as **Exhibit 5** is a true and accurate copy of the Robinhood Customer Agreement that was in effect from June 22, 2020 through December 30, 2020.

7.      Attached as **Exhibit 6** is a true and accurate copy of an educational article entitled "Market Volatility, Circuit Breakers, and Trading Halts," available on the Robinhood website at https://robinhood.com/us/en/support/articles/trading-halts/.

8.      Attached as **Exhibit 7** is a true and accurate copy of an article entitled "Trading Halts / Data Fields & Definitions," available at https://www.nasdaqtrader.com/trader.aspx?id=tradehaltcodes.

9.      Attached as **Exhibit 8** is a true and accurate copy of an announcement entitled "NYSE Equities – Regulatory Halt in HTZ," dated May 26, 2020, available at https://www.nyse.com/trader-update/history#110000260174.

10.     Attached as **Exhibit 9** is a true and accurate copy of a *Dow Jones Newswire* article entitled "Hertz Global Holdings Inc. (HTZ) Halted due to news pending," dated May 26, 2020.

11.     Attached as **Exhibit 10** is a true and accurate copy of a record, bearing the Bates number RH_HT_00000299, showing Plaintiff's orders to buy the common stock of Hertz Global Holdings Inc. on April 29, 2020, Plaintiff's order to sell that stock on May 26, 2020, and time stamps of the orders and executions.

12.     Attached as **Exhibit 11** is a true and accurate copy of a Trade Confirmation, bearing Bates numbers RH_HT_00000035-36 and dated April 29, 2020, showing Plaintiff's orders to buy the common stock of Hertz Global Holdings Inc. and the prices at which the orders were executed.

13.     Attached as **Exhibit 12** is a true and accurate copy of a Trade Confirmation, bearing Bates numbers RH_HT_00000037-41 and dated May 26, 2020, showing Plaintiff's order

to sell the common stock of Hertz Global Holdings Inc. and the price at which the order was executed.

14.     Attached as **Exhibit 13** is a true and accurate copy of an announcement by Hertz Global Holdings Inc. entitled "Hertz Global Holdings Takes Action To Strengthen Capital Structure Following Impact Of Global Coronavirus Crisis," dated May 22, 2020, available at https://newsroom.hertz.com/2020-05-22-Hertz-Global-Holdings-Takes-Action-To-Strengthen-Capital-Structure-Following-Impact-Of-Global-Coronavirus-Crisis.

15.     Attached as **Exhibit 14** is a true and accurate copy of a *New York Times* article entitled "Hertz, Car Rental Pioneer, Files for Bankruptcy Protection," dated May 22, 2020, available at https://www.nytimes.com/2020/05/22/business/hertz-bankruptcy-coronavirus-car-rental.html.

I declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 19th day of August, 2021, at New York, New York.**


        */s/ Brandon Fetzer*

        Brandon Fetzer

# EXHIBIT 1

Fast Answers

# Trading Halts and Delays

Securities exchanges, such as the New York Stock Exchange (NYSE) as well as the Nasdaq Stock Market, have the authority to halt and delay trading in a security. A trading halt—which typically lasts less than an hour but can be longer—is called during the trading day to allow a company to announce important news or where there is a significant order imbalance between buyers and sellers in a security. A trading delay (or "delayed opening") is called if either of these situations occurs at the beginning of the trading day.

There are two types of trading halts and delays—regulatory and nonregulatory. The most common regulatory halt and delay happen when a company has pending news that may affect the security's price (a "news pending" halt or delay). By halting or delaying trading, market participants can have time to assess the impact of the news. Another type of regulatory halt happens when a market halts trading in a security when there is uncertainty over whether the security continues to meet the market's listing standards. When a regulatory halt or delay is imposed by a security's primary market, the other U.S. markets that also trade the security honor this halt.

Nonregulatory halts or delays occur on exchanges, such as the NYSE (but not on Nasdaq), when there is a significant imbalance in the pending buy and sell orders in a security. When an imbalance occurs, trading is stopped to alert market participants to the situation and to allow the exchange specialists to disseminate information to investors concerning a price range where trading may begin again on this exchange. A nonregulatory trading halt or delay on one exchange does not preclude other markets from trading this security.

You can find out what stocks have had their trading halted on the NYSE and the Nasdaq Stock Market, as well as on the OTC Bulletin Board.

The SEC does not halt or delay trading in a security for news pending or order imbalances, but it can suspend trading for up to ten days and, if appropriate, take action to revoke a security's registration. For more information about the SEC's authority to suspend trading in a security, please read "Trading Suspension! When the SEC Suspends Trading in a Stock" in our Fast Answers databank.

> We have provided this information as a service to investors. It is neither a legal interpretation nor a statement of SEC policy. If you have questions concerning the meaning or application of a particular law or rule, please consult with an attorney who specializes in securities law.

*Modified: July 23, 2010*

# EXHIBIT 2

Listing Center 

## EQUITY 4 EQUITY TRADING RULES

### 4110. Use of Nasdaq on a Test Basis

Notwithstanding the listing standards set forth in the Rule 5000 Series, Nasdaq may at any time authorize the use of its systems on a test basis for whatever studies it considers necessary and appropriate.

Adopted Jan. 13, 2006 (SEC Release 34-53128); amended Nov. 23, 2020 (SR-NASDAQ-2020-079).

### 4120. Limit Up-Limit Down Plan and Trading Halts

(a) **Authority to Initiate Trading Halts or Pauses**

In circumstances in which Nasdaq deems it necessary to protect investors and the public interest, Nasdaq, pursuant to the procedures set forth in paragraph (c):

(1) may halt trading on Nasdaq of a Nasdaq-listed security to permit the dissemination of material news, provided, however, that in the Pre-Market Session (as defined in section 4120(b)(4)) Nasdaq will halt trading for dissemination of news only at the request of an issuer or pursuant to section (a)(2) below; or

(2) may halt trading on Nasdaq of a security listed on another national securities exchange during a trading halt imposed by such exchange to permit the dissemination of material news; or

(3) may halt trading on Nasdaq: (A) in a security listed on another national securities exchange when such exchange imposes a trading halt in that security because of an order imbalance or influx ("operational trading halt"); or (B) Nasdaq market makers in a security listed on Nasdaq, when the security is a derivative or component of a security listed on another national securities exchange and such exchange imposes an operational trading halt in that security. In the event that Nasdaq halts trading, Nasdaq Participants may commence quotations and trading at any time following initiation of operational trading halts, without regard to procedures for resuming trading set forth in paragraph (c); or

(4) may halt trading in an American Depository Receipt ("**ADR**") or other security listed on Nasdaq, when the Nasdaq-listed security or the security underlying the ADR is listed on or registered with another national or foreign securities exchange or market, and the national or foreign securities exchange or market, or regulatory authority overseeing such exchange or market, halts trading in such security for regulatory reasons; or

(5) may halt trading in a security listed on Nasdaq when Nasdaq requests from the issuer information relating to:

(A) material news;

(B) the issuer's ability to meet Nasdaq listing qualification requirements, as set forth in the Listing Rule 5000 Series; or

(C) any other information which is necessary to protect investors and the public interest.

(6) may halt trading in a security listed on Nasdaq when

(A) extraordinary market activity in the security is occurring, such as the execution of a series of transactions for a significant dollar value at prices substantially unrelated to the current market for the security, as measured by the national best bid and offer, and

(B) Nasdaq determines that such extraordinary market activity is likely to have a material effect on the market for the security; and

(C)

(i) Nasdaq believes that such extraordinary market activity is caused by the misuse or malfunction of an electronic quotation, communication, reporting, or execution system operated by, or linked to, Nasdaq;

(ii) After consultation with another national securities exchange trading the security on an unlisted trading privileges basis, Nasdaq believes that such extraordinary market activity is caused by the misuse or malfunction of an electronic quotation, communication, reporting, or execution system operated by, or linked to, such other national securities exchange; or

(iii) After consultation with FINRA regarding a FINRA facility trading the security, Nasdaq believes that such extraordinary

market activity is caused by the misuse or malfunction of such FINRA facility or an electronic quotation, communication, reporting, or execution system linked to such FINRA facility.

(7) may halt trading in a security that is the subject of an Initial Public Offering on Nasdaq.

(8) may halt trading in an index warrant on Nasdaq whenever Nasdaq Regulation shall conclude that such action is appropriate in the interests of a fair and orderly market and to protect investors. Among the factors that may be considered are the following:

    (A) trading has been halted or suspended in underlying stocks whose weighted value represents 20 or more of the index value;

    (B) the current calculation of the index derived from the current market prices of the stocks is not available;

    (C) other unusual conditions or circumstances detrimental to the maintenance of a fair and orderly market are present.

(9) may halt trading in a series of Portfolio Depository Receipts, Index Fund Shares (as defined in Rule 5705), Index-Linked Exchangeable Notes, Equity Gold Shares, Trust Certificates, Commodity-Based Trust Shares, Currency Trust Shares, Commodity Index Trust Shares, Commodity Futures Trust Shares, Partnership Units, and Managed Trust Securities (as defined in Rule 5711(a) - (h) and (j), respectively), or NextShares (as defined in Rule 5745) listed on Nasdaq if the Intraday Indicative Value (as defined in Rule 5705), for Portfolio Depository Receipts or Index Fund Shares, for derivative securities as defined in Rule 5711(a), (b), and (d) - (h), Rule 5711(j) for Managed Trust Securities, or Rule 5745 for NextShares) or the index value applicable to that series is not being disseminated as required, during the day in which the interruption to the dissemination of the Intraday Indicative Value or the index value occurs. If the interruption to the dissemination of the Intraday Indicative Value or the index value persists past the trading day in which it occurred, Nasdaq will halt trading no later than the beginning of the trading day following the interruption. Nasdaq may also exercise discretion to halt trading in a series of Portfolio Depository Receipts, Index Fund Shares, Exchange Traded Fund Shares (as defined in Rule 5704), Managed Fund Shares, Index-Linked Exchangeable Notes, Equity Gold Shares, Trust Certificates, Commodity-Based Trust Shares, Currency Trust Shares, Commodity Index Trust Shares, Commodity Futures Trust Shares, Partnership Units, Trust Units (as defined in Rule 5711(i)), Managed Trust Securities, Currency Warrants (as defined in Rule 5711(k)), NextShares, or Proxy Portfolio Shares (as defined in Rule 5750) based on a consideration of the following factors: (A) trading in underlying securities comprising the index or portfolio applicable to that series has been halted in the primary market(s), (B) the extent to which trading has ceased in securities underlying the index or portfolio, or (C) the presence of other unusual conditions or circumstances detrimental to the maintenance of a fair and orderly market.

(10) shall halt trading in Derivative Securities Products (as defined in Rule 4120(b)(4)(A)) for which a net asset value ("NAV") (and in the case of Managed Fund Shares under Rule 5735, a Disclosed Portfolio, in the case of NextShares under Rule 5745, a Composition File, and in the case of Proxy Portfolio Shares, a Proxy Basket, or the Fund Portfolio) is disseminated if Nasdaq becomes aware that the NAV (or in the case of Managed Fund Shares, the Disclosed Portfolio, in the case of NextShares, the Composition File, or in the case of Proxy Portfolio Shares, the Proxy Basket, or the Fund Portfolio) is not being disseminated to all market participants at the same time.

Nasdaq will maintain the trading halt until such time as Nasdaq becomes aware that the NAV (or in the case of Managed Fund Shares, the Disclosed Portfolio, or in the case of NextShares, the Composition File, or in the case of Proxy Portfolio Shares, the Proxy Basket, or the Fund Portfolio as applicable) is available to all market participants or, in the case of Derivative Securities Products traded on Nasdaq pursuant to unlisted trading privileges, until such time trading resumes in the listing market.

(11) shall, between 9:45 a.m. and 3:35 p.m., or in the case of an early scheduled close, 25 minutes before the close of trading, immediately pause trading for 5 minutes in any Nasdaq-listed security not covered by the Limit Up-Limit Down Plan, other than rights and warrants, when the price of such security moves a percentage specified below within a 5-minute period.

    (A) The price move shall be 10% or more with respect to securities included in the S&P 500® Index, Russell 1000® Index, and a pilot list of Exchange Traded Products;

    (B) The price move shall be 30% or more with respect to all Tier 2 NMS Stocks with a price equal to or greater than $1; and

    (C) The price move shall be 50% or more with respect to all Tier 2 NMS Stocks with a price less than $1.

The determination that the price of a stock is equal to or greater than $1 under paragraph (a)(11)(B) above or less than $1 under paragraph (a)(11)(C) above shall be based on the last reported closing price on Nasdaq.

At the end of the trading pause, Nasdaq will re-open the security using the Halt Cross process set forth in Nasdaq Rule 4753. In the event of a significant imbalance at the end of a trading pause, Nasdaq may delay the re-opening of a security.

Nasdaq will issue a notification if it cannot resume trading for a reason other than a significant imbalance.

Price moves under this paragraph will be calculated by changes in each consolidated last-sale price disseminated by a network processor over a five minute rolling period measured continuously. Only regular way in-sequence transactions qualify

for use in calculations of price moves. Nasdaq can exclude a transaction price from use if it concludes that the transaction price resulted from an erroneous trade.

If a trading pause is triggered under this paragraph, Nasdaq shall immediately notify the single plan processor responsible for consolidation of information for the security pursuant to Rule 603 of Regulation NMS under the Securities Exchange Act of 1934. If a primary listing market issues an individual stock trading pause, Nasdaq will pause trading in that security until trading has resumed on the primary listing market or notice has been received from the primary listing market that trading may resume. If the primary listing market does not reopen within 10 minutes of notification of a trading pause, Nasdaq may resume trading the security.

The provisions of this paragraph shall be in effect during a pilot set to end on the earlier of the initial date of operations of the Regulation NMS Plan to Address Extraordinary Market Volatility or February 4, 2014.

Operative as of April 8, 2013

(12) **Limit Up-Limit Down Mechanism**.

    (A) **Definitions**.

        (1) "**Plan**" means the Plan to Address Extraordinary Market Volatility Submitted to the Securities and Exchange Commission Pursuant to Rule 608 of Regulation NMS under the Securities Exchange Act of 1934, Exhibit A to Securities Exchange Act Release No. 67091 (May 31, 2012), 77 FR 33498 (June 6, 2012).

        (2) All capitalized terms not otherwise defined in this Rule shall have the meanings set forth in the Plan or Exchange rules, as applicable.

    (B) **Exchange Participation in the Plan**. The Exchange is a Participant in, and subject to the applicable requirements of, the Plan, which establishes procedures to address extraordinary volatility in NMS Stocks.

    (C) **Member Organization Compliance**. Member organizations shall comply with the applicable provisions of the Plan.

    (D) **Exchange Compliance with the Plan**. Exchange systems shall not display or execute buy (sell) interest above (below) the Upper (Lower) Price Bands, unless such interest is specifically exempted under the Plan.

    (E) **Repricing and Cancellation of Interest**. Exchange systems shall reprice and/or cancel buy (sell) interest that is priced or could be executed above (below) the Upper (Lower) Price Band. Any interest that is repriced pursuant to this Rule shall receive a new time stamp and new execution priority.

        (1) **Market Orders**. If a market order with a time in force other than Immediate or Cancel cannot be fully executed at or within the Price Bands, Exchange systems shall post the unexecuted portion of the buy (sell) market order at the Upper (Lower) Price Band.

        (2) **Limit-priced Interest**. Both displayable and non-displayable incoming limit-priced interest to buy (sell) that is priced above (below) the Upper (Lower) Price Band shall be repriced to the Upper (Lower) Price Band.

            (a) For limit-priced orders entered via the OUCH protocol, the order shall be repriced upon entry only if the Price Bands are such that the price of the limit-priced interest to buy (sell) would be above (below) the upper (lower) Price Band. Once slid:

                (i) if the Price Bands move such that the price of the order to buy (sell) would be below (above) the lower (upper) Price Band, the order will not be re-priced again. Rather, the order will either remain on the book at the same price or be cancelled back to the entering party, depending on how the entering party has configured its order entry port.

                (ii) if the Price Bands move such that the price of the order to buy (sell) would be above (below) the upper (lower) Price Band, the order will not be re-priced again. Rather, the order will be cancelled.

            (b) For limit-priced orders entered via RASH or FIX protocols, the order shall be eligible to be repriced by the system multiple times if the Price Bands move such that the price of resting limit-priced interest to buy (sell) would be above (below) the upper (lower) Price Band. Once slid, if the Price Bands again move such that the price of resting limit interest to buy (sell) would be below (above) the upper (lower) Price Band the order will continue to be repriced either to its original limit price or to the new price bands, whichever is less aggressive.

        (3) **IOC Orders**. If an IOC order cannot be fully executed at or within the Price Bands, Exchange systems shall cancel any unexecuted portion of the IOC Order.

        (4) **Routable Orders**. With the exception of Directed Orders, and orders submitted using either the DOTI or DOTZ routing strategy, the Exchange systems shall not route buy (sell) interest to an away market displaying a sell (buy) quote that is above (below) the Upper (Lower) Price Band. Orders that are eligible to be routed to away destinations will be price slid before routing if the buy (sell) is priced above (below) the Upper (Lower) Price Band.

(5) **Auction Orders**. On close or halt auction orders are not price slid or cancelled due to LULD price bands.

(6) **Sell Short Orders**. During a Short Sale Price Test, as defined in Rule 4763(b), Short Sale Orders priced below the Lower Price Band shall be repriced to the higher of the Lower Price Band or the Permitted Price, as defined in Rule 4763(b).

(F) **Trading Pause during a Straddle State**. The Exchange may declare a Trading Pause for a NMS Stock listed on the Exchange when (i) the National Best Bid (Offer) is below (above) the Lower (Upper) Price Band and the NMS Stock is not in a Limit State; and (ii) trading in that NMS Stock deviates from normal trading characteristics.

(G) If the Exchange is unable to reopen trading due to a systems or technology issue, it shall notify the Processor immediately.

(H) **Re-opening of Trading following a Trading Pause**. At the end of the Trading Pause, the Exchange shall re-open the security in a manner similar to the procedures set forth in Rule 4753, provided that following a Trading Pause that exists at or after 3:50 p.m. a stock shall re-open via a LULD Closing Cross pursuant to Rule 4754(b)(6). If a Trading Pause was initiated by another exchange, Nasdaq may resume trading following the Trading Pause upon receipt of the Price Bands from the Processor.

(13) shall halt trading in an Equity Investment Tracking Stock (as defined in Rule 5005) or Subscription Receipt (listed under Rule 5520) whenever Nasdaq halts or suspends trading in a security such Equity Investment Tracking Stock tracks or the common stock into which the Subscription Receipt is exchangeable.

(b) **Trading Halts for Trading of Certain Derivative Securities Products on Nasdaq Pursuant to Unlisted Trading Privileges**

(1) **During Pre-Market Session**. If a Derivative Securities Product begins trading on Nasdaq in the Pre-Market Session and subsequently a temporary interruption occurs in the calculation or wide dissemination of an applicable Required Value, Nasdaq may continue to trade the Derivative Securities Product for the remainder of the Pre-Market Session.

(2) **During Regular Market Session**. During the Regular Market Session, if a temporary interruption occurs in the calculation or wide dissemination of an applicable Required Value, and the listing market halts trading in the Derivative Securities Product, Nasdaq, upon notification by the listing market of a halt due to such temporary interruption, also shall immediately halt trading in the Derivative Securities Product on Nasdaq.

(3) **Post-Market Session and Next Trading Day**.

(A) If an applicable Required Value continues not to be calculated or widely disseminated after the close of the Regular Market Session, Nasdaq may trade the Derivative Securities Product in the Post-Market Session only if the listing market traded the Derivative Securities Product until the close of its regular trading session without a halt.

(B) If an applicable Required Value continues not to be calculated or widely disseminated as of the beginning of the Pre-Market Session on the next trading day, Nasdaq shall not commence trading of the Derivative Securities Product in the Pre-Market Session that day. If an interruption in the calculation or wide dissemination of an applicable Required Value continues, Nasdaq may resume trading in the Derivative Securities Product only if calculation and wide dissemination of the applicable Required Value resumes or trading in the Derivative Securities Product resumes in the listing market.

(4) **Definitions**. For purposes of this Rule:

(A) Derivative Securities Product means a series of Exchange Traded Fund Shares, Portfolio Depository Receipts, Index Fund Shares, Managed Fund Shares, NextShares, Trust Issued Receipts, or Proxy Portfolio Shares (as defined in Rules 5704, 5705, 5735, 5745, 5720, and 5750 respectively), a series of Commodity-Related Securities (as defined in Equity 10, Section 8), securities representing interests in unit investment trusts or investment companies, Index- Linked Exchangeable Notes, Equity Gold Shares, Trust Certificates, Commodity-Based Trust Shares, Currency Trust Shares, Commodity Index Trust Shares, Commodity Futures Trust Shares, Partnership Units, Trust Units, Managed Trust Securities, or Currency Warrants (as defined in Rule 5711(a) - (k)), or any other UTP Derivative Security (as defined in Rule 5740).

(B) Pre-Market Session means the trading session that begins at 4:00 a.m. and continues until 9:30 a.m.

(C) Post-Market Session means the trading session that begins at 4:00 p.m. or 4:15 p.m., and that continues until 8:00 p.m.

(D) Regular Market Session means the trading session from 9:30 am. until 4:00 p.m. or 4:15 p.m.

(E) Required Value shall mean (i) the value of any index or any commodity-related value underlying a Derivative Securities Product, (ii) the indicative optimized portfolio value, intraday indicative value, or other comparable estimate of the value of a share of a Derivative Securities Product updated regularly during the trading day, (iii) a net asset value in the case of a Derivative Securities Product for which a net asset value is disseminated, and (iv) a Disclosed Portfolio in the case of a Derivative Securities Product that is a series of Managed Fund Shares, as defined in Rule 5735, or Managed Trust Securities, as defined in Rule 5711(j), and a Composition File in the case of a Derivative Securities Product that is a series of

NextShares, as defined in Rule 5745.

(c) **Procedure for Initiating and Terminating a Trading Halt**

(1) Nasdaq issuers are required to notify Nasdaq of the release of certain material news prior to the release of such information to the public as required by Rule 5250(b)(1).

(2) Except in emergency situations, notification shall be provided directly to Nasdaq's MarketWatch Department through Nasdaq's electronic disclosure system available at www.nasdaq.net. In emergency situations, issuers shall instead provide notification by telephone or facsimile.

(3) Upon receipt of information, from the issuer or other source, Nasdaq will promptly evaluate the information, estimate its potential impact on the market and determine whether a trading halt in the security is appropriate.

(4) (A) Should Nasdaq determine that a basis exists under Rule 4120(a) for initiating a trading halt, the commencement of the trading halt will be effective at the time specified by Nasdaq in a notice posted on a publicly available Nasdaq website. In addition, Nasdaq shall disseminate notice of the commencement of a trading halt through major wire services.

(B) During any trading halt or pause for which a halt cross under Rule 4753 will not occur, orders entered during the trading halt or pause will not be accepted, unless subject to instructions that the order will be directed to another exchange as described in Rule 4758.

(5) Trading in a halted security shall resume at the time specified by Nasdaq in a notice posted on a publicly available Nasdaq website. In addition, Nasdaq shall disseminate notice of the resumption of trading through major wire services.

(6)

(A) In the case of a trading halt under Rule 4120(a)(6) based on the misuse or malfunction of an electronic quotation, communication, reporting, or execution system that is not operated by Nasdaq, Nasdaq will promptly contact the operator of the system in question (as well as any national securities exchange or FINRA facility to which such system is linked) to ascertain information that will assist Nasdaq in determining whether a misuse or malfunction has occurred, what effect the misuse or malfunction is having on trading in a security, and what steps are being taken to address the misuse or malfunction. If the operator of the system is unavailable when contacted by Nasdaq, Nasdaq will continue efforts to contact the operator of the system to ascertain information that will assist Nasdaq in determining whether the trading halt should be terminated.

