UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

| | |
|---|---|
| Shterna Pinchasov | |
| v | Case No. 20-CV-24897-CMA |
| Robinhood Financial, LLC | |

**EXPERT REPORT OF ALLEN FERRELL, PH.D.**

August 19, 2021

## I. Qualifications

1. I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. My Ph.D. dissertation concerned the relationship between stock prices and financial disclosures. After law school, I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2. I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, and a member of the editorial board of the Journal of Financial Perspectives. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which is responsible for advising the Harvard Corporation on how to vote shares held by its endowment), the ABA Task Force on Corporate Governance, American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3. I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of securities matters. My

testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as Appendix A.[1]

4. I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I am being compensated for my work on this matter at an hourly rate of $1,250. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

5. The materials I have considered are listed in Appendix B.

6. This report is subject to change or modification should additional relevant information become available which bears on the analysis, opinions, or conclusions contained herein.

## II. Introduction and Summary of Opinions

7. Robinhood Financial LLC ("Robinhood") is an online brokerage firm registered with the SEC that transacts in securities on behalf of its customers, who receive stock pricing and other stock information from Robinhood's trading platform.[2]

8. I understand that Plaintiff owned shares of Hertz Corporation ("Hertz") and on Tuesday May 26, 2020 entered a market order at 9:30:57 a.m. to sell her shares. The closing price of Hertz stock on May 22, 2020 was $2.84.[3] Hertz had announced after the market closed on

---

[1] In addition to the testimony listed on my CV, I was deposed on July 30, 2021 in Securitized Asset Funding LTD v. CIBC, Index Number: 653911/2015.
[2] Class Action Complaint filed November 5, 2020 ("Complaint") ¶¶ 2-6.
[3] Bloomberg LP. The markets were closed for the Memorial Day holiday on Monday May 25, 2020.

Friday May 22, 2020 that it was filing for bankruptcy protection.[4] I understand that the New York Stock Exchange ("NYSE"), the exchange on which Hertz stock traded, placed a halt on the stock at 3:56 a.m. on May 26, 2020, which was publicly disclosed.[5] I further understand that Plaintiff's order was executed for $0.41 at 2:36:53 p.m. when trading resumed.

9. Plaintiff claims that "[w]hen Robinhood's targeted customers did not receive the basic information regarding the [trading halt] placed on the Hertz Corporation stock in March 2020 [*sic*], Robinhood's targeted customers lost significant sums of money."[6] Plaintiff further claims that "[o]nce the Hertz Corporation [trading halt] was lifted, the market price of the stocks had dropped significantly, causing Plaintiff and others similarly situated damages as a result of Robinhood executing the pre-[trading halt] trades which should have been cancelled, terminated or otherwise halted."[7]

10. Plaintiff alleges that "Robinhood breached its duty of care to its targeted customers by failing to prevent customers from using its interface for stocks that had been the subject of a [trading halt] and failing to provide those customers the knowledge of the [trading halt]."[8] Plaintiff further alleges that "[h]ad Robinhood fulfilled its duty of managing the Robinhood interface for each of the stock services Robinhood's interface was 'deliberately engineered' to provide for its targeted customer-base, Plaintiff and others similarly situated would *likely* never have been harmed."[9]

---

[4] *See* "Hertz Global Holdings Takes Action to Strengthen Capital Structure Following Impact of Global Coronavirus Crisis," *PR Newswire*, May 22, 2020, 9:51 pm.
[5] *See* "Hertz Global Holdings Inc. (HTZ) Halted due to news pending," *Dow Jones Newswires*, May 26, 2020, 3:56 am *and* "Hertz Halted on NYSE Equities for News Pending," *Bloomberg First Word*, May 26, 2020, 4:05 am.
[6] Complaint ¶ 18. Throughout her complaint, Plaintiff mistakenly refers to the trading halt as a "T1 Halt" which she later corrected. Plaintiffs' Motion at 2-3.
[7] Complaint ¶ 19.
[8] Complaint ¶ 22.
[9] Complaint ¶ 20 (emphasis added).

