UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

CASE NO. 20-CV-24897-CMA

SHTERNA PINCHASOV, Individually and
on Behalf of All Others Similarly Situated,

    Plaintiff,

v.

ROBINHOOD FINANCIAL LLC,

    Defendant.
_____/

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO
PLAINTIFF'S MOTION TO CERTIFY CLASS**

    Plaintiff, SHTERNA PINCHASOV, Individually and on Behalf of All Others Similarly Situated, by and through her undersigned counsel, files this Reply to Defendant's Response to Plaintiff's Motion for Class Certification, and as grounds in support thereof state as follows:

**I.    INTRODUCTION.**

    As an initial matter, Count I (Negligence) has proven to be a catalyst for Defendant's conflation of the issues stemming from its conduct here, and therefore Plaintiff moves this Honorable Court for an amendment of the pleadings, allowing the Negligence Count ("Count I") in Plaintiff's Class Action Complaint [D.E. 1-1 at ¶¶ 51-58] to be withdrawn.[1] With that said, to ascertain Plaintiff's class predominance and superiority, this Court need only consider the actions

---

[1] In line with Fed. R. Civ. P. 15 and 16, given the deadlines imposed by this Court's prior scheduling order(s), and in consideration of L.R. 7.1(a)(3), the undersigned has attempted to confer with Defendant regarding this forthcoming request to amend the pleadings, but as of the time this Reply is being filed, Plaintiff has yet to receive a response to the same.

1

of the Defendant, and not any individualized inquiry into the potential class representatives. Alternatively, any questions of individual inquiry would not predominate, and are not fatal to class certification.

Under Plaintiff's breach of fiduciary count, there is no need to ascertain if each customer knew about the halt, what each customer knew about the stock, what each customer's individual trading strategy is or was, or any other individualized inquiry. This is because the mere act of accepting a trade on a halted stock and/or publishing or soliciting trades of a halted stock on Defendant's application, as is visible in the graphics referenced below, would be a violation of Defendant's fiduciary duties to its customers. The Defendant cites FINRA Regulation 5260 [D.E. 68-1 at Pg. 19] for the proposition that a broker-dealer may solicit bids on stocks that are halted. That regulation, however, says the opposite: "(a) No member or person associated with a member shall, directly or indirectly, effect any transaction or publish a quotation, a priced bid and/or offer, an unpriced indication of interest (including "bid wanted" and "offer wanted" and name only indications), or a bid or offer accompanied by a modifier to reflect unsolicited customer interest, in any security as to which a trading halt is currently in effect . . .).

Additionally, had Defendant prevented its customers from using its platform to place orders on halted stocks, no customer could have physically been able to put in a bid or initiate a trade on the Defendant's platform. In other words, the sale would have never happened at that moment without Defendant's facilitation. As a result, the issue of causation is very easily determined on a class-wide basis. This is because anyone who traded during the halt, traded because Defendant's platform allowed bids to be placed on halted stocks, as part of its design to solicit bids on halted stocks.

As will be described *infra*, Robinhood is a broker-dealer that offers commission-free trading for stocks and options. In lieu of commissions and fees, Robinhood earns revenue through a process known as payment for order flow. Payment for order flow is a process in which market makers or exchanges pay broker-dealers to route trades to the market maker or the exchange for execution. Therefore, the more trades Robinhood customers execute, the more revenue Robinhood receives from market makers or exchanges. In other words, Defendant has no incentive to notify customers of halts and/or prevent them from using their platform to place trades on halted stocks. It's quite the opposite. Defendant has every incentive to increase the quantity of trades, as this is precisely how it generates most of its revenue.

To substantiate that Defendant is incentivized to increase trades, it is undisputed that customers receive push notifications encouraging them to trade. Robinhood lures these targeted customers by means of over-simplification, withholding of information, and an overall "gamification" of stock trading in a highly volatile market that in some cases has led to Robinhood customers committing suicide due to the horrors that ensue from the games that Robinhood plays. The rationale for this business model of gamification employed by Robinhood is to ensure the maximum amount of trading occurs daily on their deliberately engineered platform- a platform that Robinhood engineered to pilfer and profit from their customers' frequency of trading. It is by no mistake that the withholding of information, such as when trading should not proceed during a halt, is meant to leave trading uninterrupted and therefore at the maximum volume providing then maximum profit for Robinhood to the detriment of Robinhood's customers.