(B) A trading halt initiated under Rule 4120(a)(6) shall be terminated as soon as Nasdaq determines either that the system misuse or malfunction that caused the extraordinary market activity will no longer have a material effect on the market for the security or that system misuse or malfunction is not the cause of the extraordinary market activity.

(7)

(A) A trading halt or pause initiated under Rule 4120(a)(1), (4), (5), (6), (9), (10), or (11) shall be terminated when Nasdaq releases the security for trading. For any such security listed on Nasdaq, prior to terminating the halt or pause, there will be a 5-minute Display Only Period during which market participants may enter quotations and orders in that security in Nasdaq systems. In addition, in instances where a trading halt is in effect prior to the commencement of the Display Only Period, market participants may enter orders in a security that is the subject of the trading halt on Nasdaq. Such orders will be accepted and entered into the system.

(B) At the conclusion of the 5-minute Display Only Period, the security will be released for trading unless, at the end of a Display Only Period or during the subsequent process to release the security for trading, Nasdaq detects an order imbalance in the security. In that case, Nasdaq will extend the Display Only Period for an additional 1-minute period. At the conclusion of the Display Only Period, trading shall immediately resume pursuant to Rule 4753.

(C) For purposes of Rule 4120(c)(7), an order imbalance shall be established as follows:

(1) When (i) the last available Current Reference Price, as defined in Rule 4753(a)(2)(A), disseminated immediately prior to the end of the Display Only Period and any of the three preceding Current Reference Prices differ by more than the greater of 5 percent or 50 cents, or (ii) all market orders will not be executed in the cross; or

(2) If, upon completion of the cross calculation, (i) the calculated price at which the security would be released for trading and any of the three preceding Current Reference Prices disseminated immediately prior to the initiation of the cross calculation differ by more than the greater of 5 percent or 50 cents, or (ii) all market orders would not be executed in the cross.

(8)

(A) A trading halt initiated under Rule 4120(a)(7) shall be terminated when Nasdaq releases the security for trading and the conditions described in this rule are satisfied. Prior to terminating the halt, there will be a 10-minute Display Only Period during which market participants may enter quotes and orders in that security in Nasdaq systems. In addition, beginning at

4:00 a.m., market participants may enter orders in a security that is the subject of an Initial Public Offering ("**IPO**") on Nasdaq. Such orders will be accepted and entered into the system.

After the conclusion of the 10-minute Display Only Period, the security will enter a "**Pre-Launch Period**" of indeterminate duration. The Pre-Launch Period shall end and the security shall be released for trading by Nasdaq when the conditions described in paragraphs (c)(8)(A)(i), (ii), and (iii) are all met.

(i) Nasdaq receives notice from the underwriter of the IPO that the security is ready to trade. The Nasdaq system will calculate the Current Reference Price at that time (the "**Expected Price**") and display it to the underwriter. If the underwriter then approves proceeding, the Nasdaq system will conduct the following validation checks:

(ii) The Nasdaq system must determine that all market orders will be executed in the cross; and

(iii) the security must pass the price validation test described below in subparagraph (B).

 The failure to satisfy these conditions during the process to release the security for trading will result in a delay of the release for trading of the IPO, and a continuation of the Pre-Launch Period, until all conditions have been satisfied. The underwriter, with concurrence of Nasdaq, may determine at any point during the IPO Halt Cross process up through the conclusion of the Pre-Launch Period to postpone and reschedule the IPO. Market participants may continue to enter orders and order cancellations for participation in the cross auction during the Pre-Launch Period up to the point that the cross auction process commences.

(B) Prior to the conclusion of the Pre-Launch Period, the underwriter shall select price bands for purposes of applying the price validation test. Under the price validation test, the System compares the Expected Price with the actual price calculated by the Cross. If the actual price calculated by the Cross differs from the Expected Price by an amount in excess of the price band selected by the underwriter, the security will not be released for trading and the Pre-Launch Period will continue. The underwriter shall select an upper price band (i.e., an amount by which the actual price may not exceed the Expected Price) and a lower price band (i.e., an amount by which the actual price may not be lower than the Expected Price). If a security does not pass the price validation test, the underwriter may, but is not required to, select different price bands before recommencing the process to release the security for trading. The price bands available for selection shall be in such increments, and at such price points, as may be established from time to time by Nasdaq; the available price bands shall include $0 but shall not be in excess of $0.50. Nasdaq will notify member organizations and the public of changes in available price band or increments through a notice that is widely disseminated at least one week in advance of the change. In selecting available price bands and increments, Nasdaq will consider input from underwriters and other market participants and the results of past usage of price bands to adopt price bands and increments that promote efficiency in the initiation of trading and protect investors and the public interest.

(9)

(A) For purposes of this Rule and Rule 4753, the process for halting and initial pricing of a security that is the subject of an initial public offering shall also be available for the initial pricing of any other security that has not been listed on a national securities exchange immediately prior to the initial pricing, provided that a broker-dealer serving in the role of financial advisor to the issuer of the securities being listed is willing to perform the functions under Rule 4120(c)(8) that are performed by an underwriter with respect to an initial public offering. If more than one broker dealer is serving in the role of financial advisor, the issuer must designate one to perform the functions under Rule 4120(c)(8). The financial advisor is reminded that any activities performed under Rules 4120(c)(8) and (c)(9)(A) and (B) are to be conducted in a manner that is consistent with the federal securities laws, including Regulation M and other anti-manipulation requirements.

(B) Notwithstanding the provisions of Rules 4120(c)(8)(A) and (c)(9)(A), in the case of a Direct Listing with a Capital Raise (as defined in Listing Rule IM-5315-2), for purposes of releasing securities for trading on the first day of listing, Nasdaq, in consultation with the financial advisor to the issuer, will make the determination of whether the security is ready to trade. Nasdaq shall release the security for trading if: (i) all market orders will be executed in the Cross; and, (ii) the actual price calculated by the Cross is at or above the lowest price and at or below the highest price of the price range established by the issuer in its effective registration statement. Nasdaq shall postpone and reschedule the offering only if either or both of such conditions are not met.

(10) A trading pause initiated under Rule 4120(a)(12) shall be terminated when Nasdaq releases the security for trading. For any such security listed on Nasdaq, prior to terminating the pause, there will be a 5-minute "**Initial Display Only Period**" during which market participants may enter quotations and orders in that security in Nasdaq systems.

(A) Nasdaq will:

(i) establish the "**Auction Reference Price**", which is determined by:

(a) For a Limit Down triggered pause, the Lower Band price of the LULD Band in place at the time the trading pause was triggered; or

(b) For a Limit Up triggered pause, the Upper Band price of the LULD Band in place at the time the trading pause was triggered.

(ii) determine the upper and lower "**Auction Collar**" prices, which are determined by:

(a) For a Limit Down triggered pause, the lower Auction Collar price is derived by subtracting 5% of the Auction Reference Price, rounded to the nearest minimum price increment, or in the case of securities with an Auction Reference Price of $3 or less, $0.15, from the Auction Reference Price, and the upper Auction Collar price is the Upper Band price on the LULD Band in place at the time the trading pause was triggered.

(b) For a Limit Up triggered pause, the upper Auction Collar price is derived by adding 5% of the Auction Reference Price, rounded to the nearest minimum price increment, or in the case of securities with an Auction Reference Price of $3 or less, $0.15, from the Auction Reference Price, and the lower Auction Collar price is the Lower Band price of the LULD Band in place at the time the trading pause was triggered.

(B) At the conclusion of the Initial Display Only Period, the security will be released for trading unless, at the end of an Initial Display Only Period, Nasdaq detects an order imbalance in the security. In that case, Nasdaq will extend the Display Only Period for an additional 5-minute period ("**Extended Display Only Period**"), and the Auction Collar prices will be adjusted as follows:

(i) If the Display Only Period is extended because the calculated price at which the security would be released for trading is below the lower Auction Collar price or all sell market orders would not be executed in the cross, then the new lower Auction Collar price is derived by subtracting 5% of the initial Auction Reference Price, which was rounded to the nearest minimum price increment, or in the case of securities with an Auction Reference Price of $3 or less, $0.15, from the previous lower Auction Collar price, and the upper Auction Collar price will not be changed.

(ii) If the Display Only Period is extended because the calculated price at which the security would be released for trading is above the upper Auction Collar price or all buy market orders would not be executed in the cross, then the new upper Auction Collar price is derived by adding 5% of the initial Auction Reference Price, which was rounded to the nearest minimum price increment, or in the case of securities with an Auction Reference Price of $3 or less, $0.15, to the previous upper Auction Collar price, and the lower Auction Collar price will not be changed.

(C) At the conclusion of the Extended Display Only Period, the security will be released for trading unless, at the end of the Extended Display Only Period, Nasdaq detects an order imbalance in the security. In that case, Nasdaq will further extend the Display Only Period, continuing to adjust the Auction Collar prices every five minutes in the manner described in paragraph (B) above until the security is released for trading. Nasdaq shall release the security for trading at the first point there is no order imbalance.

(D) Notwithstanding paragraphs (A) - (C) above, a Trading Pause that exists at or after 3:50 p.m. in a stock shall re-open via a LULD Closing Cross pursuant to Rule 4754(b)(6).

(E) For purposes of Rule 4120(c)(10), upon completion of the cross calculation an order imbalance shall be established as follows:

(i) the calculated price at which the security would be released for trading is above (below) the upper (lower) Auction Collar price calculated under paragraphs (A), (B), or (C) above; or

(ii) all market orders would not be executed in the cross.

Adopted Jan. 13, 2006 (SEC Release 34-53128); amended July 28, 2006 (SR-NASDAQ-2006-019); amended Oct. 16, 2006 (SR-NASDAQ-2006-043); amended Oct. 16, 2006 (SR-NASDAQ-2006-001); amended Feb. 9, 2007 (SR-NASDAQ-2006-050); amended Mar. 5, 2007 (SR-NASDAQ-2007-016); amended Aug. 20, 2007 (SR-NASDAQ-2007-073); amended Sep. 4, 2007 (SR-NASDAQ-2007-029); amended June 13, 2008 (SR-NASDAQ-2008-039); amended June 13, 2008 (SR-NASDAQ-2008-054); amended July 7, 2008 (SR-NASDAQ-2008-046); amended Jan. 30, 2009 (SR-NASDAQ-2009-004); amended Nov. 23, 2009 (SR-NASDAQ-2009-101); amended June 10, 2010 (SR-NASDAQ-2010-061), operative June 7, 2010; amended June 14, 2010 (SR-NASDAQ-2010-072); amended Sep. 10, 2010 (SR-NASDAQ-2010-079); amended Dec. 7, 2010 (SR-NASDAQ-2010-162), operative Dec. 13, 2010; amended Mar. 31, 2011 (SR-NASDAQ-2011-042); amended June 23, 2011 (SR-NASDAQ-2011-067), operative Aug. 8, 2011; Aug. 8, 2011 (SR-NASDAQ-2011-115); amended Nov. 18, 2011 (SR-NASDAQ-2011-154); amended Jan. 11, 2012 (SR-NASDAQ-2012-010); amended Mar. 19, 2012 (SR-NASDAQ-2012-038), operative Apr. 18, 2012; amended July 19, 2012 (SR-NASDAQ-2012-087); amended Jan. 24, 2013 (SR-NASDAQ-2013-015); amended Feb. 1, 2013 (SR-NASDAQ-2013-026); amended Jan. 31, 2013 (SR-NASDAQ-2013-024); amended Mar. 5, 2013 (SR-NASDAQ-2013-033), operative Mar. 18, 2013; amended Mar. 11, 2013 (SR-NASDAQ-2013-045), operative Apr. 8, 2013; amended Apr. 1, 2013 (SR-NASDAQ-2013-061); amended Apr. 29, 2013 (SR-NASDAQ-2013-073), operative May 29, 2013; amended May 28, 2013 (SR-NASDAQ-2013-076); amended June 14, 2013 (SR-NASDAQ-2013-086), operative July 14, 2013; amended June 25, 2013 (SR-NASDAQ-2013-092); amended Nov. 14, 2013 (SR-NASDAQ-2013-143); amended Dec. 4, 2013 (SR-NASDAQ-2013-151); amended Apr. 7, 2014 (SR-NASDAQ-2014-032); amended Feb. 21, 2014 (SR-NASDAQ-2014-004), operative May 12, 2014; amended Oct. 21, 2014 (SR-NASDAQ-2014-081); amended Nov. 7, 2014 (SR-NASDAQ-2014-020); amended Oct. 13, 2015 (SR-NASDAQ-2015-121); amended Mar. 25, 2016 (SR-NASDAQ-2016-008); amended Jan. 25, 2017 (SR-NASDAQ-2016-131), operative Nov. 20, 2017; amended June 8, 2017 (SR-NASDAQ-2017-058), operative July 8, 2017; amended Oct. 18, 2017 (SR-NASDAQ-2017-111); amended Dec. 8, 2017 (SR-NASDAQ-2017-129), operative Jan. 7, 2018; amended Apr. 11, 2018 (SR-NASDAQ-2018-029); amended Aug. 3, 2018 (SR-NASDAQ-2018-059), operative Sept. 3, 2018; amended Aug. 21, 2019 (SR-NASDAQ-2019-066), operative Sept. 20, 2019; amended Jan. 30, 2020 (SR-NASDAQ-2019-

060); April 3, 2020 (SR-NASDAQ-2019-090); May 14, 2020 (SR-NASDAQ-2020-019); amended Nov. 23, 2020 (SR-NASDAQ-2020-079); amended November 19, 2020 (SR-NASDAQ-2020-078), operative December 19, 2020; amended May 19, 2021 (SR-NASDAQ-2020-057).

**4121. Trading Halts Due to Extraordinary Market Volatility**

This Rule shall be in effect during a pilot period that expires at the close of business on October 18, 2021. If the pilot is not either extended or approved permanently at the end of the pilot period, the prior version of Rule 4121 shall be in effect.

(a) The Exchange shall halt trading in all stocks and shall not reopen for the time periods specified in this Rule if there is a Level 1, 2, or 3 Market Decline.

(i) For purposes of this Rule, a Market Decline means a decline in price of the S&P 500® Index between 9:30 a.m. EST and 4:00 p.m. EST on a trading day as compared to the closing price of the S&P 500® Index for the immediately preceding trading day. The Level 1, Level 2, and Level 3 Market Declines that will be applicable for the trading day will be publicly disseminated before 9:30 a.m. EST.

(ii) A "**Level 1 Market Decline**" means a Market Decline of 7%.

(iii) A "**Level 2 Market Decline**" means a Market Decline of 13%.

(iv) A "**Level 3 Market Decline**" means a Market Decline of 20%.

(b) Halts in Trading.

(i) If a Level 1 Market Decline or a Level 2 Market Decline occurs after 9:30 a.m. EST and up to and including 3:25 p.m, EST or in the case of an early scheduled close, 12:25 p.m. EST the Exchange shall halt trading in all stocks for 15 minutes after a Level 1 or Level 2 Market Decline. The Exchange shall halt trading based on a Level 1 or Level 2 Market Decline only once per trading day. The Exchange will not halt trading if a Level 1 Market Decline or a Level 2 Market Decline occurs after 3:25 p.m. EST or in the case of an early scheduled close, 12:25 p.m. EST.

(ii) If a Level 3 Market Decline occurs at any time during the trading day, the Exchange shall halt trading in all stocks for the remainder of the trading day.

(c) Re-opening of Trading

(i) The re-opening of trading following a Level 1 or 2 trading halt shall follow the procedures set forth in 4121(d) below.

(ii) If the primary listing market halts trading in all stocks, the Exchange will halt trading in those stocks until trading has resumed on the primary listing market or notice has been received from the primary listing market that trading may resume. If the primary listing market does not reopen a security within 15 minutes following the end of the 15-minute halt period, the Exchange may resume trading in that security.

(d) Re-opening of Trading.  A Level 1 or Level 2 trading halt initiated under this Rule ("**MWCB Halt**") shall be terminated when Nasdaq releases the security for trading. For any such security listed on Nasdaq, prior to terminating the MWCB Halt, there will be a 15-minute "Initial Display Only Period" during which market participants may enter quotations and orders in that security in Nasdaq systems.

(1) Nasdaq will:

(A) establish the "**Auction Reference Price**", which shall mean the Nasdaq last sale price (either round or odd lot) after 9:15 a.m. ET but prior to the MWCB Halt and, if none, the prior trading day's Nasdaq Official Closing Price ("**NOCP**").

(B) determine the upper and lower "**MWCB Auction Collar**" prices, as follows:

(i) The lower MWCB Auction Collar price is derived by subtracting 5% of the Auction Reference Price, rounded to the nearest minimum price increment, or in the case of securities with an Auction Reference Price of $3 or less, $0.15, from the Auction Reference Price.

(ii) The upper MWCB Auction Collar price is derived by adding 5% of the Auction Reference Price, rounded to the nearest minimum price increment, or in the case of securities with an Auction Reference Price of $3 or less, $0.15, to the Auction Reference Price.

(2) At the conclusion of the Initial Display Only Period, the security will be released for trading unless, at the end of the Initial Display Only Period, Nasdaq detects an order imbalance in the security. In that case, Nasdaq will extend the Display Only Period for an additional 5-minute period ("**Extended Display Only Period**"), and the MWCB Auction Collar prices will be adjusted as follows:

(A) If the Display Only Period is extended because the calculated price at which the security would be released for

# EXHIBIT 3



## 202.07 Trading Halt Procedures

Whenever the Exchange determines that trading in a listed security should be halted or delayed pending the release of a material news announcement:

*Implementation of the halt or delay will be announced and the reason for the halt or delay will be stated "news pending";

*Thereafter, the Exchange will monitor the situation closely and will commence the opening or reopening of trading in the listed security in accordance with its normal procedures as soon as the material news announcement has been made. If the announcement is not made within a reasonable time after the halt or delay is implemented, trading in the listed security may be opened or reopened in the interests of providing a liquid market. While the time period may vary from case to case as a result of the particular circumstances involved, normally if the announcement is not made within approximately 30 minutes after the delay or halt is implemented, the Exchange may commence the opening or reopening of trading in the listed security. Such action will be preceded by an announcement to the effect that trading is resuming even though the material news announcement has not been released.

## 203.01 Annual Financial Statement Requirement

Any company with voting or non-voting common securities listed on the Exchange that is required to file with the SEC an annual report that includes audited financial statements (including on Forms 10-K, 20-F, 40-F or N-CSR) is required to simultaneously make such annual report available to shareholders of such securities on or through the company's website.

A company must also post to its website a prominent undertaking in the English language to provide all holders (including preferred stockholders and bondholders) the ability, upon request, to receive a hard copy of the company's complete audited financial statements free of charge and simultaneously issue a press release stating that its annual report has been filed with the SEC. This press release must also specify the company's website address and indicate that shareholders have the ability to receive a hard copy of the company's complete audited financial statements free of charge upon request. The company must provide such hard copies within a reasonable period of time following the request. Moreover, the press

**EXHIBIT 4**



› FINRA RULES   › 5000. SECURITIES OFFERING AND TRADING STANDARDS AND PRACTICES
› 5200. QUOTATION AND TRADING OBLIGATIONS AND PRACTICES

# 5260. Prohibition on Transactions, Publication of Quotations, or Publication of Indications of Interest During Trading Halts

**The Rule**   Notices

(a) No member or person associated with a member shall, directly or indirectly, effect any transaction or publish a quotation, a priced bid and/or offer, an unpriced indication of interest (including "bid wanted" and "offer wanted" and name only indications), or a bid or offer accompanied by a modifier to reflect unsolicited customer interest, in any security as to which a trading halt is currently in effect, except as permitted under the Regulation NMS Plan to Address Extraordinary Market Volatility. If FINRA closes trading in a security pursuant to its authority under Rule 6120(a)(3), members would not be prohibited from trading through other markets for which trading is not halted.

(b) No member or person associated with a member shall, directly or indirectly, effect any transaction or publish a quotation, a priced bid and/or offer, an unpriced indication of interest (including "bid wanted" and "offer wanted" and name only indications), or a bid or offer, accompanied by a modifier to reflect unsolicited customer interest, in:

(1) a future for a single security when the underlying security has a regulatory trading halt that is currently in effect; and

(2) a future on a narrow-based securities index when one or more underlying securities that constitute 50% or more of the market capitalization of the index has a regulatory trading halt that is currently in effect.

***Cross Reference–***

*Rule 6120, Trading Halts*

---

Amended by SR-FINRA-2013-016 eff. April 8, 2013.
Amended by SR-FINRA-2009-044 eff. Dec. 14, 2009.
Amended by SR-NASD-2005-087 eff. Aug. 1, 2006.
Amended by SR-NASD-2001-47 eff. March 31, 2003.
Amended by SR-NASD-2002-97 eff. July 29, 2002.
Amended by SR-NASD-2000-33 eff. August 13, 2001.
Adopted by SR-NASD-87-13 eff. May 5, 1988.

**Selected Notices:** 86-13, 88-46, 89-2, 98-26, 01-47, 02-82, 09-60, 13-12.

---

‹ 5250. PAYMENTS FOR MARKET MAKING                    UP                    5270. FRONT RUNNING OF BLOCK TRANSACTIONS ›

**VERSIONS**

Apr 08, 2013 onwards

©2021 FINRA. All Rights Reserved.

FINRA IS A REGISTERED TRADEMARK OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

**EXHIBIT 5**

**Revised June 22, 2020**

**Robinhood Financial LLC & Robinhood Securities, LLC Customer Agreement**

In consideration of Robinhood Financial LLC, Robinhood Securities, LLC, and their agents and assigns (collectively, "Robinhood") opening one or more accounts on my behalf ("My Account(s)" or the "Account(s)") for the purchase, sale or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared through Robinhood Securities, I represent and agree with respect to all Accounts, whether margin or cash, to the terms set forth below (the "Agreement"). When used in this Agreement, the words "I", "Me", "My", "We", or "Us" mean the owner(s) of the Account. For purposes of this Agreement, Business Days are Monday through Friday, excluding federal holidays. Any references to "days" found in this Agreement are calendar days unless indicated otherwise.

**I UNDERSTAND THAT THE TERMS AND CONDITIONS OF THIS AGREEMENT GOVERN ALL ASPECTS OF MY RELATIONSHIP WITH ROBINHOOD REGARDING MY ACCOUNTS. I WILL CAREFULLY READ, UNDERSTAND AND ACCEPT THE TERMS AND CONDITIONS OF THIS AGREEMENT BEFORE I CLICK "SUBMIT APPLICATION" OR OTHER SIMILARLY WORDED BUTTON. IF I HAVE ANY QUESTIONS ABOUT ANY OF THE PROVISIONS IN THIS AGREEMENT, I WILL EMAIL [HELP@ROBINHOOD.COM](mailto:HELP@ROBINHOOD.COM). I UNDERSTAND THAT CLICKING "SUBMIT APPLICATION" IS THE LEGAL EQUIVALENT OF MY MANUALLY SIGNING THIS AGREEMENT AND I WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. BY ENTERING INTO THIS AGREEMENT, I ACKNOWLEDGE RECEIPT OF THE ROBINHOOD PRIVACY POLICY AND PRIVACY AND SECURITY STATEMENT. I UNDERSTAND THAT THIS AGREEMENT MAY BE AMENDED FROM TIME TO TIME BY ROBINHOOD, WITH REVISED TERMS POSTED ON THE ROBINHOOD WEBSITE. I AGREE TO CHECK FOR UPDATES TO THIS AGREEMENT. I UNDERSTAND THAT BY CONTINUING TO MAINTAIN MY SECURITIES BROKERAGE ACCOUNT WITHOUT OBJECTING TO ANY REVISED TERMS OF THIS AGREEMENT, I AM ACCEPTING THE TERMS OF THE REVISED AGREEMENT AND I WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. IF I REQUEST OTHER SERVICES PROVIDED BY ROBINHOOD THAT REQUIRE ME TO AGREE TO SPECIFIC TERMS AND CONDITIONS ELECTRONICALLY (THROUGH CLICKS OR OTHER ACTIONS) OR OTHERWISE, SUCH TERMS AND CONDITIONS WILL BE DEEMED AN AMENDMENT AND WILL BE INCORPORATED INTO AND MADE PART OF THIS AGREEMENT. I ALSO UNDERSTAND THAT BY CLICKING "SUBMIT APPLICATION" I HAVE ACKNOWLEDGED THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE IN SECTION 38 HEREIN.**

## 1. Capacity and Status.

If an individual, I am of legal age under the laws of the state where I reside and authorized to enter into this Agreement. If an entity, I am duly formed, validly existing and in good standing in My state of organization, have full power and authority to enter and perform this Agreement, and the persons signing the account application are fully authorized to act on My behalf. No person, except Myself, has any interest in the Account opened pursuant to this Agreement. I acknowledge that unless Robinhood receives written objection from Me, Robinhood may provide My name, address, and securities positions to requesting companies in which I hold securities. Except as otherwise disclosed to Robinhood in writing, neither I nor any member of My immediate family is an employee of any exchange, any corporation of which any exchange owns a majority of the capital stock, a member of any exchange or self-regulatory organization, a member of any firm or member corporation registered on any exchange, a bank, trust company, insurance company or any corporation, firm or individual engaged in the business of dealing either as a broker-dealer or as principal in securities. I understand and agree that I am obligated to promptly notify Robinhood in writing if I or a member of My immediate family becomes registered or employed in any of the above-described capacities. Except as otherwise disclosed to Robinhood in writing, I am not a Professional (as defined below). I further agree to promptly notify Robinhood in writing if I am now or if I become a Professional or an officer, director or 10% stockholder of any publicly traded company.