11. Plaintiff brings this action on behalf of herself and a class of "'all former and current customers of Robinhood in the United States and its territories who were affected by entering a trade during a halt at any time within 4 years preceding the filing of this lawsuit.'"[10] Plaintiff asserts that the applicable damages formula in this case is "price at trade initiation versus price at trade execution."[11]

12. I have been retained by counsel for Robinhood to assess (i) whether, as an economic matter, lack of knowledge of a trading halt necessarily causes an injury and (ii) whether the injury, if any, can be reliably determined on a classwide basis without resort to individualized proof. Based on my analysis, I have reached the following principal conclusions:

- Placing a trade order during a trading halt without knowing the halt was ongoing does not give rise to any injury in-and-of itself.

- Assessing whether the alleged failure to prevent a customer from placing an order during a trading halt or to inform the customer of the halt caused economic harm to that customer, and if so by how much, requires a highly individualized factual inquiry. Such a factual inquiry would include specific evidence as to, among other things, the alternative trading activity that would have been undertaken by that customer had the trade been prevented or the trading halt been disclosed, if any, and the customer's knowledge of the information that caused the trading halt and of the halt itself.

I provide more detail and support for my conclusions below.

### III. Placing a Trade Order During a Trading Halt Without Knowing the Halt Was Ongoing Does Not Give Rise to Any Injury In-and-Of Itself

13. Placing a trade order during a trading halt without knowing the halt was ongoing does not give rise to any injury in-and-of itself. For example, Plaintiff could not have possibly sold her shares of Hertz stock at the pre-halt price regardless of whether Robinhood had notified

---

[10] Plaintiff's Motion for Class Certification ("Plaintiffs' Motion") at 2-3. Plaintiff states that this definition of the putative class "is slightly different than what is found in the Complaint, mainly because of the word 'halt' instead of 'T1 Halt.'"
[11] Plaintiff's Motion at 18.

her of the halt or prevented her from placing trade orders during the halt. Whether or not she was aware of the bankruptcy announcement or the trading halt, there was no active market for Hertz stock during the halt and Robinhood, like every other broker/dealer, could not change that fact. As Plaintiff acknowledges, "[w]hen these trading halts are in place, broker-dealers are not able to effectuate trades on the halted securities."[12]

14. Plaintiff claims that "[a]ny reasonable broker/dealer in the industry knows or should know that their customers need to be informed that a given stock is subject to a [trading halt], in order to protect that consumer(s) from the volatility due to the news which generated the [trading halt]."[13] But, as Plaintiff acknowledges, "stock exchanges issue trading halts in order to prevent or slow down volatility."[14] Indeed, the authors of an academic article analyzing NYSE trading halts conclude that the "market-clearing price [i.e., "the price that clears supply and demand in the limit order book just prior to the reopen"] is a good predictor of subsequent equilibrium prices."[15] In other words, this study finds that investors are not necessarily worse off by trading at the post-halt opening price.

15. For the reasons explained above, Plaintiff's assertion that the applicable damages formula in this case is "price at trade initiation versus price at trade execution" is fundamentally flawed. The purported "price at trade initiation" is not an actual price that any trader – including those who had knowledge of the trading halt and/or did not place an order during the halt – could have possibly obtained.

---

[12] Plaintiff's Motion at 2.
[13] Complaint ¶ 21.
[14] Plaintiff's Motion at 1-2.
[15] S.A. Corwin and M.L. Lipson, "Order Flow and Liquidity around NYSE Trading Halts," *Journal of Finance*, vol. 55, no. 4 (August 2000), 1771-1801 at 1772.

16.     Put simply, Plaintiff's proposed formula does not measure any injury arising from Robinhood's alleged failure to notify customers when trading in specific securities was halted or to prevent them from placing orders during a trading halt.

IV.     **Assessing Whether the Alleged Failure to Prevent a Customer from Placing an Order During a Trading Halt or To Inform the Customer of the Halt Caused Economic Harm to that Customer, and If So by How Much, Requires a Highly Individualized Factual Inquiry**

17.     Any reasonable measure of economic harm must be based in reality and linked to the alleged wrongdoing, such as comparing what actually happened with what would have happened had the alleged wrongdoing not occurred.  Plaintiff claims:  "When the halts are ultimately lifted, price of the securities subject to the halt tend to vary significantly from their pre-halt trading price.  As a result, traders should approach these securities with extreme care."[16]  But Plaintiff does not explain what she or any member of the putative Class would have done differently had the alleged failures not occurred, let alone what the consequences of that supposed alternative trade decision would have been.