## II. PLAINTIFF SATISFIES THE PREDOMINANCE REQUIREMENT OF RULE 23(b)(3).

### A. Proximate Cause Can Be Established on a Class Wide Basis.

Defendant argues that "proximate cause cannot be established through common proof on a class wide basis" because "proving causation" depends on each customer's knowledge and intent because knowledge of the halt would "break the chain of causation". Defendant indicates that for Plaintiff to be successful, it would have to show that had Defendant notified a customer of a halt, that the customer would not have traded; or that if a customer knew about the halt and would have traded anyway, this would disprove causation.  However, a customer is never supposed to trade during a halt, despite their knowledge of the halt or what they would have done with that knowledge. Because Defendant published price quotations and solicitated the halted stocks, they enabled the trade when no trade was supposed to take place, Defendant breached its duty to Plaintiff. This removes any individualized inquiry as to knowledge or intent and still would prove causation, because if Defendant had not allowed the trade to be placed, as it should not have, customers would not have been physically able to place market orders which permanently deprived them of their stock when it was sold. Put another way, because Defendant solicited the trade by showing the current price of the stock without any notification that it would in fact not trade at that price, and allowed the trade to be placed, Defendant breached its fiduciary duty to customers when the stock did not trade at the stated price and/or they were permanently deprived of the stock.

Regardless, it is without question that issues of proximate causation are for a jury to decide. The Court should not make merit-based inquiries into causation at this stage. Moreover, if this Court were to agree that there would be some individualized inquiries necessary to determine causation, this would be no different than the *Collins* case, wherein this Court certified a class despite individual inquiries about whether an individual's debt was consumer or commercial. *Collins v. Erin Cap. Mgmt., LLC*, 290 F.R.D. 689, 699-700 (S.D. Fla. 2013). In *Collins*, this Court stated that:

4

> Although determining which debts are consumer will require some effort, there are means for making such determinations. Defendant's customers should be able to provide information regarding the debts, and proper drafting of the claim form may help exclude non-consumer debts.") Collins's proposed class definition limits the class to persons against whom attempts to collect debts incurred for personal, family, or household purposes were initiated by Erin Capital. "[A]ny disputes regarding whether a particular class member's debt is consumer or commercial can be remedied through proper drafting of the claim form, and at the damages phase of this case." (Citations omitted). Furthermore, "the mere existence of individualized defenses does not preclude a finding of predominance." (Citations omitted).

Another example where this Court certified a class despite Defendant's claims that individualized inquires predominated is in *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 518-21 (S.D. Fla. 2013).[2] There, this Court disagreed with the defendant's assertion that the subject claims involved highly individualized inquiries. In doing so, this Court certified the class and found that defendant's business operations were applied uniformly to its customers and proximate cause could be established despite individualized inquiries.

Finally, "breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." *Balearia Caribbean Ltd., Corp. v. Calvo*, No. 16-23300-CIV-WILLIAMS, 2019 U.S. Dist. LEXIS 36868, at *15-17 (S.D. Fla. Mar. 5, 2019) ("to prove causation, the plaintiff had to establish merely that the defendant's conduct was 'at least a substantial factor' and not a 'but for cause' in plaintiff's failure to secure the usurped business opportunity; it was neither necessary nor feasible for the plaintiff to establish 'but for' causation). In addition, the arguments made below for economic loss,

---

[2] In *Muzuco*, this Court stated:
> Defendants argue extensively that class certification is not appropriate for any of Plaintiff's claims because each will involve highly individualized issues, including: (1) whether each merchant displayed the Notice; (2) how the Notice was displayed; (3) whether each putative class member saw the Notice; and (4) whether each putative class member authorized the withdrawal. The Court disagrees.

*infra*, should be considered for proximate cause on a class wide basis. As such, proximate cause can be established on a class wide basis.

### B. Economic Loss Can Be Established and Measured on a Class Wide Basis.

Defendant argues that "Plaintiff fails to demonstrate that economic loss can be established and measured on a class wide basis". Defendant specifically takes issue with Plaintiff's damages formula. Although Defendant states that Plaintiff does not support its formula with any evidence or expert opinion, Plaintiff supports this formula, and gives an example of its application, by using the lead plaintiff's transaction in this case. Plaintiff specifically explains the amount of the stock that Plaintiff authorized Defendant to sell at, compared to the amount of the stock it actually sold at, and deduces the loss from there. This was further supported by lead Plaintiff's account statements, attached to and incorporated in Plaintiff's Motion.

Although Defendant disputes this, Plaintiff's formula is a measure of damages attributable to Robinhood's inaction of not notifying its customers of halts and allowing orders to be placed during halts, a practice which Robinhood has since changed. [D.E 65-5 at Pg. 100, lines 3-23]. No customer would have placed a market order to sell during a halt knowing the volatility of a stock after a halt. Although Plaintiff stands by her proposed damage formula as a proper method of calculation, as Plaintiff stated in its Motion for Class Certification [D.E. 65, pg. 18], damages are not fatal to class certification. *See, e.g.*, *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) (holding individual damage calculations do not defeat predominance).