## 2. Market Data.

Robinhood may choose to make certain market data available to Me pursuant to the terms and conditions set forth in this Agreement. By executing this Agreement, I agree to comply with those terms and conditions.

2020.06

CONFIDENTIAL

RH_HT_00000300

## A. Definitions.

1. "Market Data" means (a) last sale information and quotation information relating to securities that are admitted to dealings on the New York Stock Exchange ("NYSE"), (b) such bond and other equity last sale and quotation information, and such index and other market information, as United States-registered national securities exchanges and national securities associations (each, an "Authorizing SRO") may make available and as the NYSE may from time to time designate as "Market Data"; and (c) all information that derives from any such information.

2. "Nonprofessional" means any natural person who receives market data solely for his/her personal, non- business use and who is not a "Professional." A "Professional" includes an individual who, if working in the United States, is: (i) registered or qualified with the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), any state securities agency, any securities exchange or association, or any commodities or futures contract market or association; (ii) engaged as an "investment advisor" as that term is defined in Section 202 (a) (11) of the Investment Advisers Act of 1940 (whether or not registered or qualified under that Act), or (iii) employed by a bank or other organization exempt from registration under federal and/or state securities laws to perform functions that would require him or her to be so registered or qualified if he or she were to perform such functions for an organization not so exempt. A person who works outside of the United States will be considered a "Professional" if he or she performs the same functions as someone who would be considered a "Professional" in the United States.

## B. Provisions Applicable to All Users.

1. Proprietary Nature of Data. I understand and acknowledge that each Authorizing SRO and Other Data Disseminator (as defined below) has a proprietary interest in the Market Data that originates on or derives from it or its market(s). I agree not to reproduce, distribute, sell or commercially exploit the Market Data in any manner.

2. Enforcement. I understand and acknowledge that (a) the Authorizing SROs are third-party beneficiaries under this Agreement and (b) the Authorizing SROs or their authorized representative(s) may enforce this Agreement, by legal proceedings or otherwise, against Me or any person that obtains Market Data that is made available pursuant to this Agreement other than as this Agreement contemplates.

3. Data Not Guaranteed. I understand that neither Robinhood nor any Authorizing SRO, other entity whose information is made available over the Authorizing SROs' facilities (an "Other Data Disseminator"), or information processor that assists any Authorizing SRO or Other Data Disseminator in making Market Data available (collectively, the "Disseminating Parties") guarantees the timeliness, sequence, accuracy, completeness, reliability, or content of Market Data or of other market information or messages disseminated to or by any Disseminating Party. I understand that neither Robinhood Financial nor any Disseminating Party guarantees the timeliness, sequence, accuracy, completeness, reliability or content of market information, or messages disseminated to or by any party. I understand that neither Robinhood Financial nor any Disseminating Party warrants that the service provided by any such entity will be uninterrupted or error-free. I further understand that Market Data by Xignite provides market data to Robinhood Financial customers. NEITHER ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, NOR ANY DISSEMINATING PARTY SHALL BE LIABLE IN ANY WAY FOR (A) ANY INACCURACY, ERROR OR DELAY IN, OR OMISSION OF, (I) ANY MARKET DATA, INFORMATION OR MESSAGE, OR (II) THE TRANSMISSION OR DELIVERY OF ANY SUCH DATA, INFORMATION OR MESSAGE; OR (B) ANY LOSS (AS DEFINED IN THIS AGREEMENT) OR DAMAGE ARISING FROM OR OCCASIONED BY (I) ANY SUCH INACCURACY, ERROR, DELAY OR OMISSION, (II) NON-PERFORMANCE OR III) INTERRUPTION IN ANY SUCH MARKET DATA, INFORMATION, OR MESSAGE, WHETHER DUE TO ANY ACT OR OMISSION BY ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, OR ANY DISSEMINATING PARTY, OR TO ANY "FORCE MAJEURE" (E.G., FLOOD, EXTRAORDINARY WEATHER CONDITIONS, EARTHQUAKE OR OTHER ACT OF GOD, FIRE, WAR, INSURRECTION, RIOT, LABOR DISPUTE, ACCIDENT, ACTION OF GOVERNMENT, OR COMMUNICATIONS OR POWER FAILURE, EQUIPMENT OR SOFTWARE MALFUNCTION) OR ANY OTHER

2020.06

CAUSE BEYOND THE REASONABLE CONTROL OF ROBINHOOD FINANCIAL, ITS AFFILIATES, THEIR RESPECTIVE OFFICERS AND EMPLOYEES, OR ANY DISSEMINATING PARTY.

4. Permitted Use. I shall not furnish Market Data to any other person or entity. If I receive Market Data other than as a Nonprofessional, I shall use Market Data only for My individual use.

5. Dissemination, Discontinuance, or Modification. I understand and acknowledge that, at any time, the Authorizing SROs may discontinue disseminating any category of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics. The Authorizing SROs shall not be liable for any resulting liability, loss or damages that may arise therefrom.

6. Duration; Survival. This Section 2 of this Agreement remains in effect for so long as I have the ability to receive Market Data as contemplated by this Section 2. In addition, Sections 2(B)(1)-(3) and the first two sentences of Section 2(B)(7), survive any termination of this Agreement.

7. Miscellaneous. The laws of the State of New York shall govern this Section 2 and it shall be interpreted in accordance with those laws. This Subsection is subject to the Securities Exchange Act of 1934, the rules promulgated under that act, and the joint-industry plans entered into pursuant to that act.

## C. Provisions Applicable to Nonprofessionals.

1. Permitted Receipt. I understand that I may not receive Market Data from Robinhood as a Nonprofessional, and Robinhood may not provide Market Data to Me as a Nonprofessional, unless Robinhood first properly determines that I qualify as a Nonprofessional as defined above and I in fact qualify as a Nonprofessional. I agree that, as a prerequisite to Robinhood Financial qualifying Me as a Nonprofessional, I will provide to Robinhood truthful and accurate information about Me, such as: my occupation, employer, employment position and functions; my use of Market Data; my registration status with any securities agency, exchange, association, or regulatory body, or any commodities or future contract market, association, or regulatory body, whether in the United States or elsewhere; and any compensation of any kind I may receive from any individual or entity for my trading activities, asset management, or investment advice. Except as otherwise declared to Robinhood in writing, by executing this Agreement, I certify that I meet the definition of Nonprofessional as set forth in this Agreement.

2. Permitted Use. If I am a Nonprofessional, I agree to receive Market Data solely for my personal, non-business use.

3. Notification. I shall notify Robinhood promptly in writing of any change in my circumstances that may cause Me to cease to qualify as a Nonprofessional.

## 3. NASDAQ OMX Information.

## A. Definitions.

1. "Information" means certain market data and other data disseminated that has been collected, validated, processed, and recorded by any system NASDAQ OMX has developed for the creation or dissemination of Information or other sources made available for transmission to and receipt from either a distributor such as RHF or from NASDAQ OMX relating to: a) eligible securities or other financial instruments, markets, products, vehicles, indicators, or devices; b) activities of a NASDAQ OMX company; c) other information and data from a NASDAQ OMX company. "Information" also includes any element of Information as used or processed in such a way that the Information can be identified, recalculated or re-engineered from the processed Information or that the processed Information can be used as a substitute for Information.

2. "NASDAQ OMX" means The NASDAQ OMX Group, Inc., a Delaware limited liability company and its subsidiaries and Affiliates (collectively, "NASDAQ OMX").

CONFIDENTIAL                                                                                          RH_HT_00000302

## B. Use of Data.

I understand that I may use the Information only for personal use and not for any business purpose. I may not sell, lease, furnish or otherwise permit or provide access to the Information to any other natural person or entity ("Person") or to any other office or place. I will not engage in the operation of any illegal business use or permit anyone else to use the Information, or any part thereof, for any illegal purpose or violate any NASDAQ OMX or SEC Rule or any FSA rule or other applicable law, rule or regulation. I may not present the Information rendered in any unfair, misleading or discriminatory format. I shall take reasonable security precautions to prevent any Person other than Myself from gaining access to the Information.

## C. Proprietary Data.

I acknowledge and agree that NASDAQ OMX has proprietary rights to the Information that originates on or derives from markets regulated or operated by NASDAQ OMX, and compilation or other rights to Information gathered from other sources. I further acknowledge and agree that NASDAQ OMX's third-party information providers have exclusive proprietary rights to their respective Information. In the event of any misappropriation or misuse by Me or anyone who accesses the Information through Me, NASDAQ OMX or its third-party information providers shall have the right to obtain injunctive relief for its respective materials.

## D. System.

I acknowledge that NASDAQ OMX, in its sole discretion, may from time-to-time make modifications to its system or the Information. Such modifications may require corresponding changes to be made in Robinhood Financial's service. Changes or the failure to make timely changes by Me may sever or affect My access to or use of the Information. I understand that neither NASDAQ OMX nor Robinhood shall be responsible for such effects.

## E. NASDAQ OMX Limitation of Liability.

Except as may otherwise be set forth herein, NASDAQ OMX shall not be liable to Me for indirect, special, punitive, consequential or incidental loss or damage (including, but not limited to, trading losses, lost profits, or other indirect loss or damage) of any nature arising from any cause whatsoever, even if NASDAQ OMX has been advised of the possibility of such damages. NASDAQ OMX shall not be liable to Me for any unavailability, interruption, delay, incompleteness or inaccuracy of the Information. This Section shall not relieve NASDAQ OMX or Me from liability for damages that result from their own gross negligence or willful tortious misconduct or from personal injury or wrongful death claims. I agree that the terms of this Section reflect a reasonable allocation of risk and limitation of liability.

## F. Disclaimers of Warranties.

NASDAQ OMX and its third-party information providers make no warranties of any kind with respect to the Information---express, implied or statutory (including without limitation, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), any implied warranties arising from trade usage, course of dealing, course of performance or the implied warranties of merchantability or fitness for a particular use or purpose or noninfringement.

## G. Termination by NASDAQ OMX.

I acknowledge that NASDAQ OMX, when required to do so in fulfillment of statutory obligations, may by notice to Robinhood unilaterally limit or terminate the right of any or all Persons to receive or use the

CONFIDENTIAL                                                              RH_HT_00000303

Information and that Robinhood will comply with any such notice and will terminate or limit the furnishing of the Information.

## 4. Authorization.

I understand that My Account is self-directed. Accordingly, I appoint Robinhood Financial as My agent for the purpose of carrying out My directions to Robinhood Financial in accordance with the terms and conditions of this Agreement and any attendant risks with respect to the purchase or sale of securities. Robinhood Financial is authorized to open or close My Account(s), place and withdraw orders and take such other steps as are reasonable to carry out My directions. All transactions will be effected only on My order or the order of My authorized delegate, except as described in Section 10. I understand Robinhood Financial provides trading and brokerage services through the Robinhood website (the "Website") and the Robinhood mobile application (the "App"). I agree to receive and transmit financial information through such electronic means. My use or My grant of access to My Account to any third party to access information or place transactions in My Account is solely at My risk.

## 5. Customer Representations and Responsibilities.

### A. Self-directed Account.

I understand that My Account is self-directed, and so that I am solely responsible for any and all orders placed in My Account and that all orders entered by Me or on My behalf are unsolicited and based on My own investment decisions or the investment decision of My duly authorized representative or agent. Accordingly, I agree that neither Robinhood nor any of its employees, agents, principals, or representatives:

1. provide investment advice in connection with this Account;

2. recommend any security, transaction or order;

3. solicit orders;

4. act as a market maker in any security;

5. make discretionary trades; and

6. produce or provide first-party research providing a specific investment strategies such as buy, sell or hold recommendations, first-party ratings and/or price targets. To the extent research materials or similar information are available through the App or the Website or the websites of any entity controlled by, controlling, or under common control with Robinhood (such entity, an "Affiliate"), I understand that these materials are intended for informational and educational purposes only and they do not constitute a recommendation to enter into any securities transactions or to engage in any investment strategies.

### B. Information Accuracy.

I: (i) certify that the information contained in this Agreement, the account application, and any other document that I furnish to Robinhood Financial in connection with My Account(s) is complete, true and correct, and acknowledge that knowingly giving false information for the purpose of inducing Robinhood Financial to extend credit is a federal crime; (ii) authorize Robinhood Financial to contact any individual or firm noted herein or on the documents referred to in subsection (i) of this Section and any other normal sources of debit or credit information; (iii) authorize anyone so contacted to furnish such information to Robinhood Financial as Robinhood may request; and (iv) agree that this Agreement, the account application and any other document I furnish in connection with My Account is Robinhood's property, as the case may be. I shall promptly advise Robinhood Financial of any changes to the information in such agreements and documents in writing within ten (10) calendar days. I authorize Robinhood Financial to obtain reports and provide information to others concerning My creditworthiness and business conduct. Upon My request, Robinhood agrees to provide Me a copy of any report so obtained. Robinhood may

CONFIDENTIAL                                                              RH_HT_00000304

retain this Agreement, the Account application, and all other such documents and their respective records at Its sole discretion, whether or not credit is extended.

## C. Risks.

I understand that all investments involve risk, that losses may exceed the principal invested, and that the past performance of a security, industry, sector, market, or financial product does not guarantee future results or returns.

## D. Account Defaults.

I understand that My Account comes with many defaulted service instruction features and preferences. I further understand that I am not required to use these defaulted options or preferences and that once My Account is approved and opened I have the sole discretion to control and adjust such defaulted service preferences that relate to My account.

## E. Knowledge of Account.

I understand that I am solely responsible for knowing the rights and terms for all securities purchased, sold and maintained in My Account including mergers, reorganizations, stock splits, name changes or symbol changes, dividends, option symbols, and option deliverables. I further understand that certain securities may grant Me valuable rights that may expire unless I take specific action. These securities include bonds, convertible securities, warrants, stock rights and securities subject to exchange offers or tenders. I am responsible for knowing all expiration dates, redemption dates, and the circumstances under which rights associated with My securities may be called, cancelled, or modified. Robinhood may, but are not obligated to, notify Me of any upcoming expiration or redemption dates, or take any action on My behalf without My specific instructions except as required by law and the rules of regulatory authorities. I acknowledge that Robinhood may adjust My Account to correct any error. If My Account has an option position on the last trading day prior to expiration, which is one cent or more in the money, Robinhood Financial will generally exercise the option, on My behalf. However, Robinhood Financial reserves the right at Its discretion to close any option position prior to expiration date or any position resulting from the exercising/assignment after option expiration. I will be charged a commission for any such transaction. Robinhood Financial is not obligated to take any of these actions and Robinhood Financial is not liable for Losses should it not take them.

## F. Purchases.

All orders for the purchase of securities given for My Account will be authorized by Me and executed in reliance on My promise that an actual purchase is intended. It is My obligation to pay for purchases immediately or on Robinhood's demand. I understand Robinhood may at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities. I further agree not to allow any person to trade for My Account unless a trading authorization for that person has been received and approved by Robinhood. Robinhood reserve the right to require full payment in cleared funds prior to the acceptance of any order. In the event that I fail to provide sufficient funds, Robinhood may, at its option and without notice to Me, i) charge a reasonable rate of interest, ii) liquidate the Property subject of the buy order, or iii) sell other Property owned by Me and held in any of My Accounts. Robinhood may also charge any consequential Loss to My Account. For purposes of this Agreement, "Property" shall mean all monies, contracts, investments and options, whether for present or future delivery, and all related distributions, proceeds, products and accessions.

2020.06

CONFIDENTIAL

RH_HT_00000305

## G. Sales/Short Sales.

I promise to deliver all securities sold in My Account and to provide collateral of a type and amount acceptable to Robinhood Financial for all short sales in My Account. Robinhood Financial requires that a security be held in My Account prior to the acceptance of a sell order with respect to such security unless the order is specifically designated as a "short sale." If a security is not held in My Account and a sell order is processed, I must promptly deliver such security to Robinhood Financial for receipt in good deliverable form on or before the settlement date. Any order accepted without negotiable certificates or positions in My Account will be subject, at Robinhood Financial's sole discretion, to cancellation or buy-in. To ensure this will not occur, I agree to only place sell orders for securities owned by Me and held in My Account at the time My order is placed.

Proceeds of a sale will not be paid to Me or released into My Account until Robinhood Financial has received the security in good deliverable form, whether from a transfer agent or from Me and the settlement of the security is complete. If the security is not received on or before settlement date, or as market conditions warrant, Robinhood Financial may in its sole discretion purchase the security on the open market for My Account and may liquidate and close out any and all securities in My Account in order to pay for such purchase. In the event a security is bought in, I will be responsible for all resulting Losses incurred by Robinhood Financial.

I understand that I may execute short sales only in a margin Account and that such execution must comply with applicable short sales rules.

## H. Assistance by Robinhood.

I understand that when I request assistance from Robinhood or its employees in using the investment tools available on the Website or the App, it will be limited to an explanation of the tool's functionality and, if requested by Me, to the entry by Robinhood or its employees of variables provided by Me, and that such assistance does not constitute investment advice, an opinion with respect to the suitability of any transaction, or solicitation of any orders.

## I. No Tax or Legal Advice.

I understand that Robinhood does not provide tax or legal advice.

## J. Discontinuation of Services.

I understand that Robinhood may discontinue My Account and any services related to My Account immediately by providing written notice to Me

## K. Electronic Access.

1. I am solely responsible for keeping My Account numbers and PINs confidential and will not share them with third parties. "PINs" shall mean My username and password.

2. I agree and accept full responsibility for monitoring and safeguarding My Accounts and access to My Accounts.

3. I agree to immediately notify Robinhood in writing, delivered via e-mail and a recognized international delivery service, if I become aware of: (i) any loss, theft, or unauthorized use of My PINs or Account numbers; (ii) any failure by Me to receive any communication from Robinhood indicating that an order was received, executed or cancelled, as applicable; (iii) any failure by Me to receive an accurate written confirmation of an order, execution, or cancellation; (iv) any receipt by Me of confirmation of an order, execution or cancellation, which I did not place; (v) any

2020.06

CONFIDENTIAL                                                           RH_HT_00000306

inaccurate information in or relating to My orders, trades, margin status, Account balances, deposits, withdrawals, securities positions or transaction history; or (vi) any other unauthorized use or access of My Account.

4. Each of the events described in subsections (K)(3)(i)-(vi) shall be deemed a "Potential Fraudulent Event". The use and storage of any information including My Account numbers, PINs, portfolio information, transaction activity, account balances and any other information or orders available on My wireless, web-enabled cellular telephone or similar wireless communications device (collectively, "Mobile Device") or My personal computer is at My own risk and is My sole responsibility. I represent that I am solely responsible for and have authorized any orders or instructions appearing in, originating from, or associated with My Account, My Account number, My username and password, or PINs. I agree to notify Robinhood immediately after I discover any Potential Fraudulent Event, but in no event more than twenty-four (24) hours following discovery. Upon request by Robinhood, I agree to report any Potential Fraudulent Event promptly to legal authorities and provide Robinhood a copy of any report prepared by such legal authorities. I agree to cooperate fully with the legal authorities and Robinhood in any investigation of any Potential Fraudulent Event and I will complete any required affidavits promptly, accurately and thoroughly. I also agree to allow Robinhood access to My Mobile Device, My computer, and My network in connection with Robinhood's investigation of any Potential Fraudulent Event. I understand that if I fail to do any of these things I may encounter delays in regaining access to the funds in My Account. I agree to indemnify and hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers, directors, and employees harmless from and against any Losses arising out of or relating to any Potential Fraudulent Event. I acknowledge that Robinhood does not know when a person entering orders with My username and password is Me.

5. Trusted Contact Person. I understand that, pursuant to FINRA regulations, Robinhood is authorized to contact the Trusted Contact Person (as defined by FINRA Rule 4512) designated for My Account and to disclose information about My account to address possible financial exploitation, to confirm the specifics of My current contact information, health status, or the identity of any legal guardian, executor, trustee or holder of a power of attorney, or as otherwise permitted by Rule 2165.

## 6. Clearance of Trades.

I understand that Robinhood Financial has entered into a clearing agreement with Robinhood Securities whereby Robinhood Financial will introduce My Account to Robinhood Securities, and Robinhood Securities will clear all transactions, on a fully-disclosed basis. I understand that Robinhood Securities carries My Account(s) and is responsible for the clearing and bookkeeping of transactions, but is not otherwise responsible for the conduct of Robinhood Financial.

Until receipt from Me of written notice to the contrary, Robinhood Securities may accept from Robinhood Financial, without inquiry or investigation, (i) orders for the purchase or sale of securities and other property on margin, if I have elected to have a margin account, or otherwise, and (ii) any other instructions concerning my Accounts. Robinhood Securities shall look solely to Robinhood Financial unless otherwise directed by Robinhood Financial, and not to Me, with respect to any such orders or instructions; except that I understand that Robinhood Securities will deliver confirmations, statements, and all written or other notices with respect to My Account directly to Me with copies from Robinhood Financial, and that Robinhood Securities will look directly to Me or Robinhood Financial for delivery of margin, payment, or securities. I agree to hold Robinhood Securities harmless from and against any Losses arising in connection with the delivery or receipt of any such communication(s), provided Robinhood Securities has acted in accordance with the above. The foregoing shall be effective as to My Account(s) until written notice to the contrary is received from Me by Robinhood Securities or Robinhood Financial.

## 7. Review of Confirmations and Statements.

I agree that it is My responsibility to review order execution confirmations and statements of My Account(s) promptly upon receipt. I agree to receive all confirmations and account statements, as well as all tax related documents, in electronic format. I understand that account statements will evidence all activity in My Account for the stated period, including securities transactions, cash balances, credits to My Account and all fees paid from My Account. Notwithstanding Section 36.B, confirmations will be considered binding on Me unless I notify Robinhood of any objections within two (2) calendar days from the date confirmations are sent. Account statements will be considered binding on Me unless I notify you

CONFIDENTIAL                                                      RH_HT_00000307

of any objections within ten (10) calendar days after My Account statements are posted online. Such objection may be oral or in writing, but any oral objection must be immediately confirmed in writing. In all cases, Robinhood reserves the right to determine the validity of My objection. If I object to a transaction for any reason, I understand and agree that I am obligated to take action to limit any losses that may result from such transaction or I will bear sole responsibility for any losses relating to the transaction, even if My objection to the transaction is ultimately determined to be valid. Nothing in this Section 7 shall limit My responsibilities as described in Section 5 of this Agreement.