18.     Under Plaintiff's claims, the only way to determine whether customers suffered an injury in connection with the alleged wrongdoing is through a customer-by-customer and trade-by-trade examination of what each customer would have done differently had the alleged failures not occurred.  In this case, that means the economic loss arising from Robinhood's alleged failure to notify customers when trading was halted depends on individualized evidence demonstrating that a particular customer, among other things, would subsequently have sold the relevant security at a higher price (or bought it at a lower price) than the post-halt price at which the customer's trade was actually executed.

---

[16] Plaintiff's Motion at 2.

19. Setting aside whether the customer had independent knowledge of the halt or would have placed the trade during the halt even if Robinhood had provided notice of it, which are discussed below, the determination and measurement of economic loss requires specific evidence regarding the price movement of each security after the relevant halt is lifted and the subsequent trading of each customer.

20. For example, a customer who placed a sell order during a trading halt would have to prove that she was worse off by that sale – *e.g.*, that she would have sold her stock at a higher price. Merely selling a stock at a price lower than the pre-halt price does not constitute injury because the customer's order may have been executed at a better price than she could have obtained if she waited to place the trade after the halt was lifted.

21. Similarly, a customer who placed a buy order during a trading halt would have to prove that she was worse off by that purchase – *e.g.*, that she subsequently would have purchased the stock at a lower price. Merely purchasing a stock at a price higher than the pre-halt price does not constitute injury, as the price might have continued to rise, giving the customer an opportunity to earn greater profits in connection with a later sale.

22. Determining whether any alleged injury arising from a trading halt is attributable to Robinhood also turns on individualized inquiries. *First*, if a customer had independent knowledge of the relevant halt, Robinhood's failure to provide notice of that halt does not cause any injury. Information that causes trading halts and the halts themselves are publicly available information. For example, as explained above, Hertz announced its bankruptcy several days

before the halt, and the halt was publicly disclosed.[17]  Therefore, many members of the putative Class likely were fully informed when they placed their trades during a trading halt.[18]

23.     *Second*, customers may have decided to place an order during a halt even if Robinhood had provided notice of it.  For example, had a customer been informed of a trading halt, she may have decided to place the order anyway for numerous reasons, including that:  1) she investigated the cause of the halt, understood the information would impact the price, and decided to place the trade order anyway; 2) she did not have any other way to determine the value of the information and was willing to accept the post-halt opening price; or 3) she wanted to sell quickly because she saw better opportunities to invest the proceeds.

> I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 19th day of August, 2021 at Lexington, MA.



_____
Allen Ferrell

August 19, 2021

---

[17] I understand that Robinhood customers are notified quickly after a trade is executed.  Consequently, the fact that Plaintiff and other members of the putative Class who held Hertz stock had not received a notification for as much as five hours after placing their market orders to sell during a trading day suggests that at least some of them could have known there was an issue.

[18] The authors of an academic article analyzing NYSE trading halts "find that there is a surge in market order submissions and cancellations during halts" and conclude that "[a]lthough the cancellation of orders might be expected as traders wait to see how market conditions unfold, the large increase in submissions suggests that they are also willing to reenter the market before trading resumes."  S.A. Corwin and M.L. Lipson, "Order Flow and Liquidity around NYSE Trading Halts," *Journal of Finance*, vol. 55, no. 4 (August 2000), 1771-1801 at 1772.