Even assuming *arguendo* that Plaintiff's damage formula is not workable on a class wide basis, there are other measures of damages that would be appropriate and that can be uniformly applied on a case wide basis. For instance, as Plaintiff discussed *infra*, disgorgement would be an appropriate remedy in light of Defendant's conduct as it relates to class members. *Fabricant v.*

6

*Sears Roebuck & Co.*, 202 F.R.D. 310, 313 & 320 (S.D. Fla. 2001) (class action certified where plaintiffs ask for disgorgement of profits); *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 698 (M.D. Fla. 2005) (approving class certification and class settlement where expert testified disgorgement of profits was a measure of damages); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 805 n.6 (S.D.N.Y. 1983) (although not addressing the appropriate measure of damages, recognizing that disgorgement could be held to be the appropriate measure of damages in the future).

As stated *supra*, Defendant has stated in its Form S-1 Registration Statement recently filed with the Securities and Exchange Commission on August 4, 2021 (the "Form S-1"), that a majority of Defendant's revenue is derived from "payment for order flow" or "PFOF". *See* Robinhood Form S-1, Pg. 1-2. In other words, instead of receiving traditional fixed trading commissions, Robinhood is paid when it routes its consumers' trade orders to market makers for execution, a practice that has recently drawn heightened scrutiny from Congress, the SEC and state regulators and authorities. *See* Robinhood Form S-1, P. 34. The more orders and trades that occur, the greater the kickbacks Robinhood receives from market makers.[3] These kickbacks are received by Robinhood pursuant to Robinhood's "business understanding" with market makers and these arrangements are "not documented under binding contracts" between Robinhood and market makers. *Id*. Defendant is earning most of its revenue from the orders and trades made by Plaintiff and those similarly situated, although this revenue is not coming directly from Plaintiff. In that regard, Robinhood disclosed in the Robinhood Form S-1 that reduced levels of trading activity may result

---

[3] Robinhood reported that "[f]or the year ended December 31, 2020, revenue derived from PFOF and Transaction Rebates represented 75% of our total revenues, and for the three months ended March 31, 2021, represented 81% of our total revenues." See Robinhood Form S-1, Pg. 33.

7

in reduced profitability. *See Id*. at pg. 2. Thus, more trading by Robinhood consumers results in more revenue for Robinhood.

Because Defendant did not give Plaintiff and others similarly situated proper notice of trading halts, and instead solicited and facilitated trading in halted stocks pursuant to its platform, Defendant deprived Plaintiff and others of their meaningful choice and the opportunity to retain her stocks. Instead, Robinhood effectuated Plaintiff's trade when the halts were lifted, as well as tens of thousands of other trades of consumers that were similarly situated to Plaintiff. Pursuant to Robinhood's business model as described above and in the Robinhood Form S-1, Robinhood earned lucrative kickbacks from market makers on all such trades that were consummated once trading halts were lifted. In essence, Robinhood profited from the very breach of fiduciary duty alleged by the Plaintiff, the failure to provide notice and information about trading halts and the facilitating of trades in halted securities by allowing such orders to be entered. Instead of notifying or preventing Plaintiff and other consumers from entering an order or trade during the trading halts, consistent with its business model, Robinhood entered trades for execution and received kickbacks from market makers for those trades once they were consummated.

In light of Robinhood's conduct, Robinhood should be required to disgorge its profits in connection with the trades that were consummating following trading halts. Applying this method would result in damages that can be administered on a class-wide basis without individualized inquiry, though as Plaintiff argues in its Motion, individualized inquiry is not a bar to class certification.

Florida Courts have applied the equitable remedy of disgorgement in the context of corporate wrongdoing in the context of breaches of fiduciary duties and other like causes of action. In doing so the courts have described disgorgement as being the "net profit attributable to the

underlying wrong." *Bailey v. St. Louis*, 268 So. 3d 197 (Fla. 2d DCA 2018 (citing *Duty Free*, 253 So. 3d at 698 ("[t]he equitable remedy of disgorgement is measured by the defendant's ill-gotten profits or gains rather than the plaintiff's losses."). The *Bailey* Court, citing the RESTATEMENT THIRD OF RESTITUTION further stated that "disgorgement may be awarded even if the claimant has not sustained any loss." *Id*. At 202. As the RESTATEMENT (THIRD) OF RESTITUTION and Unjust Enrichment explains in § 3 "there can be restitution of wrongful gain in cases where the plaintiff has suffered an interference with protected interests but no measurable loss whatsoever."