## 8. Important Information Needed to Open a New Account.

To help the government better detect the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Therefore, I understand that when I open My Account Robinhood will ask for My name, address, date of birth and other identifying information. Robinhood may also ask copies of My driver's license, passport or other identifying documents. I understand that Robinhood may take steps to verify the accuracy of the information I provide to Robinhood in My Account application or otherwise, and that Robinhood may restrict My access to My Account pending such verification. I will provide prompt notification to Robinhood of any changes in the information including My name, address, e-mail address and telephone number.

I further understand that if I attempt to access My Account from a jurisdiction subject to certain U.S. sanctions or I am ordinarily resident in such a jurisdiction, or if you reasonably believe that I am attempting such access or have become a resident in such a jurisdiction, you may restrict My Account, and any pending orders may be cancelled. If this happens, I understand that I should contact help@robinhood.com, and that I may be asked to provide supplemental information as part of this process. I further understand that I must close My Account before establishing residency in any jurisdiction subject to U.S. sanctions.

## 9. Telephone Conversations and Electronic Communications.

I understand and agree that Robinhood may record and monitor any telephone or electronic communications with Me. Unless otherwise agreed in writing in advance, Robinhood does not consent to the recording of telephone conversations by any third party or Me. I acknowledge and understand that not all telephone or electronic communications are recorded by Robinhood, and Robinhood does not guarantee that recordings of any particular telephone or electronic communications will be retained or capable of being retrieved.

## 10. Oral Authorization.

I agree that Robinhood shall be entitled to act upon any oral instructions given by Me so long as Robinhood reasonably believes such instruction was actually given by Me or My authorized agent.

## 11. Applicable Laws and Regulations.

All transactions in My Account will be subject to federal securities laws and regulations, the applicable laws and regulations of any state or jurisdiction in which Robinhood Financial is registered, the rules of any applicable self-regulatory organization of which Robinhood Financial is a member and the rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. In no event will Robinhood Financial be obligated to effect any transaction it believes would violate any federal or state law, rule or regulation or the rules or regulations of any regulatory or self-regulatory organization.

## 12. Erroneous Distributions.

I agree to promptly return to Robinhood any assets erroneously distributed to Me. In the event that I sell a security prior to its ex-dividend/distribution date, and I receive the related cash/stock dividend or distribution in error, I direct Robinhood on My behalf to pay such dividend/distribution to the entitled purchaser of the securities I sold, and I guarantee to promptly reimburse Robinhood for, or deliver to Robinhood, said dividend or distribution.

2020.06

CONFIDENTIAL

RH_HT_00000308

## 13. Market Volatility; Market Orders; Limit Orders; and Queued Orders.

I understand that, whether I place a market or limit order, I will receive the price at which My order is executed in the marketplace, subject to any clarification stated below. Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, the execution price received may differ from the quote provided on entry of an order, and I may receive partial executions of an order at different prices. I understand that Robinhood Financial is not liable for any price fluctuations. I also understand that price quotes generally are for only a small number of shares as specified by the marketplace, and larger orders are relatively more likely to receive executions at prices that vary from the quotes or in multiple lots at different prices.

I understand that Robinhood Financial does not currently support sending traditional market buy orders and that Robinhood Financial collars all market buy orders (other than dollar-based buy orders executed during market hours) by using limit orders priced up to 5% above the last trade price. This is not the case for market sell orders. I further understand that when I send a market buy order through Robinhood Financial's trading system, the trading system generates a limit order up to 5% above the last trade price, and then Robinhood Financial sends the order to an executing broker. I understand that Robinhood Financial's implementation of market buy orders may vary depending on prices of instruments, market conditions, and other factors. I further understand that Robinhood Financial uses the following rounding mechanics with respect to buy orders: the last trade price is (i) multiplied by 1.05; (ii) rounded down to two decimal places if the last trade price is over $1.00; otherwise, rounded down to four decimal places; and (iii) for securities included in the SEC's Tick Size Pilot Program, rounded down to the nearest $.05 increment. I understand that securities may open for trading at prices substantially higher or lower than the previous closing price or the anticipated price. If I place a market order (whether during normal market hours or when the market is closed), I agree to pay or receive the prevailing market price at the time My market order is executed, subject to the specific clarification above relating to buy orders. I understand that the price I pay may be significantly higher or lower than anticipated at the time I placed the order. To avoid buying a security at a higher price and possibly exceeding My purchasing power, I understand My option to enter a limit order. I also understand that limit orders may not be executed at any particular time, or at all, if there is not sufficient trading at or better than the limit price I specify, and are only good until the end of the trading day in which they are entered. The Website contains further information regarding order types and limitations, which I agree to read and understand before placing such orders.

As a customer of Robinhood Financial, I understand that after the market has closed for the day, I have the ability to place in a queue order requests to be executed the following day upon the opening of the market ("Queued Order"). I understand that My Queued Order request is prioritized based on the order in which it is received by Robinhood Financial, and that the Queued Order requests are sent out for execution shortly after the market opens on the next day of trading. I further understand that each Queued Order request is sent out per customer and per security as Robinhood Financial market orders (described above), and that they are not aggregated.

A limit order may be "good till cancelled" which means the order remains valid until (A) it is executed; (B) I cancel the order; (C) approximately 90 days from when the order is placed; or (D) the contract to which it relates is closed. I understand that Robinhood will cancel a "good till cancelled" order at the end of every trading day (on the exchange on which the instrument to which the contract relates is traded) and place such order again at the start of the following trading day. This process will be repeated every day for as long as the "good till cancelled" order remains valid. I further agree that any "good till cancelled" orders I place should be treated as "do not reduce" orders.

## 14. Bulletin Board/Pink Sheet Stocks.

Bulletin board, pink sheet and other thinly-traded securities (collectively "bulletin board stocks") present particular trading risks, in part because they are relatively less liquid and more volatile than actively traded securities listed on a major exchange. I understand that bulletin board stocks may be subject to different trading rules and systems than other securities and that I may encounter significant delays in executions, reports of executions, and updating of quotations in trading bulletin board stocks. Robinhood Financial in its sole discretion may require limit orders on certain bulletin board stock transactions.

## 15. Research and Internet Links.

News, research, links to outside websites, and other information accessible through the App or Website ("Content") may be prepared by independent external providers not affiliated with Robinhood Financial,

CONFIDENTIAL                                                                    RH_HT_00000309

including Morningstar, Inc. (all such providers, the "Providers"). I agree not to distribute, reproduce, sell, or otherwise commercially use the Content in any manner. I understand that Robinhood may terminate My access to the Content. I understand that none of the Content is a recommendation by Robinhood to buy or sell any securities or to engage in any investment strategy.

## 16. Restrictions on Trading.

I understand that Robinhood may, in its discretion, prohibit or restrict the trading of securities, or the substitution of securities, in any of My Accounts. I understand that Robinhood may execute all orders by Me on any exchange or market, unless I specifically instruct Robinhood to the contrary. In the event of a breach or default by Me under this Agreement, Robinhood shall have all rights and remedies available to a secured creditor under all applicable laws and in addition to the rights and remedies provided herein. I understand that Robinhood may at any time, at its sole discretion and without prior notice to Me: (i) prohibit or restrict My access to the use of the App or the Website or related services and My ability to trade, (ii) refuse to accept any of My transactions, (iii) refuse to execute any of My transactions, or (iv) terminate My Account. The closing of My Account will not affect the rights or obligations of either party incurred prior to the date My Account is closed.

Further, Robinhood will not tolerate any foul or abusive language, physical violence, threatening behavior, or other inappropriate conduct directed toward Robinhood, its Affiliates' officers, employees, contractors or customers. If I engage in any such behavior, as determined by Robinhood in its sole discretion, I agree that Robinhood is authorized to: (i) liquidate any securities, instruments or other property in My Account, (ii) send Me the proceeds, and (iii) close My account. Robinhood will not be responsible for any Losses caused by the liquidation of securities, instruments or other property pursuant to this paragraph, including any tax liabilities.

## 17. Waiver; Limitation of Liability; Indemnification.

I agree that My use of the App or the Website or any other service provided by Robinhood Financial or its Affiliates is at My sole risk. The Robinhood Financial service (including the App, the Website, the provision of Market Data, Information, Content, or any other information provided by Robinhood Financial, any of its Affiliates, or any third-party content provider or market data provider) is provided on an "as is," "as available" basis without warranties of any kind, either express or implied, statutory (including without limitation, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), implied warranties arising from trade usage, course of dealing, course of performance, or the implied warranties of merchantability or fitness for a particular purpose or application, other than those warranties which are implied by and incapable of exclusion, restriction or modification under the laws applicable to this Agreement.

Although considerable effort is expended to make the Website, App and other operational and communications channels available around the clock, Robinhood does not warrant that these channels will be available and error free every minute of the day. I agree that Robinhood will not be responsible for temporary interruptions in service due to maintenance, Website or App changes, or failures, nor shall Robinhood be liable for extended interruptions due to failures beyond our control, including but not limited to the failure of interconnecting and operating systems, computer viruses, forces of nature, labor disputes and armed conflicts.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, I UNDERSTAND AND AGREE THAT ROBINHOOD, ITS AFFILIATES, THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND THE PROVIDERS (COLLECTIVELY THE "ROBINHOOD PARTIES") WILL NOT BE LIABLE TO ME OR TO THIRD PARTIES UNDER ANY CIRCUMSTANCES, OR HAVE ANY RESPONSIBILITY WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING TRADING LOSSES, DAMAGES, LOSS OF PROFITS, REVENUE, OR GOODWILL) THAT I MAY INCUR IN CONNECTION WITH MY USE OF THE SERVICE PROVIDED BY ROBINHOOD OR ANY OF ITS AFFILIATES UNDER THIS AGREEMENT (INCLUDING MY USE OF THE APP, THE WEBSITE, THE MARKET DATA, THE INFORMATION, OR THE CONTENT), BREACH OF THIS AGREEMENT, OR ANY TERMINATION OF THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, AND WHETHER OR NOT FORESEEABLE, EVEN IF ANY ROBINHOOD PARTY HAS BEEN ADVISED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES. THE ROBINHOOD PARTIES SHALL NOT BE LIABLE BY REASON OF DELAYS OR INTERRUPTIONS OF THE SERVICE OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF THEIR RESPECTIVE SYSTEMS,

2020.06

CONFIDENTIAL

RH_HT_00000310

REGARDLESS OF CAUSE, INCLUDING THOSE CAUSED BY GOVERNMENTAL OR REGULATORY ACTION, THE ACTION OF ANY EXCHANGE OR OTHER SELF REGULATORY ORGANIZATION, OR THOSE CAUSED BY SOFTWARE OR HARDWARE MALFUNCTIONS.

Except as otherwise provided by law, Robinhood or any of its affiliates or respective partners, officers, directors, employees or agents (collectively, "Indemnified Parties") shall not be liable for any expenses, losses, costs, damages, liabilities, demands, debts, obligations, penalties, charges, claims, causes of action, penalties, fines and taxes of any kind or nature (including legal expenses and attorneys' fees) (whether known or unknown, absolute or contingent, liquidated or unliquidated, direct or indirect, due or to become due, accrued or not accrued, asserted or unasserted, related or not related to a third party claim, or otherwise) (collectively, "Losses") by or with respect to any matters pertaining to My Account, except to the extent that such Losses are actual Losses and are determined by a court of competent jurisdiction or an arbitration panel in a final non-appealable judgment or order to have resulted solely from Robinhood's or any of its affiliates' gross negligence or intentional misconduct. In addition, I agree that the Indemnified Parties shall have no liability for, and I agree to indemnify, defend and hold harmless the Indemnified Parties from all Losses that result from: (i) any noncompliance by Me with any of the terms and conditions of this Agreement; (ii) any third-party actions related to My receipt and use of any Information, Market Data, Content, market analysis, other third-party content, or other such information obtained on the App or Website, whether authorized or unauthorized under this Agreement; (iii) any third-party actions related to My use of the App or the Website; (iv) My or My agent's misrepresentation or alleged misrepresentation, or act or omission; (v) Indemnified Parties following My or My agent's directions or instructions, or failing to follow My or My agent's unlawful or unreasonable directions or instructions; (vi) any activities or services of the Indemnified Parties in connection with My Account (including any technology services, reporting, trading, research or capital introduction services); or (vii) the failure by any person not controlled by the Indemnified Parties and their affiliates to perform any obligations to Me. Further, if I authorize or allow third parties to gain access to Robinhood's services, including My Accounts, I will indemnify, defend and hold harmless the Indemnified Parties against any Losses arising out of claims or suits by such third parties based upon or relating to such access and use. Robinhood does not warrant against loss of use or any direct, indirect or consequential damages or Losses to Me caused by My assent, expressed or implied, to a third party accessing My Account or information, including access provided through any other third party systems or sites.

I consent to the use of automated systems or service bureaus by Robinhood and its respective affiliates in conjunction with My Account, including automated order entry and execution, record keeping, reporting and account reconciliation and risk management systems (collectively "Automated Systems"). I understand that the use of Automated Systems entails risks, such as interruption or delays of service, errors or omissions in the information provided, system failure and errors in the design or functioning of such Automated Systems (collectively, a "System Failure") that could cause substantial damage, expense, or liability to Me. I understand and agree that Indemnified Parties will have no liability whatsoever for any of my Losses arising out of or relating to a System Failure.

I also agree that Indemnified Parties will have no responsibility or liability to Me in connection with the performance or non-performance by any exchange, clearing organization, market data provider, or other third party (including other broker-dealers and clearing firms, and banks) or any of their respective agents or affiliates, of its or their obligations relative to any securities. I agree that Indemnified Parties will have no liability, to Me or to third parties, or responsibility whatsoever for: (i) any Losses resulting from a cause over which Indemnified Parties do not have direct control, including the failure of mechanical equipment, unauthorized access, theft, operator errors, government restrictions, force majeure (as defined in this Agreement), market data availability or quality, exchange rulings or suspension of trading; and (ii) any special, indirect, incidental, consequential, punitive or exemplary damages (including lost profits, trading losses and damages) that I may incur in connection with My use of the App, the Website, Robinhood's brokerage, and other services provided by Indemnified Parties under this Agreement.

## 18. Mutual Fund Transactions.

In the event that I purchase or hold a mutual fund, I agree to read and understand the terms of its prospectus. I understand that certain mutual funds reserve the right to change their purchasing, switching or redemption procedures or suspend or postpone redemptions under certain market conditions. I further understand that any mutual fund order entered with Robinhood is placed by Robinhood on a best efforts basis as prescribed and recognized by the individual fund, and that Robinhood is not responsible for unexecuted orders due to the failure of any communication system. I agree to be fully responsible for the information contained within the mutual fund prospectus and to hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers and employees harmless

CONFIDENTIAL                                                                                  RH_HT_00000311

for any deficiencies contained therein. I authorize Robinhood to act as My agent in the purchase and redemption of fund shares.

## 19. Exchange Traded Funds.

I understand that I should consider the investment objectives and unique risk profile of Exchange Traded Funds ("ETFs") carefully before investing, and that ETFs are subject to risks similar to those of other diversified portfolios. I further understand that leveraged and inverse ETFs may not be suitable for all investors and may increase exposure to volatility through the use of leverage, short sales of securities, derivatives, and other complex investment strategies, and that although ETFs are designed to provide investment results that generally correspond to the performance of their respective underlying indices, they may not be able to exactly replicate the performance of the indices because of expenses and other factors. I further understand that ETFs are required to distribute portfolio gains to shareholders at year end, which may be generated by portfolio rebalancing or the need to meet diversification requirements, and that ETF trading will also generate tax consequences. I understand that I can obtain prospectuses from issuers or their third party agents who distribute and make prospectuses available for review. Additional regulatory guidance on ETFs can be found here.

## 20. Effect of Attachment or Sequestration of Accounts.

Robinhood shall not be liable for refusing to obey any orders given by or for Me with respect to any of My Accounts that has or have been subject to an attachment or sequestration in any legal proceeding against Me, and Robinhood shall be under no obligation to contest the validity of any such attachment or sequestration.

## 21. Event of Death.

It is agreed that in the event of My death, the representative of My estate or the survivor or survivors shall immediately give Robinhood written notice thereof, and Robinhood may, before or after receiving such notice, take such proceedings, require such papers and inheritance or estate tax waivers, retain such portion of, or restrict transactions in the Account as Robinhood may deem advisable to protect Robinhood against any tax, liability, penalty or loss under any present or future laws or otherwise. Notwithstanding the above, in the event of My death, all open orders shall be canceled, but Robinhood shall not be responsible for any action taken on such orders prior to the actual receipt of notice of death. Further, Robinhood may in Its discretion close out any or all of the Accounts without awaiting the appointment of a personal representative for My estate and without demand upon or notice to any such personal representative. The estate of any of the Account holders who have died shall be liable and each survivor shall continue to be liable, jointly and severally, to Robinhood for any net debit balance or loss in said account in any way resulting from the completion of transactions initiated prior to the receipt by Robinhood of the written notice of the death of the decedent or incurred in the liquidation of the Account or the adjustment of the interests of the respective parties, and for all other obligations pursuant to this Agreement. Such notice shall not affect Robinhood's rights under this Agreement to take any action that Robinhood could have taken if I had not died.

## 22. Tax Reporting; Tax Withholding.

The proceeds of sale transactions and dividends paid will be reported to the Internal Revenue Service ("IRS") in accordance with applicable law.

## A. U.S. Persons.

This subsection is applicable if I am a U.S. person. Under penalties of perjury, I certify that the taxpayer identification number that I have provided or will provide to Robinhood (including any taxpayer identification number on any Form W-9 that I have provided or will provide to Robinhood) is My correct taxpayer identification number. I certify that I am not subject to backup withholding and I am a United States Person (including a U.S. resident alien) as such term is defined in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended ("U.S. Person"). If a correct Taxpayer Identification Number is not provided Robinhood Financial, I understand I may be subject to backup withholding tax at the appropriate rate on all dividends, interest and gross proceeds paid to me. Backup withholding taxes

CONFIDENTIAL                                                              RH_HT_00000312

are sent to the IRS and cannot be refunded by Robinhood Financial. I further understand that if I waive tax withholding and fail to pay sufficient estimated taxes to the IRS, I may be subject to tax penalties.

## B. Non-U.S. Persons.

This subsection is applicable if I am not a U.S. Person. I certify that I fully understand all the information on any Form W-8BEN that I have submitted or will submit to Robinhood. Under penalties of perjury, I declare that (i) I have examined all the information (including all the information in the English language) on any Form W-8BEN that I have submitted or will submit to Robinhood and (ii) to the best of My knowledge and belief all such information is true, correct, and complete. I authorize Robinhood to provide any such Form W-8BEN to Robinhood Securities or any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. I agree that I will submit a new Form W-8BEN to Robinhood within 30 calendar days if any certification made on any previously submitted Form W-8BEN becomes incorrect. I understand that the IRS does not require My consent to any provisions of such Form W-8BEN other than the certifications required to establish My status as a non-U.S. Person and, if applicable, obtain a reduced rate of withholding.

## 23. Equity Orders and Payment For Order Flow.

SEC rules require all registered broker-dealers to disclose their policies regarding any "payment for order flow" arrangement in connection with the routing of customer orders. "Payment for order flow" includes, among other things, any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer from any broker-dealer in return for directing orders. I understand that Robinhood transmits customer orders for execution to various exchanges or market centers based on a number of factors. These include: size of order, trading characteristics of the security, favorable execution prices (including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing and reduced execution costs through price concessions from the market centers. I further understand that certain of the exchanges or market centers may execute orders at prices superior to the publicly quoted market in accordance with their rules or practices and that while a customer may specify that an order be directed to a particular market center for execution, the order-routing policies, taking into consideration all of the factors listed above, are designed to result in favorable transaction processing for customers. The nature and source of any payments or credits received by Robinhood in connection with any specific transactions will be furnished upon written request.

## 24. Free Credit Balances and Sweep Service.

If I enroll in Robinhood Financial Cash Management ("Cash Management"), I understand that I am electing to participate in the Insured Network Deposit ("IND") sweep service (the "Sweep Service"). Under the Sweep Service, free credit balances in My Account will be deposited into interest-bearing accounts at one or more banks ("Participating Depository Institutions"), in accordance with the Insured Network Deposit Sweep Program Disclosures ("IND Disclosures") available on the Website and in the App. By enrolling in Cash Management, I represent and warrant that I have reviewed the IND Disclosures and agree to the terms set forth in the IND Disclosures. If I am not enrolled in Cash Management, free credit balances in My Account will remain in My Account, will not earn interest and will not be eligible for FDIC insurance, but will be eligible for SIPC protection as described in the IND Disclosures.

## 25. Fees and Charges.

I understand that Robinhood does not charge fees or commissions for executing buy and sell orders. However, I understand that other fees may apply. The current fees are included in the fee schedule available in the App and on the Website. I agree to pay any such fees at the then-prevailing rate. I acknowledge that the prevailing fees may change and that change may occur without notice. I agree to be bound by such changes once they are posted in the fee schedule available in the App and on the Website. I also agree to pay all applicable federal, state, local, and foreign taxes. I authorize Robinhood Financial to automatically debit My Account for any such fees and taxes. I also agree to pay such expenses incurred by Robinhood in connection with collection of any unpaid balance due on My Accounts including attorney's fees allowed by law.

CONFIDENTIAL                                                                      RH_HT_00000313

## 26. ACH Transactions.

### A. Debit Transactions.

Robinhood will initiate an ACH debit at My request to debit funds from an account that I own at another financial institution ("External Account") for deposit into My Account. I understand that in order for Robinhood to initiate an ACH debit, the financial institution holding my External Account must participate in the ACH system. I understand that for the ACH transfers to be established, at least one common name must match exactly between My Account and My External Account. I authorize Robinhood to take such steps as it deems appropriate to verify my ownership of External Account, including by telling the bank at which such External Account is held that I have authorized and consented to such bank disclosing to Robinhood any information that Robinhood may request about Me or My External Account. I also agree to cooperate with Robinhood's verification of my ownership of such External Account by promptly providing any identification and/or other documentation that Robinhood may request regarding such External Account. I represent and warrant that there are sufficient funds in My External Account to cover the amount of the deposit to My Account. Robinhood will initiate the ACH debit to My External Account on the Business Day or next Business Day after I request the transfer. A transfer request will be deemed to have been made on a Business Day if it is received by Robinhood by 7:00 p.m. (Eastern Time) on such Business Day; if received after that time, the transfer request will be deemed to have been made on the next Business Day.

Within 60 days of the date of My ACH deposit, My funds may only be withdrawn to the External Account from which such funds were debited.

I understand that an ACH debit transfer may be reversed or rejected if: (A) there are insufficient funds in My External Account; (B) there is a duplicate transaction; (C) the transaction is denied by the bank holding My External Account; or (D) My External Account does not support ACH transfers. I acknowledge that in the event of an ACH reversal, I will incur a fee. Before initiating making an ACH debit transfer, I agree to check Robinhood Financial's most recent Commissions and Fees Schedule. I agree that I am solely liable and responsible for any ACH reversal fees that I incur.

### B. Credit Transactions.

Robinhood will initiate an ACH credit at My request to transfer funds from My Account to a recipient that I designate. I agree that I will have sufficient Available Funds in My Account to cover the amount of any ACH credit that I ask Robinhood to initiate. Robinhood will debit the amount of such request from My Account on the Business Day or next Business Day after I request the transfer. A transfer request will be deemed to have been made on a Business Day if it is received by Robinhood on such Business Day; if received after that time, the transfer request will be deemed to have been made on the next Business Day.

I agree that Robinhood may use any means which Robinhood, in its sole discretion, considers suitable to execute my ACH credit transfers.

## 27. Fractional Shares.

I acknowledge and understand that Robinhood rounds all holdings of fractional shares to the sixth decimal place, the value of fractional shares to the nearest cent, and any dividends paid on fractional shares to the nearest cent. I further understand that Robinhood will not accept dollar-based purchases or sales of less than $1.00 and that I will receive proceeds from the sale of any whole or fractional shares rounded to the nearest cent.