Appendix A

1

November, 2020

# Allen Ferrell

Harvard Law School
Cambridge, Massachusetts 02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

**CURRENT POSITIONS**

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Member of Editorial Board,* Journal of Financial Perspectives

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

**EDUCATION**

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

**PREVIOUS POSITIONS**

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

**COURSES TAUGHT**

*Contracts*
*Corporate Finance*
*Law and Finance*
*Securities Litigation*
*Securities Regulation*

**REFEREE FOR FOLLOWING JOURNALS**

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

**CONSULTING AREAS**

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

## Papers

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison to the RiskMetrics and IRRC Governance Databases" with Martijn Cremers, Paul Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns: Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

"Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

5

**TESTIMONY LAST FOUR YEARS**

*Pearlstein et al. v. Blackberry Limited*, Case No. 1:13-cv-7060-CM, Expert report and deposition on November 3, 2020

*In re Grupo Televisa Securities Litigation*, Case No. 1:18-cv-01979-LLS, Expert report and deposition on February 21, 2020

*In re Snap Securities Litigation,* Case No. 2:17-cv-03679-SVW-AGR, Expert report and deposition on December 16, 2019

*People of the State of New York v. Exxon Mobil Corporation,* Index No. 452044/2018, Expert report and deposition on July 23, 2019 and trial testimony on November 6, 2019

*In re Signet Jewelers Limited Securities Litigation*, Case No. 1:16-cv-06728-CM, Expert report and deposition on May 14, 2019

*Trustees of DALI et al. v. Barrick Gold Corporation,* Case No. CV-14-502316-00CP, Ontario Superior Court of Justice, Expert reports and deposition on April 16, 2019

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019

*CC IMA v. IMA Pizza*, JAMS Ref No. 1425026556, Testimony on September 13, 2018

*Bradley Cooper v. Thoratec Corporation et al.,* Case No. 4:14-cv-00360-CW, Expert report and deposition on April 11, 2018

*Blattman v. C3, Inc. et al.,* Case No. 1:15-cv-00530-GMS, Expert report and deposition on December 22, 2017

*United States v. Kaleil Tuzman*, 15 Criminal Case No. 536 (US Attorney for the Southern District of New York), testimony on December 15 and 18, 2017

*United States v. Brian Block*, 16 Criminal Case No. 595 (US Attorney for the Southern District of New York), testimony on June 13, 2017

*In re Alere-Abbott Merger Litigation*, Case No. 12963-VCG, Expert report and deposition on April 7, 2017

*Beaver County Employees' Retirement Fund, et al.,* Case No. 0:14-cv-007856-ADM-TNL, Expert report and deposition on September 16, 2016

6

*In re Aeropostale, Inc., et al,* Case No. 16-11275, Expert report and trial testimony in U.S. Bankruptcy Court, Southern District of New York, August 17, 2016 and deposition on August 14, 2016

*Jaffe v. Household International, Inc.*, Civil Action 02-C-5893, Expert report and depositions on May 27, 2016 and February 27, 2016

*Better & YRC Investors v. YRC Worldwide*, Civil Action No. 11-CV-2072, Expert report and deposition on March 8, 2016

*David Kaplan et al v. S.A.C. Capital Advisors, L.P.*, Civil Action No. 12-CV-9350, Expert report and deposition on March 3, 2016

*In re Genworth Financial Inc. Securities Litigation*, Civil Action No. 3:14-CV-682, Expert report and deposition on February 2, 2016

# Appendix B
# Materials Considered

### Court Documents

Class Action, Shterna Pinchasov, on her own behalf, and on behalf of those similarly situated, v Robinhood Financial, LLC, Class Action Complaint, Filed on November 5, 2020

Case No. 20-CV-24897-CMA, Shterna Pinchasov, on her own behalf, and on behalf of those similarly situated, v Robinhood Financial, LLC, Plaintiff's Motion for Class Certification

### News and Academic Articles

"Hertz Global Holdings Takes Action to Strengthen Capital Structure Following Impact of Global Coronavirus Crisis," *PR Newswire*, May 22, 2020, 9:51 PM

"Hertz Global Holdings Inc. (HTZ) Halted due to news pending," *Dow Jones Newswires*, May 26, 2020, 3:56 AM

"Hertz Halted on NYSE Equities for News Pending," *Bloomberg First Word*, May 26, 2020, 4:05 AM

S.A. Corwin and M. L. Lipson, "Order Flow and Liquidity around NYSE Trading Halts," *Journal of Finance*, vol. 55, no. 4 (August 2000)

### Public Data

Bloomberg L.P.