     Disgorgement, as well as other equitable remedies are often used and applied by Courts in class actions. *Fabricant*, 202 F.R.D. at 313 & 320 (class action certified where plaintiffs ask for disgorgement of profits). Accordingly, even taking Defendant's argument as true, if damages cannot be measured by what Plaintiff "lost" because this was a function of the market[4], Plaintiff and all others similarly situated would still be entitled to damages. Further, even if Plaintiff suffered no actual loss, consistent with the law as stated in *Bailey*, "disgorgement may be awarded even if the claimant has not sustained any loss". These are damages attributable to Plaintiffs' theory of liability. If ultimately the factfinder finds that Defendant committed an underlying wrong, *i.e.*, that it breached its duty to Plaintiff when it did not notify her of the trading halt, then Plaintiff would be entitled to disgorgement of the profits Defendant made when it was paid for her order. The measure of damages for Defendant's pay-per-order-flow would be consistent across the board for all class members, the amount of the kickbacks received by Robinhood as a result of trading orders that were opened during trading halts and consummated when said halts were lifted. The

---

[4] Even if the market conditions affected the price of Plaintiff's stock, the loss caused by Defendant was Plaintiff's loss of her stock through a sale she did not authorize Defendant to effectuate at a lower price. Had Defendant prevented her from using the platform to place an order, instead of allowing her to place a sale order at the then current market price, the sale of the stock would not have happened at that moment (because it physically could not have happened), and Plaintiff would not have been deprived of the opportunity to do as she pleases with her stock, despite any diminution in value caused by the market.

result would be that Plaintiff and others similarly situated would be seeking uniform relief from Defendant's conduct and practices that were equally applicable to all proposed class members.

As such, recognizing the caselaw stated in Plaintiff's Motion about damages calculations not being fatal to a class action, coupled with the fact that there are various damages theories that would satisfy the predominance requirement for a class action, this Court should not bar class certification based on Defendant's damages argument.

### III.   PLAINTIFF SATISFIES THE SUPERIORITY REQUIREMENT OF RULE 23(b)(3).

To the extent Defendant claims superiority is not met due to individualized inquiries, the same arguments made above regarding why these inquiries are not applicable should be considered in this section and will not be repeated herein.

### IV.   PLAINTIFF'S PROPOSED CLASS IS ASCERTAINABLE.

Defendant argues that Plaintiff's class is not ascertainable because the definition implicates an impermissible fail-safe class. This is based on the mistaken belief that the class definition includes "conclusory language identifying class membership in terms of the ultimate merits question". A cursory review of Plaintiff's class definition shows there are no merit-based question that would implicate a determination of liability from the beginning. In fact, as an initial matter to Plaintiff's cause of action, liability is only found if defendant had a duty to inform. Further, it is axiomatic that a class would include members who claim to be injured or affected by a defendant's actions or inactions. To the extent Defendant claims this definition includes individualized inquires, Plaintiff's counter arguments have been briefed above on this issue.

### V.   CONCLUSION

For the reasons stated above, and the reasons included in Plaintiff's Motion to Certify Class, this Court should grant certification of Plaintiff's Proposed Class.

DATED: August 31, 2021.

        Respectfully submitted,

        By: */s/ Venessa V. Solis*
        Venessa Valdes Solis, Esq.
        Florida Bar No. 77122
        Ely R. Levy, Esq.
        Florida Bar No. 15452
        **LEVY & PARTNERS, PLLC**
        3230 Stirling Road, Suite 1
        Hollywood, Florida 33021
        Telephone: (954) 727-8570
        Email: elevy@lawlp.com – Service Address
        Email: venessa@lawlp.com – Service Address
        Email: maritza@lawlp.com – Service Address

        Michael A. Citron, Esq.
        Florida Bar No. 105083
        **MAC LEGAL, P.A.**
        4601 Sheridan Street, Suite 205
        Hollywood, Florida 33021
        Telephone: (954) 395-2954
        Email: Michael@maclegalpa.com – Correspondence
        Email: Service@maclegalpa.com – Service Address

        Igor Hernandez, Esq.
        Florida Bar No. 106386
        **CORNISH HERNANDEZ GONZALEZ, PLLC**
        2525 Ponce de Leon Blvd, Suite 300
        Coral Gables, Florida  33134
        Telephone: (305) 780-6058
        Email: service@CHGLawyers.com
        Email: ihernandez@chglawyers.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnishedto all parties and their respective August 31, 2021 via CM/ECF to:

Grace Mead
Florida Bar No. 49896
Ryan Thornton
Florida Bar No. 99195

**STEARNS WEAVER MILLER**
Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: 305-789-3559
Email: gmead@stearnsweaver.com
Email: rthornton@stearnsweaver.com
*Counsel for Defendant*
Maeve O'Connor (*pro hac vice*)
Elliot Greenfield (*pro hac vice*)
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, New York 10022
Telephone: 212.909.6000
Email: mloconnor@debevoise.com
Email: egreenfield@debevoise.com
*Counsel for Defendant*

   */s/ Venessa V. Solis*