I understand that if I enter repeated fractional orders with individual notional values of less than $0.01, my account may be restricted.

I understand that a vendor employed by Robinhood will aggregate any proxy votes for fractional shares of Robinhood's customers with all votes reported to the issuer or issuer's designated vote tabulator and that, while Robinhood's vendor will report such proxy votes on fractional shares, the issuer or tabulator may not fully count such votes.

2020.06

CONFIDENTIAL

RH_HT_00000314

I understand that Robinhood will execute all orders that include fractional shares ("Fractional Orders") on a principal basis. To the extent that Robinhood must purchase or sell shares in the market to fulfill any part of my Fractional Order, the fractional component of that order will be fulfilled at the execution price Robinhood received for the corresponding whole shares. To the extent that Robinhood fulfills my Fractional Order for national exchange-listed securities ("NMS Securities") entirely out of its inventory and without purchasing or selling shares in the market ("Inventory Fulfillment"), Robinhood will endeavor to price such shares or fractional shares at a price between the National Best Bid and Offer ("NBBO") at the time of the order for orders made during market hours, or, for such orders made during extended hours trading (9:00-9:30 a.m. and 4:00-6:00 p.m. Eastern), Robinhood will endeavor to price such orders between the best bid and offer at the time of the order, as reported by an external vendor ("Vendor BBO"). For Inventory Fulfillment of Fractional Orders for securities not listed on a national exchange ("Non-NMS Securities") made during market hours as well as extended hours trading, Robinhood will endeavor to price such orders between Vendor BBO.

All non-market orders placed outside market hours and extended hours trading are queued and fulfilled either at or near the beginning of extended hours trading (9:00 a.m. Eastern) or at or near market open (9:30 a.m. Eastern), according to my instructions. All market orders placed outside market hours and extended hours trading are queued and fulfilled at or near market open. To the extent that I trade outside of market hours, these trades are subject to Robinhood's Extended Hours Trading Disclosure.

I understand Robinhood only accepts market orders for fractional shares at this time and does not permit limit orders for fractional shares. I understand that fractional shares within My Account (i) are unrecognized, unmarketable, and illiquid outside the Robinhood platform, (ii) are not transferrable in-kind, and (iii) may only be liquidated and the proceeds transferred out via a wire transfer. I acknowledge that, subject to applicable requirements, Robinhood may report holdings and transactions in My Account in terms of either U.S. Dollars, shares, or both.

## 28. Phone Calls.

You agree that, by providing information Robinhood requests, Robinhood and its third party services providers may contact you via mail, phone or email.

Specifically, if you provide us with a phone number: (a) you represent and warrant that the number you provide is your phone number, and you will promptly notify us if that changes, and (b) you consent to receive calls (including text messages) made to that phone number that may be prerecroded and/or completed with an automatic telephone dialing system (automated calls) for purposes including but not limited to providing account-related communications (including security alerts), investigating or preventing fraud, and/or collecting amounts owed to Robinhood. We may share your number with third parties that provide services to us in connection with any of the foregoing purposes, including but not limited to debt collectors. You understand that message, telephone minute and data rates may apply for calls made to a mobile phone number. You may opt out at any time from receiving these types of calls orally or in writing to limitsharing@robinhood.com. Please note, even if you opt out, we may still make other calls as permitted by law.

You consent to our recording of phone calls, including calls we make to you or that we receive from you.

## 29. Dividend Reinvestment Program.

Except as expressly stated otherwise, the provisions of this Section 29 will only apply if I am enrolled in Robinhood's Dividend Reinvestment Program ("DRIP"). My enrollment in the DRIP will be activated within three business days after I notify Robinhood of my intention to enroll an eligible security through the App. "Eligible security" means all shares available for fractional investing through Robinhood. I understand that in order to be eligible for dividend reinvestment, the securities must be held in My Account.

I may specify individual securities or have all Eligible securities in My Account enrolled for dividend reinvestment. If I choose to reinvest dividends from all Eligible securities, I understand that individual securities could subsequently no longer be Eligible securities at Robinhood's discretion or under applicable law. In those cases, only those securities will be discontinued from the DRIP. If I specify individual securities, I may add additional Eligible securities to the DRIP at any time if I hold a position in those securities. Enrollment with respect to these additional Eligible securities will be effective within three business days after Robinhood receives notification from me through the App. If I maintain open orders for securities I do not already hold, I may not enroll those securities for dividend reinvestment

CONFIDENTIAL                                                                    RH_HT_00000315

until my open orders are executed. If my entire Account is set up for dividend reinvestment, any eligible securities I purchase in the future will automatically participate in the DRIP.

All eligible cash distributions will be reinvested on all securities I have selected in the DRIP, provided that I owned the securities on the record date for determining shareholders eligible to receive dividends, and continue to hold the securities through payable date. "Eligible cash distributions" means most cash distributions, including regular and optional dividends, cash-in-lieu payments, and capital gains distributions. Special dividends, late ex-date, liquidation, and miscellaneous payments may not be eligible distributions. Optional dividends will be processed in accordance with dividend reinvestment instructions. If I have a margin account, Robinhood is permitted to borrow a dividend paying stock in the normal course of business and, as a result, in such situations instead of a dividend payment I may receive a cash in lieu payment. If I receive a cash in lieu payment, I authorize Robinhood to treat such payment as if it was not "in lieu" and reinvest it accordingly.

Robinhood will credit My Account upon completion of the dividend reinvestment. Robinhood will reinvest dividends on the business day following receipt of funds. In the rare instance in which Robinhood is unable to reinvest all dividends on the business day following receipt, it will reinvest the remaining funds as soon as reasonably possible thereafter, which may take up to five business days. I will not have use of the funds prior to reinvestment.

I understand that my participation in the DRIP is voluntary and that Robinhood has not made any recommendation that I should participate. I further understand that Robinhood is not recommending or offering any advice regarding the purchase of any security included as an Eligible security in the DRIP. I further understand that dividend reinvestment does not assure profits on my investments, nor does it protect against losses in declining markets.

I may terminate my participation in the DRIP, or the enrollment of individual securities in the DRIP, at any time by giving notice through the App. Termination will take effect prior to the next Eligible cash distribution provided my notice to terminate was received at least three business days prior to the record date of that distribution. I understand that my notice to terminate my participation in the DRIP will not affect any obligations that may result from transactions initiated prior to Robinhood's receipt and processing of my notice.

If I participate in the DRIP, I understand Robinhood will reinvest the dividends of a particular stock at or near the opening price on the trading day following receipt of the dividend. Robinhood will combine Eligible cash distributions from My Account with those from other Robinhood clients requesting dividend reinvestment in the same security and use these combined funds to purchase securities on my behalf and on behalf of these other clients. If the combined reinvested funds do not total the purchase price of at least one share, the distribution will be invested in fractional shares. On that same day, Robinhood will credit My Account with that number of shares, including fractional shares, equal to my Eligible cash distribution divided by the purchase price per share. Robinhood does not intend to charge a fee for transactions executed pursuant to the DRIP.

Dividend reinvestment may result in my owning interests in fractional shares of a security. I will be entitled to receive future dividend payments on my fractional shares, although other corporate actions may result in allocation of only whole shares and cash in lieu of fractions as determined by the issuer. In mandatory corporate reorganizations, my partial interest will be handled according to the specific terms of the reorganization. In voluntary corporate reorganizations, Robinhood will act on my instructions with respect only to my whole shares.

Because fractional share positions cannot be transferred, reorganized, or issued in certificate form, my partial interest will be liquidated, without commission charges to me, at prevailing market prices in the event My Account is transferred or closed, the stock is reorganized, or stock certificates are ordered out of My Account. The timing of such liquidations will be at the discretion of Robinhood.

Reinvestment of dividends may result in my owning a fractional share position in securities that are callable in part. In the event of a call, fractional shares to be called will be determined through a random selection process. The probability of my fractional share holdings being called will be proportional to the holdings of all Robinhood clients who own a fractional share position in that security. Prior to the publication date of such a call, I have the right to withdraw from My Account cash in lieu of my uncalled, fully paid partial holdings. Once a call is announced, however, all shares, whether registered or held in street name, participate in the random selection process. If my fractional shares are selected and I no longer hold the shares that I held on the publication date of the call, I will be responsible for covering those shares.

CONFIDENTIAL                                                                      RH_HT_00000316

## 30. Cash Management Services.

Except as expressly stated otherwise, the provisions of this Section 30 will only apply if I am enrolled in Cash Management.

## A. General.

I understand and agree that by enrolling in Cash Management, I may apply for a Robinhood-branded debit card issued by the bank identified in My Robinhood Debit Card Agreement ("Card"). I further understand and agree that by using My Card, exercising My electronic fund transfer ("EFT") privileges offered in connection with My Account, and/or by successfully completing a request using Pay by Check, I authorize Robinhood to debit My Account immediately whenever an electronic draft or Card transaction is presented for payment on My behalf, when an EFT transaction is effected, when a Pay by Check request is successfully completed on My Account and/or when any fee or charge is due (collectively "Payment" or "Payments"). I further understand and agree that when I request a Payment or withdrawal or instruct Robinhood to make a purchase of securities from My Account, Robinhood is authorized to place a block on the amount of the transaction ("Blocked Amounts") prior to the settlement date of the Payment, withdrawal or trade, and that the Blocked Amounts will not be available for use for additional Payments or the purchase of securities. I agree to maintain Available Funds sufficient to pay for Payments made by Me or any Authorized Card User (as defined below) and to pay for any securities trades and for interest on any margin loans and other transaction fees. For this purpose, "Available Funds" in My Account will fluctuate daily and means the sum of (i) free credit balances, (ii) deposits to Participating Depository Institutions through the Sweep Service, and (iii) available margin loan value if My Account has margin privileges, minus (x) uncleared funds, (y) Blocked Amounts, and (z) deposits subject to a hold. The loan value of eligible securities for the purpose of margin is subject to regulatory requirements and Robinhood credit policies then in effect.

## B. Payments and Withdrawals.

I agree that any Payments that I make from My Account will be lawful. I agree that Payments will be deducted from the Available Funds in My Account in the following order: first, from free credit balances; second, by withdrawal of funds deposited to Participating Depository Institutions as part of the Sweep Service; and third, if My Account has margin privileges, from margin loans on the eligible securities in My margin Account. Robinhood will debit My Account only up to an amount equal to the Available Funds. I understand and agree that (i) if there are insufficient Available Funds in My Account to cover Payments when they become due, Robinhood has no obligation to make such Payments, and (ii) Robinhood has no obligation to make partial Payments. Robinhood will not charge a fee with respect to any declined Payment for which there were insufficient Available Funds. I acknowledge and agree, however, that Robinhood will not be responsible for any costs or losses that I may incur (including fees, costs, charges, attorneys' fees, investment losses, claims, demands, or liability resulting from any litigation or other actions) as a result of Robinhood's decision to decline any Payment or withdrawal or other transaction because My Account has insufficient Available Funds.

I understand that if a Payment is funded by a margin loan, I will incur interest until the margin loan is repaid.

I agree that if my Available Funds at any time falls below zero, Robinhood may suspend my ability to make Payments and terminate My Card. If this occurs, I agree to immediately pay all amounts owed to Robinhood, including any purchases on My Card which will be immediately charged to My Account.

I acknowledge and agree that Robinhood reserves the right to decline any Payments at any time for any reason with or without notice to Me. If Robinhood decides to take such action, I understand and agree that I am responsible for any pending debits, which will be processed and deducted from My Account.

I understand that transactions will post to My Account in any order determined by Robinhood and that Robinhood may change that order without prior notice to Me. Robinhood will comply with requirements of applicable law regarding the order of posting transactions.

2020.06

## C. Limitation of Liability.

I agree that, subject to any limitations imposed by applicable law, and except as otherwise set forth in this Agreement or in the disclosures contained in the Robinhood Debit Card Agreement, which has been provided to Me or made available to me in connection with the opening of My Account, Robinhood, Robinhood's agents, any processing bank, and the Card issuer will not be liable for any loss I incur in connection with My Account and any Payments or other features of My Account unless Robinhood is grossly negligent in fulfilling this Agreement. In no event will Robinhood, Robinhood's agents, any processing bank, and the Card issuer shall not be liable for consequential, special or indirect damages or losses unless applicable law requires otherwise. I also agree that liability regarding online services or use of the App is further limited by the Robinhood Terms and Conditions, available at https:// about.robinhood.com/legal/. To the extent I utilize online services or the App I acknowledge that I am bound by such Robinhood Terms and Conditions.

## D. Debit Cards.

I understand and agree that My use of the Card is subject to the terms, conditions and disclosures set forth in the Robinhood Debit Card Agreement, which has been provided to Me in connection with the opening of My Account and which I may access on the Website.

I understand and agree that I cannot request a Card for another person to use. I agree, however, that if I permit another person to have access to use My Card or Card number (an "Authorized Card User"), I am authorizing all Card transactions by such person and I agree that there are no limits to my authorization. I accept all liability with respect to the Card transactions effected by Me and any Authorized Card Users. I further agree that I may terminate the authority of an Authorized Card User only by contacting help@robinhood.com, to cancel my Card. I agree that the cancellation of My Card is effective only after Robinhood has a reasonable period to act on My notice.

If My Card is cancelled, I agree to destroy, or if requested by Robinhood, return the Card to Robinhood. I acknowledge that I will be responsible for any Card transactions that are processed because of My failure to destroy or return the Card following cancellation.

If My Account includes margin privileges, I agree that transactions that exceed My free credit balances and deposits in the Sweep Service may result in margin credit being extended to My Account, for which I will be charged interest. I agree to review the Margin Disclosure Statement, which is available at https://about.robinhood.com/legal/.

## E. Deposits.

The provisions in this Section 30.E shall apply to My Account whether or not I am enrolled in Cash Management.

*General; Holds.* I acknowledge and agree that funds that I deposit to My Account may be subject to one or more hold periods, which are described in the RHF Funds Availability schedule available at https:// about.robinhood.com/legal/. I understand and agree that Robinhood reserves the right to modify the RHF Funds Availability schedule at any time by posting an updated schedule at https://about.robinhood.com/ legal/, or otherwise providing notice to me. During the applicable hold period, My funds will not be available for Payments, withdrawal, or the settling of securities transactions, in each case as described in the RHF Funds Availability schedule. I further understand and agree that Robinhood reserves the right to further delay making deposited funds available for periods longer than the hold periods specified in the RHF Funds Availability schedule to the extent Robinhood determines that additional time is needed to verify information about the item deposited or the sender or if Robinhood otherwise believes there is a risk of fraud or other unlawful activity with respect to My Account.

*Mistaken Deposits.* If funds are deposited or transferred into My Account by mistake or otherwise, I agree that Robinhood may correct the situation and deduct any interest paid by Participating Depository Institutions, if applicable, without prior notice to Me.

CONFIDENTIAL                                                                                          RH_HT_00000318

*Returned Funds.* I acknowledge and agree that I am responsible for returned transactions. If I have funds transferred into My Account and that transfer is returned for any reason, Robinhood may charge the transfer and interest paid by Participating Depository Institutions, if applicable, against My Account, without prior notice to Me.

## F. Electronic Fund Transfers.

The provisions in this Section 30.F relating to EFTs other than Card transactions shall apply to My Account whether or not I am enrolled in Cash Management.

I understand that My Account may be eligible for a variety of EFTs, which may be subject to separate agreements, terms and conditions. These services may include use of the Card, and the "Move Money" functionality of the App. I understand that I may be required to agree to separate terms and conditions governing the particular service I use to initiate EFTs. In addition, I understand and agree that my use of EFT services are subject to the disclosures set forth in Appendix A (Electronic Fund Transfer Disclosures), and acknowledge that I have received and reviewed such disclosures.

## G. Security.

I agree to protect My Card, and My PINs, from access by anyone not authorized by Me to use them. I acknowledge that I will be liable for all Card and online transactions conducted by anyone to whom I have given access or who has obtained access even if not authorized by Me, up to applicable legal limits. I understand that I am responsible for reviewing My Account statement promptly to discover and report unauthorized activity, including use of My Card, Card number or PIN. I agree to notify Robinhood as provided in Appendix A (Electronic Fund Transfer Disclosures) if I believe or have reason to believe that there has been unauthorized activity in My Account or that My Card, Card number or PIN has been lost, stolen or may be used by an unauthorized person. Unless limited by law or as otherwise set forth in this Agreement or in the disclosures contained in Robinhood Debit Card Agreement, which is provided to Me as part of the Account opening process and is available on the Website, I agree that I will be responsible for losses that arise from My failure to (i) safeguard My Card and PINs, (ii) review My monthly statement for possible unauthorized activity and (iii) report any unauthorized activity to Robinhood as provided herein or in the Robinhood Debit Card Agreement.

## H. No Illegal Purpose.

I agree and understand that I may not use my debit card or any Payments on My Account for any illegal purpose. I agree and understand that Robinhood may, in its discretion, deny any transactions that appear to be made for an illegal purpose.

## I. Pay by Check.

I agree and understand that if I try to stop payment on a check after it has been mailed to the payee, Robinhood will attempt to but cannot guarantee that payment on the check will be stopped. I understand that a stop payment order on a check is valid for six months. I understand that if I wish to renew a stop payment on a check after the six month period, I must contact Robinhood to request another stop payment. I agree and understand that I may still be liable to the holder of the check even if I have requested a stop payment for the amount of the check. I agree and understand that Robinhood may deduct My Account for the amount on the check if the stop payment request is unsuccessful.

## J. Disclosure of Information.

I agree and understand that all disclosures of My non-public personal information shall be made in accordance with the terms of the this Agreement or the Robinhood Privacy Policy (available on the

CONFIDENTIAL                                                                          RH_HT_00000319

Website at https://about.robinhood.com/legal/, as applicable. I agree that My consent to sharing non-public personal information will remain in effect until I revoke such consent by updating My settings and visibility, which I may do at any time through the App.

In addition, I understand and agree that Robinhood may disclose information about My Account and My related activities to third parties under the following circumstances: - As necessary to complete My Payment transactions; - To investigate any complaint, disputed transaction, transaction inquiry or request I make or as necessary to investigate potential fraud or misuse related to My Account; - To respond to requests from credit bureaus, creditors or other third parties for account-related information, to the extent such inquiries are necessary for processing My transactions or are usual and customary in the course of servicing similar products or accounts; - As necessary to comply with any applicable law, government or court order or subpoena; or - In accordance with My written permission or as otherwise permitted under the Robinhood Privacy Policy.

## I. Termination.

I understand that Robinhood may terminate my participation in Cash Management or in specific features of Cash Management for any reason, upon notice to me.

## 31. Consent to Redeem Shares.

I understand and agree that whenever it is necessary for Robinhood's protection or to satisfy a margin call, deficiency, debit or other obligation owed to Robinhood, Robinhood may (but is not required to) sell, assign and deliver all or any part of the securities in My Account, or close any or all transactions in My Account. I understand that Robinhood may, but is not obligated to, attempt to contact Me before taking any such action. I understand and agree that Robinhood reserves the right to take any such action without prior notice or demand for additional collateral, and free of any right of redemption, and that any prior demand, call or notice will not be considered a waiver of our right to sell or buy without demand, call or notice.

I further understand that Robinhood may choose which securities to buy or sell, which transactions to close, and the sequence and timing of liquidation, and may take such actions on whatever exchange or market and in whatever manner (including public auction or private sale) that Robinhood chooses in the exercise of its business judgment. I agree not to hold Robinhood liable for the choice of which securities to buy or sell or of which transactions to close or for the timing or manner of the liquidation. I also agree not to hold Robinhood liable for taking such action.

I understand and agree that Robinhood is entitled to exercise the rights described in this section in its sole discretion, including, but not limited to, whenever any of the following occurs:

  • The equity level in My Account falls below required minimums;
  • Sufficient funds or securities are not deposited to pay for transactions in My Account;
  • I reverse any ACH debit transfer to My Account;
  • A petition of bankruptcy or for the appointment of a receiver is filed by or against Me;
  • An attachment is levied against My Account;
  • I die or become incapacitated or incompetent; or
  • My Account is closed.

## 32. Electronic Delivery of Trade and Account Information; Notice.

All communications, notices, legal disclosures, and other materials related to My Account or this Agreement, including account statements, trade confirmations, margin calls, notices, disclosures, regulatory communications and other information, documents, data and records regarding My Account (the "Communications"), or an alert that any such Communication has been posted to the secure section of the Website or the App, and is available for viewing, may be sent to Me at the mailing address for My Account or the e-mail address that I have given to Robinhood in My account application or at such other address as I may hereafter give Robinhood in writing or by e-mail at least ten (10) calendar days prior to delivery, and all communications so sent, whether in writing or otherwise, shall be deemed given to Me personally, whether actually received or not.

CONFIDENTIAL                                                    RH_HT_00000320

## 33. API.

### A. Overview; Definitions.

Robinhood may, in Robinhood's sole discretion, provide third parties with an application programming interface and other materials in accordance with any accompanying documentation (collectively, the "API Package") (such third parties, "API Licensees"), to make available certain features and functionality of Robinhood's mobile applications, websites, or technology platform via the API Licensees' products (such products, the "Licensee Products"). The API Package and the Licensee Products are collectively referred to as the "API Products". "Personal Information" means My personally identifiable information (including username, logon password, financial information, trade data, and other financial information) and all data exchanged between Robinhood and the API Products.

### B. Access to My Personal Information.

Through My use of any API Products, I may be providing API Licensees with access to My Account and Personal Information. By using any API Products, I acknowledge that such API Products may employ security, policies, procedures and systems of API Licensees which may or may not be less stringent and secure than Robinhood's policies, procedures and systems. I agree that My use of any API Products shall be subject to the terms and conditions of this Agreement, in addition to any other agreements which I executed with respect to any such API Products. I understand and agree that any end user agreement that I executed with any API Licensee is concluded between Me and such API Licensee only, and not with Robinhood; and such API Licensee, not Robinhood, is solely responsible for such Licensee Product and the content thereof. I understand and agree that the API Products may deliver Personal Information to Robinhood, and that Robinhood is authorized to receive and store such Personal Information consistent with Robinhood's then-in-effect policies and procedures. Further, I agree that the API Products may request Personal Information stored by Robinhood, and I consent to Robinhood's disclosure of such Personal Information to the API Products.

### C. No Recommendations.

To the extent the Licensee Products or API Licensees express opinions or make recommendations, I understand that such opinions and recommendations are expressed solely by API Licensees and are not the opinions or recommendations of Robinhood. The existence of the API Products and Robinhood's consent to any connectivity between any Licensee Products and Robinhood's technology, the App, the Website, or trading platform(s) does not constitute (i) any recommendation by Robinhood to invest in any security or utilize any investment strategy; or (ii) any representation, warranty, or other guarantee by Robinhood as to the present or future value or suitability of any sale, trade, or other transaction involving any particular security or any other investments. The existence of any and all information, tools and services provided by API Licensees or by the Licensee Products shall not constitute Robinhood's endorsement of API Licensees or the Licensee Products.

### D. Data Provided by Robinhood to API.

From time to time, and subject to then-in-effect agreements between Robinhood and API Licensees, Robinhood may, in its own discretion, make market data feeds received from third parties available via the API Products. Robinhood does not make any guarantees in regard to such market data feeds. Furthermore, API Licensees or Licensee Products may make available to Me market data feeds independent of Robinhood. I am aware that from time to time that there may be discrepancy between the market data presented on the App or Website and information provided by any API Products due to a variety of reasons, including the time to update and transmit such data to a mobile application or website and latency caused by such API Product's or My local environment (such as computer set up, connection speed, etc.). Robinhood is not responsible for the accuracy of any market data displayed on any API Products or otherwise made available by API Licensees.

22                                                                                                                   2020.06

## E. Risks; No Liability.

I acknowledge that there may be latency between the time an order (or other Personal Information) is submitted from the API Products and the time such order or Personal Information is received by Robinhood. Latency may also affect order modification and order cancellation requests. The time an order or a request is actually received by Robinhood (including for execution) will be the official time, including for the purposes of routing the order to the market for execution. In addition, all orders submitted to Robinhood are subject to order vetting by Robinhood. Orders created and submitted through any API Products are not vetted until they are received by Robinhood. It is possible that Robinhood may reject an order placed through any API Products. Robinhood cannot guarantee that any order will be accepted when such order is routed to the market for execution, and Robinhood cannot guarantee that notifications and Personal Information provided to Me by Robinhood will be successfully delivered to or displayed by any API Products.

Without limiting the generality of any other terms in this Agreement, I agree that:

1. Robinhood or its Affiliates shall not be liable for any Losses as a result of any issues addressed in this Section 33 of this Agreement, nor shall Robinhood or its Affiliates be liable for any Losses realized for technical issues involving any API Products or API Licensee technology or product offerings (including system outages or downtime).

2. Robinhood or its Affiliates shall not be responsible for any investment research provided by any API Licensee or any Licensee Products.

3. Robinhood or its Affiliates makes no representations, warranties or other guarantees as to the accuracy, timeliness or efficacy of any market data, information, or other functionality made available by any API Licensee or any API Products.

## F. Intellectual Property.

My use of any API Products will not confer to Me any title, ownership interest or intellectual property rights that otherwise belongs to Robinhood or any of its affiliates. The API Package, including content, is protected under U.S. patent, copyright laws, international treaties or conventions, and other laws and will remain Robinhood's exclusive property, as applicable. Names, logos, and all related product and service names, design marks, and slogans displayed by or relating to Robinhood or any of its Affiliates or API Licensees in the context of the API Products shall remain the property of the respective owner, and use of such property by Robinhood or any API Licensee in marketing or provision of any API Products does not grant ownership of or entitle Me to use any such name or mark in any manner.

## G. User's Representations and Warranties.

I represent and warrant that:

1. By virtue of utilizing any API Products, I consent to and accept any risk associated with Robinhood's sharing of Personal Information with any API Licensee and shall not hold Robinhood, its Affiliates, or their respective officers, directors, or employees responsible for any Losses resulting from the sharing of such Personal Information.

2. I agree that My use of any API Products or API Licensee's content, information, technology, or functionality is at My own risk.

3. I agree that Robinhood may revoke any API Licensee or API Products' authorization at any time, for any reason, with or without cause and without prior notice to Me.

## 34. Electronic Signatures; Modifications to the Agreement.

I agree to transact business with Robinhood electronically. By electronically signing an application for an Account, I acknowledge and agree that such electronic signature is valid evidence of My consent to be

CONFIDENTIAL                                                        RH_HT_00000322

legally bound by this Agreement and such subsequent terms as may govern the use of Robinhood's services. The use of an electronic version of any document fully satisfies any requirement that the document be provided to Me in writing. I accept notice by electronic means as reasonable and proper notice, for the purpose of any and all laws, rules and regulations. I acknowledge and agree that Robinhood Financial may modify this Agreement from time to time and I agree to consult the Website from time to time for the most up-to-date Agreement. The electronically stored copy of this Agreement is considered to be the true, complete, valid, authentic and enforceable record of the Agreement, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. I agree to not contest the admissibility or enforceability of Robinhood Financial's electronically stored copy of the Agreement.

## 35. Margin Accounts.

### A. Election.

This numbered section applies to my account to the extent I elect and am approved for a Robinhood Gold margin account.

### B. Margin Trading.

I understand that margin trading involves interest charges and risks, including the potential to lose more than deposited or the need to deposit additional collateral in a falling market. Before using margin, customers must determine whether this type of trading strategy is right for them given their specific investment objectives, experience, risk tolerance, and financial situation. If I have elected to have a margin Account, I represent that I have read the Margin Disclosure Statement, Day Trading Risk Disclosure, and FINRA Investor Information. These disclosures contain information on Robinhood's lending policies, interest charges, and the risks associated with margin accounts.

### C. Hypothecation.

Within the limitations imposed by applicable laws, rules and regulations, all securities now or hereafter held by Robinhood, or carried by Robinhood in any account for Me (either individually or jointly with others), or deposited to secure same, may from time to time, without any notice, be carried in your general loans and may be pledged, repledged, hypothecated or re-hypothecated, separately or in common with other securities for the sum due to you thereon or for a greater sum and without retaining in your possession or control for delivery a like amount of similar securities. The IRS requires Broker Dealers to treat dividend payments on loaned securities positions as payments received in lieu of dividends for 1099 tax reporting purposes. Taxation of substitute dividend payments may be greater than ordinary on qualified dividends. It is understood, however, that you agree to deliver to Me upon My demand and upon payment of the full amount due thereon, all securities in such accounts, but without obligation to deliver the same certificates or securities deposited by Me originally. Any securities in My margin or short account may be borrowed by you, or lent to others.

### D. Interest.

Debit balances in My Accounts shall be charged with interest in accordance with your established custom, as disclosed to Me in the Customer Information Brochure pursuant to the provisions of the Securities Exchange Act.

CONFIDENTIAL                                                                              RH_HT_00000323

## E. Margin.

I agree to maintain in all accounts with Robinhood such positions and margins as required by all applicable statutes, rules, regulations, procedures and custom, or as you deem necessary or advisable. I agree to promptly satisfy all margin and maintenance calls.

## F. Sales.

I agree to specifically designate any order to sell a security, which I do not own as a short sale, and understands that Robinhood will mark such order as a short sale. I agree that any order which is not specifically designated as a short sale is a sale of securities owned by me, and that I will deliver the securities on or before settlement date, if not already in the account. If I should fail to make such delivery in the time required, Robinhood is authorized to borrow such securities as necessary to make delivery for the sale, and I agree to be responsible for any loss you may thereby sustain, or which you may sustain as a result of your inability to borrow such securities.

## 36. Consent to Electronic Delivery of Documents.

## A. Consent.

**By agreeing to electronic delivery, I am giving My informed consent to electronic delivery of all Account Documents, as defined below, other than those I have specifically requested to be delivered in paper form.** "Account Documents" include notices, disclosures, current and future account statements, regulatory communications (such as prospectuses, proxy solicitations, and privacy notices), trade confirmations, tax-related documents, and any other information, documents, data, and records regarding My Account, this Agreement (including amendments to this Agreement), and the agreements and disclosures governing the services delivered or provided to Me by Robinhood Financial, the issuers of the securities or other property in which I invest, and any other parties. I agree that I can access, view, download, save, and print any Account Documents I receive via electronic delivery for My records.

## B. Electronic Delivery System.

I acknowledge that Robinhood's primary methods of communication with Me include (A) posting information on the Website, (B) providing information via the App, (C) sending email(s) to My email address of record, and, to the extent required by law, (D) providing Me with notice(s) that will direct Me to the App or the Website where I can read and print such information. Unless otherwise required by law, Robinhood reserves the right to post Account Documents on the Website without providing notice to Me. Further, Robinhood reserves the right to send Account Documents to My postal or email address of record, or via the App or Website. I agree that all Account Documents provided to Me in any of the foregoing manner is considered delivered to Me personally when sent or posted by Robinhood, whether I receive it or not.

All e-mail notifications regarding Account Documents will be sent to My e-mail address of record. I agree to maintain the e-mail address that I have provided Robinhood until I provide Robinhood with a new one. I understand that e-mail messages may fail to transmit promptly or properly, including being delivered to SPAM folders. I further understand that it is My sole responsibility to ensure that any emails from Robinhood or its Affiliates are not marked as SPAM. Regardless of whether or not I receive an e-mail notification, I agree to check the Website regularly to avoid missing any information, including time-sensitive or otherwise important communication. If I authorize someone else to access the e-mail account I have provided Robinhood, I agree to tell them to share the Account Documents with Me promptly, and I accept the risk that they will see My sensitive information. I understand that if I use a work e-mail address or computing or communications device, My employer or other employees may have access to the Account Documents.

Additionally, I acknowledge that the Internet is not a secure network and agree that I will not send any confidential information, including Account numbers or passwords, in any unencrypted e-mails. I also

2020.06

CONFIDENTIAL                                                                                        RH_HT_00000324

understand that communications transmitted over the Internet may be accessed by unauthorized or unintended third parties and agree to hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers and employees harmless for any such access regardless of the cause.

I agree to promptly and carefully review all Account Documents when they are delivered and notify Robinhood Financial in writing within five (5) calendar days of delivery if I object to the information provided (or other such time specified herein). If I fail to object in writing within such time, Robinhood Financial is entitled to treat such information as accurate and conclusive. I will contact Robinhood to report any problems with accessing the Account Documents.

## C. Costs.

Potential costs associated with electronic delivery of Account Documents may include charges from Internet access providers and telephone companies, and I agree to bear these costs. Robinhood Financial will not charge Me additional online access fees for receiving electronic delivery of Account Documents.

## D. Archival.

Upon My request, I may obtain copies of up to six (6) prior years of account statements, and three (3) prior years of trade confirmations.

## E. Revocation of Consent.

Subject to the terms of this Agreement, I may revoke or restrict My consent to electronic delivery of Account Documents at any time by notifying Robinhood Financial in writing of My intention to do so. I also understand that I have the right to request paper delivery of any Account Document that the law requires Robinhood Financial to provide Me in paper form. Robinhood Financial will not treat My request for paper copies as a withdrawal of My consent to electronic delivery of Account Documents. I understand that if I revoke or restrict My consent to electronic delivery of Account Documents or request paper delivery of same, Robinhood Financial, in its sole discretion, may charge Me a reasonable service fee for the delivery of any Account Document that would otherwise be delivered to Me electronically, restrict or close My account, or terminate My access to Robinhood Financial's services. I understand that neither My revocation or restriction of consent, My request for paper delivery, nor Robinhood Financial's delivery of paper copies of Account Documents will affect the legal effectiveness or validity of any electronic communication provided while My consent was in effect.

## F. Duration of Consent.

My consent to receive electronic delivery of Account Documents will be effective immediately and will remain in effect unless and until either I or Robinhood Financial revokes it. I understand that it may take up to three (3) Business Days to process a revocation of consent to electronic delivery, and that I may receive electronic notifications until such consent is processed.

## G. Hardware and Software Requirements.

I understand that in order to receive electronic deliveries, I must have access to a computer or Mobile Device with Internet access, a valid e-mail address, and the ability to download such applications as Robinhood Financial may specify and to which I have access. I also understand that if I wish to download, print, or save any information I wish to retain, I must have access to a printer or other device in order to do so.

2020.06

CONFIDENTIAL                                                              RH_HT_00000325

## H. Consent and Representations.

I hereby agree that I have carefully read the above information regarding informed consent to electronic delivery and fully understand the implications thereof. Additionally, I hereby agree to all conditions outlined above with respect to electronic delivery of any Account Document. I will maintain a valid e-mail address and continue to have access to the Internet. If My e-mail address changes, I agree to immediately notify Robinhood Financial of My new e-mail address in writing.

## 37. Miscellaneous Provisions.

The following provisions shall also govern this Agreement:

## A. Contact Information.

Robinhood Customer Service may be contacted by visiting support.robinhood.com or by email at help@robinhood.com.

## B. Interpretation.

The heading of each provision hereof is for descriptive purposes only and shall not be (1) deemed to modify or qualify any of the rights or obligations set forth herein or (2) used to construe or interpret any of the provisions hereunder. When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "or," when used in this Agreement, has the inclusive meaning represented by the phrase "and/or." Unless the context of this Agreement otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively; and (ii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement. References to any law shall be deemed to refer to such law as amended from time to time and to any rules or regulations promulgated thereunder.

## C. Binding Effect; Assignment.

This Agreement shall bind My heirs, assigns, executors, successors, conservators and administrators. I may not assign this Agreement or any rights or obligations under this Agreement without first obtaining Robinhood's prior written consent. Robinhood may assign, sell, or transfer My Account and this Agreement, or any portion thereof, at any time, without My prior consent.

## D. Severability.

If any provisions or conditions of this Agreement are or become inconsistent with any present or future law, rule, or regulation of any applicable government, regulatory or self-regulatory agency or body, or are deemed invalid or unenforceable by any court of competent jurisdiction, such provisions shall be deemed rescinded or modified, to the extent permitted by applicable law, to make this Agreement in compliance with such law, rule or regulation, or to be valid and enforceable, but in all other respects, this Agreement shall continue in full force and effect.

## E. Website Postings.

I agree and understand that Robinhood Financial may post other specific agreements, disclosures, policies, procedures, terms, and conditions that apply to My use of the App, the Website, or My Account

CONFIDENTIAL                                                                          RH_HT_00000326

on the Website ("Website Postings"). I understand that it is My continuing obligation to understand the terms of the Website Postings, and I agree to be bound by the Web Postings as are in effect at the time of My use.

## F. Entirety of Agreement.

This Agreement, any attachments hereto, other agreements and policies referred to in this Agreement (including the Website Postings), and the terms and conditions contained in My Account statements and confirmations, contain the entire agreement between Robinhood and Me and supersede all prior or contemporaneous communications and proposals, whether electronic, oral, or written, between Robinhood and Me, provided, however, that any and all other agreements between Robinhood and Me, not inconsistent with this Agreement, will remain in full force and effect.

## G. Amendment.

Robinhood may at any time amend this Agreement without prior notice to Me. The current version of the Agreement will be posted on the Website and My continued Account activity after such amendment constitutes My agreement to be bound by all then-in-effect amendments to the Agreement, regardless of whether I have actually reviewed them. Continued use of the App, the Website or any other Robinhood Financial services after such posting will constitute My acknowledgment and acceptance of such amendment. I agree to regularly consult the Website for up-to-date information about Robinhood Financial services and any modifications to this Agreement. Robinhood is not bound by any verbal statements that seek to amend the Agreement.

## H. Termination.

Robinhood may terminate this Agreement, or close, deactivate, or block access to My Account at any time in its sole discretion. I will remain liable to Robinhood for all obligations incurred in My Account, pursuant to this Agreement, or otherwise, whether arising before or after termination. I may terminate this Agreement after paying any obligations owed upon written notice. This Agreement survives termination of My Account.

## I. No Waiver; Cumulative Nature of Rights and Remedies.

I understand that Robinhood's failure to insist at any time upon strict compliance with any term contained in this Agreement, or any delay or failure on Robinhood's part to exercise any power or right given to Robinhood in this Agreement, or a continued course of such conduct on Robinhood's part, shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to Robinhood in this Agreement are cumulative and not exclusive of any other rights or remedies to which Robinhood is entitled.

## J. International Customers.

The products and services described on the Website are offered only in jurisdictions where they may be legally offered. Neither the Website nor the App shall be considered a solicitation for or offering of any investment product or service to any person in any jurisdiction where such solicitation or offering would be illegal. I understand that Robinhood, in its sole discretion, may accept unsolicited accounts from non-U.S. residents, depending on the country of residence and other factors. I understand that Robinhood is based in the United States and that Robinhood accepts only U.S. currency in Robinhood's customer accounts.

CONFIDENTIAL                                                    RH_HT_00000327

## K. Governing Law.

This Agreement and all transactions made in My Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

## 38. Arbitration.

**A. This Agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement, the parties agree as follows: (1) All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed. (2) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited. (3) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings. (4) The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date. (5) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry. (6) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court. (7) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement. B. Any controversy or claim arising out of or relating to this Agreement, any other agreement between Me and Robinhood, any Account(s) established hereunder, any transaction therein, shall be settled by arbitration in accordance with the rules of FINRA Dispute Resolution, Inc. ("FINRA DR"). I agree to arbitrate any controversy or claim before FINRA DR in the State of California. C. This agreement to arbitrate constitutes a waiver of the right to seek a judicial forum unless such a waiver would be void under the federal securities laws. If I am a foreign national, non-resident alien, or if I do not reside in the United States, I agree to waive My right to file an action against Robinhood in any foreign venue. D. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

ACCEPTED AND AGREED: I acknowledge that I have read the preceding terms and conditions of this Agreement, that I understand them and that I hereby manifest my assent to, and my agreement to comply with, those terms and conditions by accepting this agreement. **I ALSO UNDERSTAND THAT BY ACCEPTING THIS AGREEMENT I HAVE ACKNOWLEDGED THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE IN SECTION 38 HEREIN. I ALSO AGREE (1) THAT ANY OF MY MARGIN ACCOUNT SECURITIES MAY BE BORROWED BY ROBINHOOD OR LOANED TO OTHERS; (2) I HAVE RECEIVED OF A COPY OF THIS AGREEMENT AND (3) I HAVE REVIEWED A COPY OF THE MARGIN DISCLOSURE STATEMENT.**

## Appendix A

## Electronic Fund Transfer Services Disclosures

The following disclosures apply to the use of any EFT services offered by Robinhood, including the Card, ACH transactions and the Move Money functionality of the App.

Solely for purposes of these disclosures: (i) references to the Bank shall include any financial institution that issues the Card or provides services in connection with ACH, Move Money or other EFT transactions; (ii) "you" and "your" mean the owner of the Account; and (iii) "we" and "us" means Robinhood and the Bank collectively.

CONFIDENTIAL                                                          RH_HT_00000328

## 1. Your Liability.

Contact Robinhood Customer Service AT ONCE if you believe your Card or PIN has been lost or stolen or if you believe that an electronic fund transfer has been made without your permission. Telephoning is the best way of keeping your losses down. You could lose all the Available Funds in your Account (plus your maximum overdraft line of credit). If you tell Robinhood within 2 business days after you learn of the loss or theft of your Card or PIN, you can lose no more than $50 if someone used your Card or PIN without your permission.

If you do NOT tell Robinhood within 2 business days after you learn of the loss or theft of your Card or PIN, and Robinhood can prove that it could have stopped someone from using your Card or PIN without your permission if you had told Robinhood, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by Card or using your PIN, tell Robinhood at once. If you do not tell Robinhood within sixty (60) days after the statement was mailed to you, or otherwise made available to you, you may not get back any money you lost after the sixty (60) days if Robinhood can prove that Robinhood could have stopped someone from taking the money if you had told Robinhood in time. If a good reason (such as a long trip or a hospital stay) kept you from telling Robinhood, Robinhood will extend the time periods.

## 2. Contact in event of unauthorized transfer.

If you believe your Card or PIN has lost or stolen, contact Robinhood by emailing help@robinhood.com,.

## 3. Business Days.

Business Days are Monday through Friday, excluding federal holidays.

## 4. Transfer Types and Limitations.

You may use your Card to make purchases at any merchant that accepts Mastercard debit cards or debit cards of other networks in which the Bank participates, and to make ATM withdrawals, in each case subject to the Available Funds in your Account, the transaction limits described below, and the other terms and conditions of this Agreement. You acknowledge and agree that the value available to you for use with the Card is limited to the Available Funds in your Account. So long as you do not exceed the Available Funds in your Account, you may use the Card to purchase goods or services wherever the Card is honored, and to obtain cash by initiating cash withdrawal transactions through the Card from any financial institution or ATM that accepts the Card. Each time you use the Card, you authorize Robinhood to reduce the Available Funds in your Account by the amount of the purchase or withdrawal and any applicable fees, costs, or holdings. Nevertheless, if you exceed the Available Funds in your Account you shall remain fully liable to Robinhood for the amount of the transactions and any applicable fees and charges.

You may also make ACH withdrawals from your Account, either originated through Robinhood or originated by a third party (a "non-originated" withdrawal), subject to the Available Funds in your Account, the transaction limits described below, and the other terms and conditions of this Agreement. You also may make ACH deposits to your Account, either originated through Robinhood or originated by a third party (a "non-originated" deposit), subject to the transaction limits described below.

There are limits on the dollar amount of transactions you can make with your Card each day and each month, and limits on the amount of ACH withdrawals and deposits you can make each day. The following lists the limits for each type of transaction:

**Originated ACH Withdrawals**\* Daily Limit: $50,000.00
Weekly Limit: N/A Monthly Limit: N/A

CONFIDENTIAL                                                              RH_HT_00000329

**Originated ACH Deposits**\* Daily Limit: $50,000.00
Weekly Limit: N/A Monthly Limit: N/A

**Non-Originated ACH Withdrawals**\* Daily Limit: $250,000.00
Weekly Limit: N/A Monthly Limit: N/A

**Non-Originated ACH Deposits**\* Daily Limit: $250,000.00
Weekly Limit: N/A Monthly Limit: N/A

**Point of Sale Purchases with the Card**\* Daily Limit: $5,000.00 Weekly Limit: N/A Monthly Limit:
$15,000.00

**ATM Withdrawals**\* Daily Limit: $510.00 Weekly Limit: N/A Monthly Limit: $5,000.00

**Originated ACH**\* Daily Limit: N/A, subject to the Weekly Limit Weekly Limit: $2,999 Monthly Limit: N/A

## 5. Fees.

We will not charge you any fees for use of ATMs that are part of the AllPoint or MoneyPass ATM
networks, or for point of sale transactions using the Card, or for initiating other EFTs on your behalf. If
you withdraw funds from ATMs outside of the AllPoint or MoneyPass ATM networks, you may be
separately assessed fees by those ATM owners or operators.

## 6. Confidentiality.

We may disclose information to third parties about you, your Card, or the transactions you make using
any of the EFT services we provide:

1. Where it is necessary or helpful for completing or correcting transactions and resolving claims
   regarding transactions;
2. In order to verify the existence and condition of your Card or your Account for a third party, such
   as a merchant;
3. In order to comply with a valid request by a government agency, a court order, or other legal or
   administrative reporting requirements;
4. If you consent by giving us your written permission;
5. To our employees, auditors, affiliates, service providers, or attorneys as needed;
6. In order to prevent, investigate or report possible illegal activity;
7. In order to issue authorizations for transactions on the Card;
8. As permitted by applicable law; or
9. Otherwise as necessary to fulfill our obligations under this Agreement and the terms applicable to
   the EFT service you are using.

Please see Robinhood's privacy policy, available at about.robinhood.com/legal, and the applicable
Bank's privacy policy, available at https://www.suttonbank.com/_/kcms-doc/85/49033/WK-Privacy-
Disclosure-1218.pdf, for further details. (The Robinhood privacy policy and the applicable Bank's privacy
policy are referred to collectively as the "Privacy Policies"). You hereby agree to Robinhood's and the
Bank's collection, use and sharing of information about you and the Card as provided in the Privacy
Policies, which are made a part of this Agreement. The Privacy Policies also tell you how you can (i)
limit the ways in which Bank and Robinhood share information about you, or (ii) request corrections to
the information that Bank or Robinhood maintain about you. You agree that information you provide in
connection with your Card or other EFT services you use is being provided directly to both Robinhood as
the holder of the Account associated with the service and the Bank as the Card issuer or provider of the
EFT service, as applicable.

## 7. Documentation.

*Terminal Transfers.* You can get a receipt at the time you make any transfer to or from your Account
using an ATM from the AllPoint or MoneyPass ATM networks or at the point of sale.

CONFIDENTIAL                                                          RH_HT_00000330

*Preauthorized Credits.* If you have arranged to have direct deposits made to your Account at least once every 60 days from the same person or company, the person or company making the deposit will tell you every time they send us the money. You can also check your Account online to see if a deposit has been received.

*Periodic Statements.* You will get a monthly Account statement, unless there are no transfers in a particular month. In any case you will get the statement at least quarterly. You may obtain information about the Available Funds in your Account and a history of your Cash Management transactions on the App.

## 8. Preauthorized Payments/Stop Payment Procedure and Notice of Varying Amounts.

You do not have the right to request that Robinhood in advance make regular payments out of your Account, although you may ask third parties to initiate regular payments out of your Account.

*Right to stop payment:* If you have automatic recurring payments taken out of your Account, you can stop any of these payments by contacting us at help@robinhood.com,. You must contact us in time for us to receive your request at least three business days before the payment is scheduled to be made.

*Notice of varying amounts:* If these regular payments vary in amount, the party you are going to pay will tell you, 10 days before each payment, when the payment will be made and how much it will be. (The party you are going to pay may allow you to choose to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

*Liability for failure to stop payment of a preauthorized transfer:* If you order us to stop a payment at least three business days before the transfer is scheduled and we do not do so, we will be liable for your losses or damages.

## 9. Our Liability.

If we do not complete a transaction to or from your Account on time or in the correct amount according to our Agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

1. If through no fault of Robinhood or the Bank, you do not have enough Available Funds in your Account to complete the transaction;

2. If a merchant refuses to accept your Card;

3. If an electronic terminal where you are making a transaction does not operate properly, and you knew about the problem when you initiated the transaction;

4. If access to your Card has been blocked after you reported your Card lost or stolen;

5. If there is a hold or your funds are subject to legal or administrative process or other encumbrance restricting their use;

6. If Robinhood or the Bank have reason to believe the requested transaction is unauthorized;

7. If circumstances beyond the control of Robinhood or the Bank (such as fire, flood, or computer or communication failure) prevent the completion of the transaction, despite reasonable precautions that Robinhood or the Bank have taken; or

8. For any other exception stated in this Agreement with you or by applicable law.

CONFIDENTIAL                                                                          RH_HT_00000331

## 10. Errors or Questions About Electronic Transfers.

In case of errors or questions about your electronic transfers, including your Card transactions, or if you think your statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt, contact Robinhood by emailing help@robinhood.com,. Robinhood must hear from you no later than sixty (60) days after you were sent the FIRST statement on which the problem or error appeared.

1. Tell Robinhood your name and account number.

2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

3. Tell Robinhood the dollar amount of the suspected error.

Robinhood will determine whether an error occurred within ten (10) business days after Robinhood hears from you and will correct any error promptly. If Robinhood needs more time, however, it may take up to forty-five (45) days to investigate your complaint or question. If Robinhood decides to do this, Robinhood will credit your Account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes Robinhood to complete our investigation.

For errors involving new accounts, point of sale, or foreign initiated transactions, Robinhood may take up to ninety (90) days to investigate your complaint or question. For new accounts, Robinhood may take up to twenty (20) business days to credit your Account for the amount you think is in error.

Robinhood will tell you the results of our investigation within three (3) business days after completing the investigation. If Robinhood decides that there was no error, Robinhood will send you a written explanation. You may ask for copies of the documents that Robinhood used in our investigation.

2020.06

CONFIDENTIAL

RH_HT_00000332

**EXHIBIT 6**



< Investing

# Market Volatility, Circuit Breakers, and Trading Halts

## What is a volatile market?

A volatile market is often characterized by extreme price fluctuations and widespread uncertainty. Nobody knows what to expect, and fear—or euphoria—can grip investors.

During these moments, it can be tough to sit still. Your investment portfolio may seemingly plummet—or soar—based on the smallest whisper: a rumor that the Fed might change interest rates, that the government may approve an industry bailout, or that the president might issue an executive order. It's hard to guess what impact each development could have on the stock market.

## What's a circuit breaker?

After the 1987 stock market crash, known as "Black Monday," the US Securities and Exchange Commission adopted market-wide circuit breakers, or certain thresholds at which trading is halted for a pre-defined period of time. These circuit breakers were updated in 2012 in order to make them more meaningful in today's high speed electronic markets.

Market-wide trading halts are designed to curtail panic selling during volatile periods. When these take effect, all trading temporarily stops on US equities, options, and futures exchanges.

## What's a market-wide trading halt?

A market-wide trading halt is like a timeout. It gives everybody a chance to catch their breath and may help slow the stampede of a selloff. Halts are issued by US equities, options, and futures exchanges.

There are three circuit breakers that can trigger market-wide halts in the US:

        

- **Level 1**: The S&P 500 drops 7% from its closing price the previous day, triggering a 15-minute trading halt.

- **Level 2**: The S&P 500 drops 13% from its closing price the previous day, triggering another 15-minute trading halt.

- **Level 3**: The S&P 500 drops 20% from its closing price the previous day, and trading is suspended for the remainder of the day.

It's worth noting, Level 1 and Level 2 halts may only happen once per trading day. That means, if the S&P 500 slides by 7% (resulting in a 15-minute timeout), trading would only stop again if the decline reaches 13% or more. Likewise, if the S&P 500 drops by 13% (again, resulting in a 15-minute suspension), trading would only cease if the downturn reaches 20%.

Please keep in mind, Level 1 and Level 2 circuit breakers can only take effect before 3:25pm ET. At 3:25pm ET and beyond, only a Level 3 halt—a 20% decline in the S&P 500—would cause trading to stop for the day.

Regular US stock market trading hours are 9:30am – 4:00pm ET.

## Can I place new orders during a trading halt?

Yes, you can place new orders during a trading halt but **they won't be processed until the market reopens.**

Note that all new and outstanding orders will remain "pending" until markets reopen. When the halt ends, your orders will be processed. **Please note that market orders held or placed during a halt may fill at a very different price once trading resumes.**

## Can I use Robinhood during a trading halt?

Yes, Robinhood will still function. You will be able to view your positions, read your newsfeed, and contact support during a trading halt. While you can place new orders during the halt, they won't be processed until the market reopens.



Outstanding orders, including market and limit orders, won't be processed until the halt is over and markets reopen; this also applies to options orders. **Please note that market orders held or placed during a halt may fill at a very different price once trading resumes.**

## Why are charts flat during a trading halt?

When trading is halted, charts reflect the price of the last filled order. No trades are being executed, so prices neither rise, nor fall. Rest assured, the price most likely didn't flatline at zero. When the market reopens, the chart will display normally again.

## Why do options prices display as $0.01 during a trading halt?

During a trading halt, no orders are being processed so the "mark price" defaults to the $0.01 on your Robinhood app. Market prices will display normally after the halt is over.

## Can I still trade cryptocurrency during a trading halt?

Yes. Halts imposed by US equities, options, and futures exchanges do not directly affect cryptocurrency trading.

## Can I deposit and/or withdraw funds during a trading halt?

Yes. You can deposit or withdraw funds as you normally would.

## I have a concern about an order placed during a trading halt.

If you believe one of your orders was affected by a trading halt and still have questions, please get in touch with our support team. Please provide as much information as you can about the order(s) you

  

Reference No. 20200315–1120108–3368879

**Still have questions?** Contact Robinhood Support

The 3-minute newsletter with fresh takes on the financial news you need to start your day.

name@email.com                                    **Subscribe**

Stocks & Funds

Options

Gold

Cash Management

Crypto

Learn

Support

Snacks

About us

Careers

Affiliates

Blog

Investor Relations





Check the background of the firm on FINRA's BrokerCheck

Brokerage Customer Relationship Summary

Robinhood Terms & Conditions

Disclosure Library

Privacy

© 2021 Robinhood. All rights reserved.

Robinhood means Robinhood Markets and its in-application and web experiences with its family of wholly owned subsidiaries which includes Robinhood Financial, Robinhood Securities, and Robinhood Crypto.

All investments involve risk and loss of capital.

Securities trading is offered to self-directed customers by Robinhood Financial. Robinhood Financial is a member of the Financial Industry Regulatory Authority (FINRA).

 View Important Disclosures

**EXHIBIT 7**



| U.S. Market | Trading Products | Market Data | Connectivity | Regulation | Market Statistics | News | Support | Product Login |

## Trading Halts

### Data Fields & Definitions

| Field | Description |
|---|---|
| Halt Date | Date of initial halt being implemented. |
| Halt Time | Time of initial halt being implemented. |
| Issue Symbol | Symbol of the Issue |
| Issue Name | Name of the Company |
| Mkt | Market Category Code:<br><br>NASDAQ<br>Non-NASDAQ |
| Reason Code | Explanation for why trading is halted. See allowed values in the table below located on this page. |
| Pause Threshold Price | Price at which trading was halted for securities subject to a trading pause. |
| Date | Date which trading is resumed. |
| Resumption Quote Time | Time when quotations are scheduled to resume following a halt. |
| Resumption Trade Time | Time when trading is scheduled to resume following a halt. |

The schedule of trading halt codes below identifies the reason for which trading in FINRA®/CQS securities is halted. When an issue resumes quoting, the code will change. Listed below are the trading halt code identifiers and a description of what each represents:

| Trade Halt Code | Trade Halt Description |
|---|---|
| T1 | **Halt - News Pending**<br>Trading is halted pending the release of material news. |
| T2 | **Halt - News Released**<br>The news has begun the dissemination process through a Regulation FD compliant method(s). |
| T5 | **Single Stock Trading Pause in Effect**<br>Trading has been paused by NASDAQ due to a 10% or more price move in the security in a five-minute period. |
| T6 | **Halt - Extraordinary Market Activity**<br>Trading is halted when extraordinary market activity in the security is occurring; NASDAQ determines that such extraordinary market activity is likely to have a material effect on the market for that security; and 1) NASDAQ believes that such extraordinary market activity is caused by the misuse or malfunction of an electronic quotation, communication, reporting or execution system operated by or linked to NASDAQ; or 2) after consultation with either a national securities exchange trading the security on an unlisted trading privileges basis or a non-NASDAQ FINRA facility trading the security, NASDAQ believes such extraordinary market activity is caused by the misuse or malfunction of an electronic quotation, communication, reporting or execution system operated by or linked to such national securities exchange or non- NASDAQ FINRA facility. |
| T8 | **Halt - Exchange-Traded-Fund (ETF)**<br>Trading is halted in an ETF due to the consideration of, among other factors: 1) the extent to which trading has ceased in the underlying security(s); 2) whether trading has been halted or suspended in the primary market(s) for any combination of underlying securities accounting for 20% or more of the applicable current index group value; 3) the presence of other unusual conditions or circumstances deemed to be detrimental to the maintenance of a fair and orderly market. |
| T12 | **Halt - Additional Information Requested by NASDAQ**<br>Trading is halted pending receipt of additional information requested by NASDAQ. |
| H4 | **Halt - Non-compliance**<br>Trading is halted due to the company's non-compliance with NASDAQ listing requirements. |
| H9 | **Halt - Not Current**<br>Trading is halted because the company is not current in its required filings. |

Site Uses Cookies

This website utilizes cookies and similar technologies for functionality and other purposes. Your use of this website constitutes your acceptance of cookies. To learn more about our cookies and the choices we offer, please see the link to our Cookie Policy.

Ok, got it    Privacy Policy

| O1 | Operations Halt, Contact Market Operations |
|---|---|
| IPO1 | IPO Issue not yet Trading |
| M1 | Corporate Action |
| M2 | Quotation Not Available |
| LUDP | Volatility Trading Pause |
| LUDS | Volatility Trading Pause - Straddle Condition |
| MWC1 | Market Wide Circuit Breaker Halt - Level 1 |
| MWC2 | Market Wide Circuit Breaker Halt - Level 2 |
| MWC3 | Market Wide Circuit Breaker Halt - Level 3 |
| MWC0 | Market Wide Circuit Breaker Halt - Carry over from previous day |
|  |  |
| T3 | News and Resumption Times<br>The news has been fully disseminated through a Regulation FD compliant method(s); or NASDAQ has determined either that system misuse or malfunction that caused extraordinary market activity will no longer have a material effect on the market for the security or that system misuse or malfunction is not the cause of the extraordinary market activity; or NASDAQ has determined the conditions which led to a halt in an Exchange-Traded Fund are no longer present. Two times will be displayed: (1) the time when market participants can enter quotations, followed by (2) the time the security will be released for trading. All trade halt and resumption times will be posted in HH:MM:SS format. |
| T7 | Single Stock Trading Pause/Quotation-Only Period<br>Quotations have resumed for affected security, but trading remains paused. |
| R4 | Qualifications Issues Reviewed/Resolved; Quotations/Trading to Resume |
| R9 | Filing Requirements Satisfied/Resolved; Quotations/Trading To Resume |
| C3 | Issuer News Not Forthcoming; Quotations/Trading To Resume |
| C4 | Qualifications Halt ended; maint. req. met; Resume |
| C9 | Qualifications Halt Concluded; Filings Met; Quotes/Trades To Resume |
| C11 | Trade Halt Concluded By Other Regulatory Auth.; Quotes/Trades Resume |
| R1 | New Issue Available |
| R2 | Issue Available |
| IPOQ | IPO security released for quotation |
| IPOE | IPO security - positioning window extension |
| MWCQ | Market Wide Circuit Breaker Resumption |
| M | Volatility Trading Pause<br>Trading has been paused in an Exchange-Listed issue (Market Category Code = C) |
| D | Security deletion from NASDAQ / CQS |
| Space | Reason Not Available |
| Notes | Halt codes H4 and H9 may be activated in situations where a SEC trading suspension is terminated and a NASDAQ trading halt is terminated, but the company in either instance is not in compliance with specific NASDAQ requirements. Any questions related to a specific trading halt or to the trading halts codes should be directed to MarketWatch at 800.537.3929 or 301.978.8500. |

**Additional Information**

**Current Trading Halts**
**About MarketWatch**
Contact MarketWatch at
800.537.3929 or
301.978.8500.

**Popular Sections:**
Performance Statistics
Email Sign-Up

Site Uses Cookies
·This website utilizes cookies and similar technologies for functionality and other purposes. Your use of this website constitutes your acceptance of cookies. To learn more about our cookies and the choices we offer, please see the link to our Cookie Policy.
·

Ok, got it     Privacy Policy

Share

**Site Uses Cookies**
This website utilizes cookies and similar technologies for functionality and other purposes. Your use of this website constitutes your acceptance of cookies, To learn more about our cookies and the choices we offer, please see the link to our Cookie Policy.

Ok, got it          **Privacy Policy**

**EXHIBIT 8**

MENU
×

# NYSE Equities - Regulatory Halt in HTZ

MARKETS ▼

03:58 AM, 26 MAY 2020

**MARKET:** NYSE     **SERVICE:** TRADING

NYSE Equities has halted the following symbol for news pending:

HTZ – HERTZ GLOBAL HOLDINGS INC– 03:56:04

TRADE
## Trader Updates & Announcements

Close

| Date | Description | MARKET | SERVICE |
|------|-------------|--------|---------|
| 11:47 AM 17 June 2020 | NYSE Equities - Regulatory Halt in HTZ | NYSE | Trading |
| 02:11 PM 26 May 2020 | NYSE - Regulatory Halt Reopening Auctions in HTZ and LTM | NYSE | Trading |
| 03:58 AM 26 May 2020 | NYSE Equities - Regulatory Halt in HTZ | NYSE | Trading |
| 09:22 AM 18 July 2019 | NYSE Bonds - Redemptions - Traded Bonds for 07/18/2019 | NYSE BONDS | Trading |
| 09:11 AM 16 July 2019 | NYSE Bonds - Redemptions - Traded Bonds for 07/16/2019 | NYSE BONDS | Trading |
| 04:38 PM 19 June 2019 | NYSE - New Security Notification for Symbol HTZ RT WI | NYSE | Trading |
| 09:37 AM 06 November 2017 | NYSE Bonds - Redemptions - Traded Bonds for 11/06/2017 | NYSE BONDS | Trading |
| 10:56 AM 07 August 2017 | CHANGE IN CLEARING STATUS - TRADED BONDS | NYSE BONDS | Trading |
| 10:14 AM 02 August 2017 | NYSE Bonds - Addition to the List of Traded Bonds | NYSE BONDS | Trading |

FIRST | PREVIOUS | 1 | 2 | NEXT | LAST

# Filter results

**Market**

☐ NYSE

☐ NYSE ARCA EQUITIES

☐ NYSE NATIONAL

☐ NYSE AMERICAN OPTIONS

☐ NYSE ARCA OPTIONS

☐ NYSE BONDS

☐ FINRA/NYSE TRF

☐ NYSE BQT

☐ NYSE AMERICAN                                                                                          ✕

☐ NYSE CHICAGO

# NYSE Equities - Regulatory Halt in HTZ

**Service**          03:58 AM, 26 MAY 2020

☐ Trading

    **MARKET:** NYSE     **SERVICE:** TRADING

☐ Post Trade

☐ Market Data     NYSE Equities has halted the following symbol for news pending:

**Search**          HTZ – HERTZ GLOBAL HOLDINGS INC– 03:56:04

Hertz

---

**From Date**

MM/DD/YYYY                                                                   Close

**To Date**

MM/DD/YYYY

**Year**

All

Clear filters

# EXHIBIT 9

## *Hertz Global Holdings Inc. (HTZ) Halted due to news pending*

Dow Jones Institutional News

May 26, 2020 Tuesday 7:56 AM GMT

Copyright 2020 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2020, Dow Jones & Company, Inc.

**DOW JONES** NEWSWIRES

**Length:** 9 words

## Body

(END) Dow Jones Newswires

May 26, 2020 03:56 ET (07:56 GMT)

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** May 26, 2020

**End of Document**

# EXHIBIT 10

| UUID | Symbol | Time Entered | Last Transaction At | Cancelled at | Side | Effect | Order Type | Trigger | Quantity | Cancelled Quantity | Filled Quantity | Limit Price | Stop Price | Notional |  |
|------|--------|--------------|---------------------|--------------|------|--------|------------|---------|----------|--------------------|-----------------|-------------|------------|----------|--|
|  | HTZGQ | 05/26/2020, 09:30:57 | 05/26/2020, 14:36:53 | N/A | Sell | Close | Market | Immediate | 1,200 | 0 | 1,200 | – | – | $491.86 | F |
|  | HTZGQ | 04/29/2020, 15:20:25 | 04/29/2020, 15:20:25 | N/A | Buy | Open | Market | Immediate | 1,200 | 0 | 1,200 | – | – | $4,820.31 | F |

CONFIDENTIAL

# EXHIBIT 11

 Robinhood

85 Willow Rd, Menlo Park, CA 94025

support@robinhood.com

04/29/2020

**Sterna Pinchasov** Account #: ████████

## Transaction Confirmation

Thank you for letting Robinhood Securities, LLC ("RHS") serve you through Robinhood Financial, LLC ("RHF").

1. Amounts due for securities transactions must be received on or before the settlement date shown.

2. All orders are received and executed subject to the applicable rules, regulations and customs of the SEC, FINRA, and the exchange or market where the order is entered, the provisions of the Securities Exchange Act of 1934.

3. Failure of customer to notify RHS in writing within five days of the receipt of this document of any concerns constitutes an acceptance of the transaction.

4. For purchase transactions in a margin account, it is agreed that sufficient cash or acceptable collateral will be deposited on or before the settlement date, or at such earlier time that payment may be demanded to satisfy applicable margin requirements.

5. Securities purchased and securities pledged as margin are or may be hypothecated for the sum due thereon or for a greater sum, under circumstances which permit commingling thereof with securities of other customers, all without further notice to the customer.

6. If shares loaned for a short sale are no longer available, RHS reserves the right to decide, by random selection, which positions will be subject to a buy-in.

7. Upon written request and where available, further details of items herein will be provided including: the execution date and time, the counterparty when acting as agent, the detailed breakdown of fees and the remuneration details, if any, to RHS, or RHF for directing orders to select market participants and details of provisions that may cause a call or prepayment.

8. All transactions on this confirmation are presumed to be unsolicited unless noted otherwise.

9. Any Good Till Canceled (GTC) orders may expire or be terminated by RHS or RHF in their ordinary course of business after the order has remained open for a reasonable period of time. Please contact RHF for more specific details. Until such expiration or cancellation, or cancellation by the customer, all open orders are considered good. When entering a substitute order, the responsibility for cancelling the original order rests upon the customer. Therefore, if a customer fails to cancel an existing order, transactions resulting from the execution of both the original and new order(s) will be entered into the customer's account.

10. The responsibility to cancel an open order resides with the customer. Any transactions which result from the execution of any order which the customer has not instructed RHF/RHS to cancel will be entered into the customer's account.

11. The default Cost Basis Election or tax relief method used by RHS for tax preparing is First-In-First-Out (FIFO) for Equities. Please contact RHF if you wish to change the default tax-relief method for your account or specify different tax lots for liquidation.

12. Backup Withholding - if you have not provided us with your correct social security number/tax id number, under federal law, you may be subject to a $50 penalty as well as backup withholding on certain payments.

13. RHS may receive remuneration for directing orders to particular broker-dealers or market centers for execution. Such remuneration is considered compensation to the firm. The source and nature in connection with your transactions are available upon written request. RHF, when clearing through RHS, may share in such payments or may directly receive payment for order flow for certain transactions. Details are available upon written request.

14. If you request the sale of a non-marketable or worthless security, RHF will be the buyer to the transaction in the event a market cannot be located. In such a sale, you are deeming the security worthless and RHF thereby makes no representation regarding the present or future value of these securities. The transaction is irreversible and you will have no further claim to the securities and no claim against RHF for any losses related to the sale.

Accounts carried by Robinhood Securities, LLC Member FINRA & SIPC - support@robinhood.com Tax ID 38-4019216

---

**MKT = Market in which transaction was Executed/Cleared**
NYSE - New York Stock Exchange
NYSEA - NYSE Alternext
USE - Other US Exchange
MF - Mutual Funds
OP - Options
OTC - Over-the-Counter/NASDAQ
UND - Underwriting
FOREX - Foreign Exchange
OTH - Other

**Buy/Sell Codes**
B = Buy or Buy To Open
S = Sell or Sell To Close
BCXL = Cancel Buy
SCXL = Cancel Sell
BTC = Buy To Close
STO = Sell To Open
BTCX = Buy To Close Cancel
STOX = Sell to Open Cancel

**Account Types**
C = Cash
M = Margin
N = Non-negotiable
S = Short

**U/S: Solicitation**
U = Unsolicited
S = Solicited

**CAP = Capacity in which the firm acted:**
1 - 2,4 - 5,8 - As AGENT
3 - As PRINCIPAL, your broker has bought from you or sold to you and may have received a profit or loss on the transaction
6 - As AGENT for both buyer and seller

RH_HT_00000035

 Robinhood

85 Willow Rd, Menlo Park, CA 94025
support@robinhood.com

04/29/2020

**Sterna Pinchasov** Account #

| EQUITIES/OPTIONS | B/S | TRADE DATE | SETTLE DATE | ACCT TYPE | PRICE | QTY | PRINCIPAL | COMM | TRAN FEE | NET AMOUNT | MKT | CAP | U/S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hertz<br>HTZ CUSIP: 42806J106 | B | 04/29/2020 | 05/01/2020 | M | $4.0150 | 100 | $401.50 | $0.00 | $0.00 | $401.50 | OTC | 1 | U |
| Hertz<br>HTZ CUSIP: 42806J106 | B | 04/29/2020 | 05/01/2020 | M | $4.0150 | 100 | $401.50 | $0.00 | $0.00 | $401.50 | OTC | 1 | U |
| Hertz<br>HTZ CUSIP: 42806J106 | B | 04/29/2020 | 05/01/2020 | M | $4.0150 | 300 | $1,204.50 | $0.00 | $0.00 | $1,204.50 | OTC | 1 | U |
| Hertz<br>HTZ CUSIP: 42806J106 | B | 04/29/2020 | 05/01/2020 | M | $4.0183 | 700 | $2,812.81 | $0.00 | $0.00 | $2,812.81 | OTC | 1 | U |

**Total Quantity Bought:** 1,200

**Total Dollars Bought:** $4,820.31

**Total Quantity Sold:** 0

**Total Dollars Sold:** $0.00

# EXHIBIT 12

# Robinhood 🪶

85 Willow Rd, Menlo Park, CA 94025
support@robinhood.com

05/26/2020

**Sterna Pinchasov** Account #: ▮▮▮▮▮▮

## Transaction Confirmation

Thank you for letting Robinhood Securities, LLC ("RHS") serve you through Robinhood Financial, LLC ("RHF").

1. Amounts due for securities transactions must be received on or before the settlement date shown.

2. All orders are received and executed subject to the applicable rules, regulations and customs of the SEC, FINRA, and the exchange or market where the order is entered, the provisions of the Securities Exchange Act of 1934.

3. Failure of customer to notify RHS in writing within five days of the receipt of this document of any concerns constitutes an acceptance of the transaction.

4. For purchase transactions in a margin account, it is agreed that sufficient cash or acceptable collateral will be deposited on or before the settlement date, or at such earlier time that payment may be demanded to satisfy applicable margin requirements.

5. Securities purchased and securities pledged as margin are or may be hypothecated for the sum due thereon or for a greater sum, under circumstances which permit commingling thereof with securities of other customers, all without further notice to the customer.

6. If shares loaned for a short sale are no longer available, RHS reserves the right to decide, by random selection, which positions will be subject to a buy-in.

7. Upon written request and where available, further details of items herein will be provided including: the execution date and time, the counterparty when acting as agent, the detailed breakdown of fees and the remuneration details, if any, to RHS, or RHF for directing orders to select market participants and details of provisions that may cause a call or prepayment.

8. All transactions on this confirmation are presumed to be unsolicited unless noted otherwise.

9. Any Good Till Canceled (GTC) orders may expire or be terminated by RHS or RHF in their ordinary course of business after the order has remained open for a reasonable period of time. Please contact RHF for more specific details. Until such expiration or cancellation, or cancellation by the customer, all open orders are considered good. When entering a substitute order, the responsibility for cancelling the original order rests upon the customer. Therefore, if a customer fails to cancel an existing order, transactions resulting from the execution of both the original and new order(s) will be entered into the customer's account.

10. The responsibility to cancel an open order resides with the customer. Any transactions which result from the execution of any order which the customer has not instructed RHF/RHS to cancel will be entered into the customer's account.

11. The default Cost Basis Election or tax relief method used by RHS for tax preparing is First-In-First-Out (FIFO) for Equities. Please contact RHF if you wish to change the default tax-relief method for your account or specify different tax lots for liquidation.

12. Backup Withholding - if you have not provided us with your correct social security number/tax id number, under federal law, you may be subject to a $50 penalty as well as backup withholding on certain payments.

13. RHS may receive remuneration for directing orders to particular broker-dealers or market centers for execution. Such remuneration is considered compensation to the firm. The source and nature in connection with your transactions are available upon written request. RHF, when clearing through RHS, may share in such payments or may directly receive payment for order flow for certain transactions. Details are available upon written request.

14. If you request the sale of a non-marketable or worthless security, RHF will be the buyer to the transaction in the event a market cannot be located. In such a sale, you are deeming the security worthless and RHF thereby makes no representation regarding the present or future value of these securities. The transaction is irreversible and you will have no further claim to the securities and no claim against RHF for any losses related to the sale.

Accounts carried by Robinhood Securities, LLC Member FINRA & SIPC - support@robinhood.com Tax ID 38-4019216

---

**MKT = Market in which transaction was Executed/Cleared**
NYSE - New York Stock Exchange
NYSEA - NYSE Alternext
USE - Other US Exchange
MF - Mutual Funds
OP - Options
OTC - Over-the-Counter/NASDAQ
UND - Underwriting
FOREX - Foreign Exchange
OTH - Other

**Buy/Sell Codes**
B = Buy or Buy To Open
S = Sell or Sell To Close
BCXL = Cancel Buy
SCXL = Cancel Sell
BTC = Buy To Close
STO = Sell To Open
BTCX = Buy To Close Cancel
STOX = Sell to Open Cancel

**Account Types**
C = Cash
M = Margin
N = Non-negotiable
S = Short

**U/S: Solicitation**
U = Unsolicited
S = Solicited

**CAP = Capacity in which the firm acted:**
1 - 2,4 - 5,8 - As AGENT
3 - As PRINCIPAL, your broker has bought from you or sold to you and may have received a profit or loss on the transaction
6 - As AGENT for both buyer and seller

CONFIDENTIAL

RH_HT_00000037

# Robinhood 🖋

85 Willow Rd, Menlo Park, CA 94025
support@robinhood.com

05/26/2020
**Sterna Pinchasov** Account #: ███████

| Equities/Options | B/S | Trade Date | Settle Date | Acct Type | Price | QTY | Principal | Comm | Tran Fee | Net Amount | MKT | CAP | U/S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alibaba<br>BABA CUSIP: 01609W102 | B | 05/26/2020 | 05/28/2020 | M | $206.0000 | 5 | $1,030.00 | $0.00 | $0.00 | $1,030.00 | OTC | 1 | U |
| AMN Healthcare<br>AMN CUSIP: 001744101 | S | 05/26/2020 | 05/28/2020 | M | $46.0522 | 45 | $2,072.35 | $0.00 | $0.05 | $2,072.30 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 5,000 | $687.35 | $0.00 | $0.00 | $687.35 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 500 | $68.75 | $0.00 | $0.00 | $68.75 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 600 | $82.50 | $0.00 | $0.00 | $82.50 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 2,700 | $371.25 | $0.00 | $0.00 | $371.25 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 500 | $68.75 | $0.00 | $0.00 | $68.75 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 500 | $68.75 | $0.00 | $0.00 | $68.75 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 2,100 | $288.75 | $0.00 | $0.00 | $288.75 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 1,600 | $220.00 | $0.00 | $0.00 | $220.00 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 500 | $68.75 | $0.00 | $0.00 | $68.75 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 500 | $68.75 | $0.00 | $0.00 | $68.75 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 100 | $13.75 | $0.00 | $0.00 | $13.75 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 200 | $27.50 | $0.00 | $0.00 | $27.50 | OTC | 1 | U |

# Robinhood 🖋

85 Willow Rd, Menlo Park, CA 94025
support@robinhood.com

05/26/2020

**Sterna Pinchasov** Account #: ███████

| Equities/Options | B/S | Trade Date | Settle Date | Acct Type | Price | QTY | Principal | Comm | Tran Fee | Net Amount | MKT | CAP | U/S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | B | 05/26/2020 | 05/28/2020 | M | $0.1375 | 200 | $27.50 | $0.00 | $0.00 | $27.50 | OTC | 1 | U |
| Hertz<br>HTZ CUSIP: 42806J106 | S | 05/26/2020 | 05/28/2020 | M | $0.4100 | 1,200 | $492.00 | $0.00 | $0.14 | $491.86 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 250 | $34.48 | $0.00 | $0.03 | $34.45 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 30 | $4.14 | $0.00 | $0.00 | $4.14 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 1 | $0.14 | $0.00 | $0.00 | $0.14 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 699 | $96.39 | $0.00 | $0.08 | $96.31 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 300 | $41.37 | $0.00 | $0.04 | $41.33 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 300 | $41.37 | $0.00 | $0.04 | $41.33 | OTC | 1 | U |

CONFIDENTIAL

# Robinhood 🖋

85 Willow Rd, Menlo Park, CA 94025
support@robinhood.com

05/26/2020

**Sterna Pinchasov** Account #: ███████

| Equities/Options | B/S | Trade Date | Settle Date | Acct Type | Price | QTY | Principal | Comm | Tran Fee | Net Amount | MKT | CAP | U/S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 1,600 | $220.64 | $0.00 | $0.19 | $220.45 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 700 | $96.53 | $0.00 | $0.08 | $96.45 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 1,400 | $193.06 | $0.00 | $0.17 | $192.89 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1380 | 100 | $13.80 | $0.00 | $0.01 | $13.79 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 3,800 | $524.02 | $0.00 | $0.47 | $523.55 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 145 | $20.00 | $0.00 | $0.02 | $19.98 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 757 | $104.39 | $0.00 | $0.09 | $104.30 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 100 | $13.79 | $0.00 | $0.01 | $13.78 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1378 | 100 | $13.78 | $0.00 | $0.01 | $13.77 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1378 | 970 | $133.67 | $0.00 | $0.12 | $133.55 | OTC | 1 | U |
| TOP Ships TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 300 | $41.37 | $0.00 | $0.04 | $41.33 | OTC | 1 | U |

RH_HT_00000040

# Robinhood 🖋

85 Willow Rd, Menlo Park, CA 94025
support@robinhood.com

05/26/2020
**Sterna Pinchasov** Account #:

| Equities/Options | B/S | Trade Date | Settle Date | Acct Type | Price | QTY | Principal | Comm | Tran Fee | Net Amount | MKT | CAP | U/S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 400 | $55.16 | $0.00 | $0.05 | $55.11 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 289 | $39.85 | $0.00 | $0.03 | $39.82 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1378 | 623 | $85.85 | $0.00 | $0.07 | $85.78 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 18 | $2.48 | $0.00 | $0.00 | $2.48 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 18 | $2.48 | $0.00 | $0.00 | $2.48 | OTC | 1 | U |
| TOP Ships<br>TOPS CUSIP: Y8897Y164 | S | 05/26/2020 | 05/28/2020 | M | $0.1379 | 1,200 | $165.48 | $0.00 | $0.14 | $165.34 | OTC | 1 | U |
| Netflix<br>NFLX CUSIP: 64110L106 | B | 05/26/2020 | 05/28/2020 | M | $415.3603 | 6 | $2,492.16 | $0.00 | $0.00 | $2,492.16 | OTC | 1 | U |

**Total Quantity Bought:**　15,011　　　　**Total Dollars Bought:**　$5,584.51

**Total Quantity Sold:**　16,245　　　　**Total Dollars Sold:**　$4,630.73

# EXHIBIT 13

Hertz Newsroom

# Hertz Global Holdings Takes Action To Strengthen Capital Structure Following Impact Of Global Coronavirus Crisis

*Voluntarily Files for Chapter 11 Reorganization*

*As an Essential Business, Hertz and Subsidiaries Around the World Remain Open with Same Award-Winning Service for Customers*

*All Customer and Loyalty Programs Expected to Continue as Usual*

*$1 Billion in Cash on Hand to Support Continuing Operations*

ESTERO, Fla., May 22, 2020 /PRNewswire/ -- Hertz Global Holdings, Inc. (NYSE: HTZ) ("Hertz" or the "Company") today announced it and certain of its U.S. and Canadian subsidiaries have filed voluntary petitions for reorganization under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware.

The impact of COVID-19 on travel demand was sudden and dramatic, causing an abrupt decline in the Company's revenue and future bookings. Hertz took immediate actions to prioritize the health and safety of employees and customers, eliminate all non-essential spending and preserve liquidity. However, uncertainty remains as to when revenue will return and when the used-car market will fully re-open for sales, which necessitated today's action. The financial reorganization will provide Hertz a path toward a more robust financial structure that best positions the Company for the future as it navigates what could be a prolonged travel and overall global economic recovery.

Hertz's principal international operating regions including Europe, Australia and New Zealand are not included in today's U.S. Chapter 11 proceedings. In addition, Hertz's franchised locations, which are not owned by the Company, also are not included in the Chapter 11 proceedings.

## All Hertz Businesses Remain Open and Serving Customers

All of Hertz's businesses globally, including its Hertz, Dollar, Thrifty, Firefly, Hertz Car Sales, and Donlen subsidiaries, are open and serving customers. All reservations, promotional offers, vouchers, and customer and loyalty programs, including rewards points, are expected to continue as usual. Customers can count on the same high level of service and reliability, including new initiatives such as "Hertz Gold Standard Clean" sanitization protocols to provide additional safety in response to the COVID-19 pandemic.

"Hertz has over a century of industry leadership and we entered 2020 with strong revenue and earnings momentum," said Hertz President and CEO Paul Stone. "With the severity of the COVID-19 impact on our business, and the uncertainty of when travel and the economy will rebound, we need to take further steps to weather a potentially prolonged recovery. Today's action will protect the value of our business, allow us to continue our operations and serve our customers, and provide the time to put in place a new, stronger financial foundation to move successfully through this pandemic and to better position us for the future. Our loyal customers have made us one of the world's most iconic brands, and we look forward to serving them now and on their future journeys."

## First Day Motions

As part of the reorganization process, the Company will file customary "First Day" motions, which should allow it to maintain operations in the ordinary course. Hertz intends to continue to provide the same vehicle quality and selection; to pay vendors and suppliers under customary terms for goods and services received on or after the filing date; to pay its employees in the usual manner and to continue without disruption their primary benefits; and to continue the Company's customer loyalty programs.

## Sufficient Cash to Support Operations

As of the filing date, the Company had more than $1 billion in cash on hand to support its ongoing operations. Depending upon the length of the COVID-19 induced crisis and its impact on revenue, the Company may seek access to additional cash, including through new borrowings, as the reorganization progresses.

## Strong Upward Trajectory

Hertz was on a strong upward financial trajectory prior to the COVID-19 pandemic, including ten consecutive quarters of year-over-year revenue growth and nine quarters of year-over-year adjusted corporate EBITDA improvement. In January and February 2020, the Company increased global revenue 6% and 8% year over year,

respectively, driven by higher U.S. car rental revenue. In addition, the Company was recognized as No. #1 in customer satisfaction by J.D. Power and as one of the World's Most Ethical Companies by Ethisphere.

## Taking Actions in Response to COVID-19

When the effects of the crisis began to manifest in March, causing an increase in car rental cancellations and a decline in forward bookings, the Company moved quickly to adjust. Hertz took action to align expenses with significantly lower demand levels by closely managing overhead and operating costs, including:

- reducing planned fleet levels through vehicle sales and by canceling fleet orders,
- consolidating off-airport rental locations,
- deferring capital expenditures and cutting marketing spend, and
- implementing furloughs and layoffs of 20,000 employees, or approximately 50% of its global workforce.

The Company actively engaged with many of its largest creditors to temporarily reduce the required payments under the Company's vehicle operating lease. Although Hertz negotiated short-term relief with such creditors, it was unable to secure longer-term agreements. Additionally, the Company sought assistance from the U.S. government, but access to funding for the rental car industry did not become available.

## Additional Information

White & Case LLP is serving as legal advisor, Moelis & Co. is serving as investment banker, and FTI Consulting is serving as financial advisor.

Additional information for customers regarding Hertz's restructuring is available www.hertz.com/drivingforward. Court filings and information about the claims process for suppliers and vendors are available at https://restructuring.primeclerk.com/hertz, by calling the Company's claims agent at (877) 428-4661 (toll-free in the U.S.) or (929) 955-3421 (for parties outside the U.S.) or emailing hertzinfo@primeclerk.com.

## ABOUT HERTZ
The Hertz Corporation, a subsidiary of Hertz Global Holdings, Inc., operates the Hertz, Dollar and Thrifty vehicle rental brands throughout North America, Europe, the Caribbean, Latin America, Africa, the Middle East, Asia, Australia and New Zealand. The Hertz Corporation is one of the largest worldwide vehicle rental companies, and the Hertz brand is one of the most recognized globally. Product and service initiatives such as Hertz Gold Plus Rewards, Ultimate Choice, Carfirmations, Mobile Wi-Fi and unique vehicles offered through its specialty collections set Hertz apart from the competition. Additionally, The Hertz Corporation owns the vehicle leasing and fleet management leader Donlen Corporation, operates the Firefly vehicle rental brand and Hertz 24/7 car sharing business in international markets and sells vehicles through Hertz Car Sales. For more information about The Hertz Corporation, visit: www.hertz.com.

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS
This press release contains "forward-looking statements" within the meaning of federal securities laws. Words such as "expect" and "intend" and similar expressions identify forward-looking statements, which include but are not limited to statements related to our liquidity, the expected effects on our business, financial condition and results of operations due to the spread of the COVID-19 virus, the bankruptcy process, the Company's ability to obtain approval from the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court throughout the course of the Chapter 11 cases, the effects of the Chapter 11 cases, including increased professional costs, on the Company's liquidity, results of operations and business, the Company's ability to comply with the continued listing criteria of the New York Stock Exchange (the "NYSE") and risks arising from the potential suspension of trading of the Company's common stock on, or delisting from, the NYSE, the effects of Chapter 11 on the interests of various constituents and the ability to negotiate, develop, confirm and consummate a plan of reorganization. We caution you that these statements are not guarantees of future performance and are subject to numerous evolving risks and uncertainties that we may not be able to accurately predict or assess, including those in our risk factors that we identify in our most recent annual report on Form 10-K for the year ended December 31, 2019, as filed with the Securities and Exchange Commission on February 25, 2020, and quarterly reports on Form 10-Q filed subsequent thereto. We caution you not to place undue reliance on our forward-looking statements, which speak only as of the date of this filing, and we undertake no obligation to update this information.

SOURCE Hertz Global Holdings, Inc.

For further information: Investor Contact: Hertz Investor Relations, (239) 301-6800, investorrelations@hertz.com; Media Contact: Hertz Media Relations, (239) 301-6300, mediarelations@hertz.com

https://newsroom.hertz.com/2020-05-22-Hertz-Global-Holdings-Takes-Action-To-Strengthen-Capital-Structure-Following-Impact-Of-Global-Coronavirus-Crisis

# EXHIBIT 14

**The New York Times** | https://www.nytimes.com/2020/05/22/business/hertz-bankruptcy-coronavirus-car-rental.html

## *Hertz, Car Rental Pioneer, Files for Bankruptcy Protection*

The company, which had amassed a large debt, has been devastated by the sharp drop in travel during the pandemic.

 **By Niraj Chokshi**

May 22, 2020

Hertz, which started with a fleet of a dozen Ford Model T's a century ago and became one of the world's largest car rental companies, filed for bankruptcy protection on Friday after falling victim to its mountain of debt.

The coronavirus pandemic has devastated Hertz by grounding business travelers and tourists, making it impossible for the company to continue paying its lenders. A sharp drop in used car prices has also decreased the value of its fleet.

"They were doing quite well, but when you turn off the revenues and you own all these cars and all of a sudden the cars are worth less it's a very tough business," said John Healy, an analyst and managing director with Northcoast Research in Cleveland.

Hertz said late Friday that it would use more than $1 billion in cash on hand to keep its business running while it proceeds with the bankruptcy process.

"Today's action will protect the value of our business, allow us to continue our operations and serve our customers, and provide the time to put in place a new, stronger financial foundation to move successfully through this pandemic and to better position us for the future," Paul E. Stone, its chief executive, said in a statement.

The bankruptcy filing excludes operations in Australia, Europe and New Zealand as well as the company's franchisee locations. Hertz also said that it had sought aid from the federal government, but that funding for its industry "did not become available."

Though it had piled up $17 billion in debt, Hertz, which also owns the Dollar and Thrifty brands, was reporting healthy sales at the start 2020. The company's revenue rose 6 percent in January and February.

But the pandemic dealt what the company has described as "a rapid, sudden and dramatic" blow. Sales dried up in March as much of the world started to shelter at home. Airports, where Hertz and its competitor Avis Budget Group earn most of their revenue, turned into ghost towns.

By late March, the company started to cut back on spending, sold some of its cars, furloughed workers and combined nearby outposts. Hertz management suggested that they had some room to maneuver, including access to $1 billion in cash.

"Hertz is a resilient company, with resilient brands and resilient people," its chief executive, Kathryn Marinello, said in a statement at the time.

**Daily business updates**  The latest coverage of business, markets and the economy, sent by email each weekday. Get it sent to your inbox.

But Ms. Marinello resigned last week, and Hertz has since laid off or furloughed 20,000 employees, half of its work force. The company had cut pay for senior leaders in March, too, but reversed that decision recently.

The company's march to bankruptcy began in late April when it missed a payment on a lease for some of its fleet, which includes about 667,000 cars, sport utility vehicles and other vehicles worldwide. It persuaded lenders to give it until midnight on Friday to put together a financial plan that they could accept. But in a filing this month, Hertz acknowledged the enormity of the task.

"If our business does not recover quickly and we are unable to successfully restructure our substantial indebtedness, obtain further waivers or forbearance or raise additional capital, there is substantial doubt that we will be able to continue as a going concern," the company said.

Hertz had struggled in the years after the financial crisis of 2008 but had begun to turn around recently. Under Ms. Marinello, the company had improved operations, cut costs and reduced its debt, analysts said.

**Daily Business Briefing**

**Latest Updates ›**

Updated 21 minutes ago

- Robinhood's revenue more than doubled even as it lost money last quarter.
- Fed officials saw a path to slowing bond-buying this year, but debated when to start.
- The I.M.F. says it will block Afghanistan from getting $460 million in reserve funds.

"I have no doubt that had the coronavirus not happened that Hertz would have eventually achieved its turnaround," said Ryan Brinkman, an automotive industry analyst with J.P. Morgan.

The company's shares closed on Friday at $2.84, down from around $20 in late February. Carl Icahn, the billionaire investor, owned about 39 percent of the company's shares as of mid-March.

Its peers were better suited for the moment. Avis Budget Group, which has less debt, said last month that it had access to enough cash to survive the year. Avis, which also raised $500 million in a bond sale this month, acted more quickly to cut costs, analysts said. Enterprise, a private company, is better diversified and not nearly as reliant on rentals at airports as either Avis or Hertz.

When Ms. Marinello took the helm of Hertz in early 2017, she inherited a troubled company.

In addition to amassing a lot of debt, Hertz had recently purchased too many compact cars, which have been falling out of favor with American drivers for years, and failed to meet corporate cost-cutting goals. Her predecessor spun off the company's equipment rental business. Earlier, Hertz decided to move its headquarters from New Jersey to Florida, which led many seasoned executives to leave the company.

"The company lost a lot of momentum during that time," Ms. Marinello told investors soon after taking over. She was the company's fourth boss in three years. And Hertz had been poorly served by "incredibly optimistic demand forecasts" and misguided car purchases, she said.

By some accounts, the company's modern difficulties date to 2012. That year, Hertz, under the leadership of Mark Frissora, bought Dollar Thrifty in a deal valued at $2.3 billion, a price that some investors and analysts believed was too rich.

"That was the beginning of their troubles," said Betsy Snyder, a credit analyst at S&P Global Ratings.

In mid-2014, Hertz said it would need to correct its financial results going back three years because of a string of accounting errors. A few months later, Mr. Frissora stepped down.

Hertz had overstated income before taxes by $235 million, the Securities and Exchange Commission said last year. The company agreed to pay the regulator $16 million to settle fraud and other charges. Hertz sued Mr. Frissora and other former senior managers, seeking to recover at least $56 million in compensation and arguing that they had pressured subordinates to meet financial goals, which they did through the misleading accounting. The case is still pending.

Mr. Frissora does not agree that he is to blame for the accounting errors or the company's current problems, Stephen Cohen, a spokesman, said in a statement.

"During his tenure at Hertz, Mark presided over substantial value creation and operational improvements," Mr. Cohen said, noting that he was succeeded by several chief executives in the six years since he left Hertz. "Those C.E.O.s, and not Mark, have set the company's strategy and overseen its operations leading to the company's current circumstances."

Also in 2014, Mr. Icahn, the activist investor, disclosed that he had amassed a stake of almost 8.5 percent in the company. He has since gained control of three board seats and expanded his holdings in the company, most recently in March when he purchased about 11.5 million shares at $7 to $8 each.

The bankruptcy filing represents a devastating blow to an institution that began in the early days of the American automobile industry.

Hertz was founded in Chicago in 1918 when a former Ford Motor salesman, Walter Jacobs, bought a dozen Model T's and formed Rent-a-Car, Inc. The business grew rapidly and, within five years, it had a fleet of about 600 vehicles, according to Hertz.

In 1923, Jacobs sold the company to John Hertz, the owner of Chicago Yellow Cab Company, who renamed it. Together, the pair expanded the business nationwide. In 1932, the company opened its first airport car rental facility at Chicago's Midway Airport, according to Hertz. The next year, it started offering one-way rentals. By 1955, the company had more than 1,000 locations worldwide. Today, there are more than 12,000 corporate and franchisee locations.

Ford bought a controlling stake in Hertz in 1987 and sold it to three private equity firms — Clayton Dubilier & Rice, the Carlyle Group and Merrill Lynch Global Private Equity — in 2005. A year later, the private equity firms listed Hertz on the stock market in an initial public offering.

The company's future is uncertain, though most analysts are optimistic that it can emerge from bankruptcy after restructuring its debt.

"I don't think Hertz is going away," Ms. Snyder said. "When you think about car rental, you think about Hertz. It's an iconic brand."